1   NOSSAMAN LLP
2   THOMAS D. LONG (SBN 105987)
    DAVID GRAELER (SBN 197836)
3   445 S. Figueroa Street, 31st Floor
    Los Angeles, California  90071
4   Telephone: 213.612.7800
5   Facsimile: 213.612.7801
    Email:  tlong@nossamam.com
6           dgraeler@nossaman.com
7
    Attorneys for the Federal Deposit Insurance
8   Corporation, as Receiver of IndyMac Bank, F.S.B.

·9

FILED

10 JUL -2 PM 1:25

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

10              **UNITED STATES DISTRICT COURT**
11              **CENTRAL DISTRICT OF CALIFORNIA**
12

13  FEDERAL DEPOSIT INSURANCE          Case No.:  **CV10  4915**~RSWL
14  CORPORATION, AS RECEIVER FOR                    (Sf(x)
    INDYMAC BANK, F.S.B.
15
            Plaintiff,                 **COMPLAINT**
16
            v.                         JURY TRIAL DEMANDED.
17
18  SCOTT VAN DELLEN, RICHARD
    KOON, KENNETH SHELLEM, AND
19  WILLIAM ROTHMAN,
20          Defendants.
21
22
23
24
25
26
27
28

393199.1_DOC
──────────────────────────────────
                    **COMPLAINT**

# <u>TABLE OF CONTENTS</u>

**Page**

I.      BACKGROUND FACTS. ...............................................................1

II.    JURISDICTION AND VENUE. .................................................3

III.    PARTIES. ...................................................................................3

     A.     Plaintiff. ...........................................................................3

     B.     Defendants. .......................................................................3

IV.    GENERAL ALLEGATIONS OF FACTS RELATING TO CLAIMS FOR RELIEF. ...............................................................................5

     A.     Background of IndyMac Bank, F.S.B. and Its Collapse. ........................5

     B.     The Organizational History of HBD. ...............................6

     C.     HBD Followed A High Risk Growth Strategy. ..............9

     D.     HBD Followed A High Risk Underwriting Strategy. ...........14

          1.     HBD violated its own credit policies. .................14

          2.     HBD's consideration of loan applications was superficial and hasty. ...............................................17

          3.     HBD's credit matrix led to poor underwriting decisions. ...........18

          4.     HBD's compensation of officers encouraged risky loans. ...........19

          5.     IndyMac recognized HBD's flaws. ...................21

          6.     Summary. ........................................................22

V.     DEFENDANTS' DUTIES TO INDYMAC. .............................22

VI.    CLAIMS FOR RELIEF. ...........................................................24

     A.     Count Based on Allegations That Loan Production at HBD Should Have Been Reduced or Eliminated No Later Than Early 2006 ...........24

Count 1 ................................................................. 24

**B.**   **Counts Based on Allegations Related to The Loans Made By HBD in the Fiesta Development, Inc. Borrower Relationship.** .......................................................... 26

Count 2 ................................................................. 26

Count 3 ................................................................. 28

Count 4 ................................................................. 36

**C.**   **Count Based on Allegations Related to the Loan Made By HBD in the Main Street Partners, Inc. Borrower Relationship.** .......................................................... 41

Count 5 ................................................................. 41

**D.**   **Counts Based on Allegations Related to the Loans Made By HBD in the Pinn Brothers Borrower Relationship.** ................... 44

Count 6 ................................................................. 44

Count 7 ................................................................. 47

**E.**   **Count Based on Allegations Related to the Loan Made By HBD in the Ralph Giannella Borrower Relationship.** ............... 49

Count 8 ................................................................. 49

**F.**   **Counts Based on Allegations Related to the Loans Made By HBD in the Corinthian Homes Borrower Relationship.** ........... 55

Count 9 ................................................................. 55

Count 10 ............................................................... 58

Count 11 ............................................................... 62

Count 12 ............................................................... 65

Count 13 ............................................................... 68

**G.** **Count Based on Allegations Related to the Loan Made By HBD in the Christopherson Homes Borrower Relationship**................................................................72

      **Count 14** ........................................................72

**H.** **Counts Based on Allegations Related to the Loans Made By HBD in the Dr. Gansean Visvabharathy ("Dr. Vish") Borrower Relationship.** ........................................75

      **Count 15** ........................................................75

      **Count 16** ........................................................78

**I.** **Counts Based on Allegations Related to the Loans Made By HBD in the Cambridge Homes Borrower Relationship**..................82

      **Count 17** ........................................................82

      **Count 18** ........................................................88

      **Count 19** ........................................................93

**J.** **Counts Based on Allegations Related to the Loans Made By HBD in the McComic Consolidated, Inc. Borrower Relationship**................................................................99

      **Count 20** ........................................................99

      **Count 21** ........................................................103

      **Count 22** ........................................................109

      **Count 23** ........................................................114

**K.** **Counts Based on Allegations Related to the Loans Made By HBD in the Prosperity Real Estate Investors, Inc. Borrower Relationship.**........................................119

      **Count 24** ........................................................119

      **Count 25** ........................................................121

**L.** **Counts Based on Allegations Related to the Loans Made By HBD in the Reynen & Bardis Borrower Relationship.** ................124

-iii-

**COMPLAINT**

Count 26 .................................................................................. 124

Count 27 .................................................................................. 128

Count 28 .................................................................................. 131

Count 29 .................................................................................. 135

Count 30 .................................................................................. 139

Count 31 .................................................................................. 143

**M.**   **Counts Based on Allegations Related to the Loans Made By HBD in the Decal Custom Homes and Construction, Inc. Borrower Relationship.** ................................................ 147

Count 32 .................................................................................. 147

Count 33 .................................................................................. 150

**N.**   **Counts Based on Allegations Related to the Loans Made By HBD in the J.P. Eliopulos Enterprises, Inc. Borrower Relationship.** ................................................................. 155

Count 34 .................................................................................. 155

Count 35 .................................................................................. 163

**O.**   **Count Based on Allegations Related to the Loan Made By HBD in the Terrapin Group Borrower Relationship.** ........................ 168

Count 36 .................................................................................. 168

**P.**   **Count Based on Allegations Related to the Loan Made By HBD in the Neumann Homes Borrower Relationship.** ........................ 172

Count 37 .................................................................................. 172

**Q.**   **Counts Based on Allegations Related to the Loans Made By HBD in the WL Homes, LLC Borrower Relationship.** ................. 177

Count 38 .................................................................................. 177

Count 39 .................................................................................. 179

Count 40 .................................................................................. 182

**R.**     **Counts Based on Allegations Related to the Loans Made By HBD in the Drake Development, LLC Borrower Relationship.....................................................185**

      **Count 41 ....................................................................185**

      **Count 42 ....................................................................190**

**S.**     **Count Based on Allegations Related to the Loan Made By HBD in the Villa Development, LLC Borrower Relationship.....................................................194**

      **Count 43 ....................................................................194**

**T.**     **Counts Based on Allegations Related to the Loans Made By HBD in the Lafferty Homes, Inc. Borrower Relationship.....................................................197**

      **Count 44 ....................................................................197**

      **Count 45 ....................................................................201**

**U.**     **Count Based on Allegations Related to the Loan Made By HBD in the Pacer Communities, Inc. Borrower Relationship.....................................................205**

      **Count 46 ....................................................................205**

**V.**     **Count Based on Allegations Related to the Loan Made By HBD in the Adams Homes Borrower Relationship...........................208**

      **Count 47 ....................................................................208**

**W.**     **Count Based on Allegations Related to the Loan Made By HBD in the Maisel Presley Borrower Relationship...........................212**

      **Count 48 ....................................................................212**

**X.**     **Count Based on Allegations Related to the Loan Made By HBD in the Integral Partners Borrower Relationship.....................219**

      **Count 49 ....................................................................219**

**Y.**    **Count Based on Allegations Related to the Loan Made By HBD in the Private Island Homes, LLC Borrower Relationship**.................................................**223**

   **Count 50** ......................................................................**223**

**Z.**    **Counts Based on Allegations Related to the Loans Made By HBD in the MWH Development Corp. Borrower Relationship**.................................................**229**

   **Count 51** ......................................................................**229**

   **Count 52** ......................................................................**233**

   **Count 53** ......................................................................**239**

**AA.**   **Counts Based on Allegations Related to the Loans Made By HBD in the Mountain View Bravo Borrower Relationship**.................................................**243**

   **Count 54** ......................................................................**243**

   **Count 55** ......................................................................**246**

   **Count 56** ......................................................................**251**

**BB.**   **Count Based on Allegations Related to the Loan Made By HBD in the Pacific Pride Communities Borrower Relationship**.................................................**255**

   **Count 57** ......................................................................**255**

**CC.**   **Count Based on Allegations Related to the Loan Made By HBD in the Rokas International Borrower Relationship.**.................................**261**

   **Count 58** ......................................................................**261**

**DD.**   **Count Based on Allegations Related to the Loan Made By HBD in the Pacific Century Homes Borrower Relationship**.................................................**267**

   **Count 59** ......................................................................**267**

**EE.**   **Counts Based on Allegations Related to the Loans Made By HBD in the Dunmore Homes Borrower Relationship**.................................**272**

Count 60 ......................................................................... **272**

Count 61 ......................................................................... **275**

**FF.** **Count Based on Allegations Related to the Loan Made By HBD in the AKT Development Borrower Relationship.** ................... **280**

Count 62 ......................................................................... **280**

**GG.** **Count Based on Allegations Related to the Loan Made By HBD in the Alpine Real Property Borrower Relationship.** ................ **286**

Count 63 ......................................................................... **286**

**HH.** **Count Based on Allegations Related to the Loan Made By HBD via PBG in the Shahvand Aryana and James Braswell Borrower Relationship.** ........................................................ **291**

Count 64 ......................................................................... **291**

**II.** **Counts Based on Allegations Related to the Loans Made By HBD via PBG in the John Gates Borrower Relationship.** ........................................................................... **296**

Count 65 ......................................................................... **296**

Count 66 ......................................................................... **299**

Count 67 ......................................................................... **303**

**JJ.** **Count Based on Other Loans Resulting in Losses** ............................... **306**

Count 68 ......................................................................... **306**

**VII.** **PRAYER FOR RELIEF** ............................................................... **308**

## COMPLAINT

Plaintiff, Federal Deposit Insurance Corporation ("Plaintiff" or "FDIC") as Receiver for IndyMac Bank, F.S.B. ("IndyMac" or "The Bank") as and for its complaint against Defendants alleges as follows:

## I.  BACKGROUND FACTS.

1.      This action is brought by the FDIC in its capacity as Receiver for IndyMac. Pursuant to 12 U.S.C. § 1821(d)(2), the FDIC is the successor to all claims originally held by IndyMac, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution.

2.      This action asserts only claims against former officers of IndyMac arising out of the operations of the Bank's Homebuilder Division ("HBD").

3.      IndyMac first became involved in homebuilder lending with the formation of Construction Lending Corporation of America ("CLCA") in 1994 when the Bank was a real estate investment trust ("REIT").  IndyMac was chartered as a bank on or about July 1, 2000.  CLCA continued as a division of the Bank and was renamed HBD in or about mid 2002.

4.      HBD provided land, acquisition and development ("A&D"), construction and combined acquisition, development and construction ("AD&C") loans to homebuilders in selected markets throughout the United States.  HBD's primary focus was on non-public regional builders.

5.      HBD's total commitments grew from approximately $1.1 billion at year-end 2003 to $2 billion at year-end 2006.  HBD's management continued to push for growth until new production was halted in October 2007.  The Bank was seized on July 11, 2008. At that time, the outstanding balance on HBD's portfolio was $898,573,743.  IndyMac's losses on HBD's portfolio are estimated to exceed at least $500 million.

6.      The Bank's losses from the operation of HBD stem from two significant

departures from safe and sound banking practices.  First, HBD's management repeatedly disregarded HBD's credit policies and approved loans to borrowers who were not credit worthy and/or for projects that provided insufficient collateral.  HBD's compensation plans for its management and account officers encouraged them to push for growth in loan production volume with little regard for credit quality.  Second, HBD's management continued to follow a strategy of growth at the tail-end of the longest appreciating real estate market in over four decades.  HBD's management pushed to grow loan production despite their awareness that a significant downturn in the market was imminent and despite warnings from IndyMac's upper management about the likelihood of a market decline.  Indeed, HBD's management unwisely continued operations in homebuilder lending in deteriorating markets even after becoming aware of the market decline.

7.     This action seeks damages against key members of HBD's management team based upon negligence and breach of fiduciary duties.

8.     The actions and omissions which give rise to the Defendants' liability include, among other things, negligently approving loans with deficient collateral; negligently approving loans where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt; negligently approving loans that violated applicable laws and regulations and/or the Bank's internal policies; negligently approving loans to borrowers who were or should have been known to be not creditworthy and/or in financial difficulty; negligently approving loans with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantors; negligently approving loans with inadequate appraisals; negligently permitting loans to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds; negligently permitting loans to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain

security or otherwise protect the Bank's interests; negligently approving loans to be made outside the normal and prudent trade areas of the Bank; negligently continuing and even expanding HBD's homebuilder lending despite knowledge of deteriorating market conditions; negligently approving loans despite the Bank having a high geographic concentration of loans in the same market; negligently approving loans despite the borrower having a high geographic concentration of property in the same market; and negligently approving loans where there was very little likelihood of the loan repaying within the term of the loan..

## II.   JURISDICTION AND VENUE.

9.     This is an action arising under the laws of the United States of America, specifically including 12 U.S.C. § 1821(d)(2) and (k) and 12 U.S.C. § 1819(a).  This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.  This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

10.     The venue of this action is proper pursuant to 28 U.S.C. § 1391(b), because the claims and causes of action asserted herein arose within the Central District of California.

## III.   PARTIES.

### A.   Plaintiff.

11.     Plaintiff is acting in its capacity as Receiver for IndyMac, and is authorized to sue pursuant to 12 U.S.C. § 1821(d)(2) and (k).

12.     In accordance with 12 U.S.C. § 1821(d)(2), FDIC as Receiver of IndyMac, and as successor to all claims of IndyMac, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution, is a real party in interest to this action and is entitled to recover damages for any injuries sustained, including those set forth below.

### B.   Defendants.

13.     Scott Van Dellen ("Van Dellen") is a resident of the State of California and

of the Central District of California.  Van Dellen joined IndyMac in 2001 and served as the President and Chief Executive Officer ("CEO") of HBD from September 16, 2002 until the seizure of the Bank on July 11, 2008.  He also served as interim Chief Credit Officer ("CCO") of HBD from late 2006 until the seizure of the Bank.  Van Dellen was a voting member of HBD's Management Loan Committee (sometimes also known as the "Junior Loan Committee") and its Executive Loan Committee (sometimes also known as the "Senior Loan Committee") during his entire tenure at HBD.  Van Dellen approved all of the loans which are the subject of this Action.

14.    Richard Koon ("Koon") is a resident of the State of California and of the Central District of California.  Koon joined the Bank as HBD's Chief Lending Officer ("CLO") in July 2001 and remained in that position until he left HBD on July 15, 2006.  Koon remained an employee of the Bank outside of HBD until he was laid off in January 2008.  Koon was a member of the Junior Loan Committee during his entire tenure at HBD and was involved in approvals relating to at least 40 of the residential construction loans which are the subject of this action.  Koon was replaced as CLO by William Rothman.

15.    Kenneth Shellem ("Shellem") is a resident of the State of California and of the Central District of California.  Shellem joined IndyMac in March 2000 and performed work in internal audit review until he was assigned the position of the Bank's corporate CCO in June or July of 2000.  Shellem was reassigned from the corporate office to work as CCO of HBD starting in March 2002.  Shellem ceased serving as CCO of HBD on or about November 15, 2006.  He remained an employee of the Bank outside of HBD until his termination on March 31, 2007.  Shellem was a voting member of the Junior Loan Committee throughout his tenure as CCO of HBD from March 2002 until November 2006.  Shellem was involved in approvals relating to at least 57 of the residential construction loans which are the subject of this action.

16.    William Rothman ("Rothman") is a resident of the State of California and of

the Central District of California.  Rothman joined IndyMac in October 2004 as a regional manager of HBD.  Rothman became the CLO of HBD in July 2006 and remained in that position until the seizure of IndyMac.  Throughout his time as CLO of HBD, Rothman was a voting member of the Junior Loan Committee.  Rothman was involved in approvals relating to at least 34 of the residential construction loans at issue in this action.

## IV.   GENERAL ALLEGATIONS OF FACTS RELATING TO CLAIMS FOR RELIEF.

### A.   Background of IndyMac Bank, F.S.B. and Its Collapse.

17.   IndyMac was formed when the First Federal Savings and Loan Association of San Gabriel Valley became a wholly-owned subsidiary of IndyMac Bancorp., Inc. ("Bancorp").  The thrift was renamed IndyMac Bank, F.S.B. and became a federally chartered thrift under a charter from the Office of Thrift Supervision ("OTS").  IndyMac was a wholly-owned subsidiary of IndyMac Intermediate Holdings, Inc., which in turn was a wholly-owned subsidiary of Bancorp.

18.   The precursor to Bancorp and IndyMac was IndyMac Mortgage Holding Company, Inc. (ultimately assuming the name IndyMac Bancorp, Inc.), a passive real estate investment trust ("REIT") founded in 1985.  IndyMac Mortgage Holding Company, Inc. terminated its REIT status effective January 1, 2000 and converted to a fully taxable entity on July 1, 2000.

19.   IndyMac commenced operations with $5.1 billion in total assets and eight retail branch offices on July 1, 2000.  The Bank originated residential loans for sale, securitization, and for investment.  Residential mortgage lending and mortgage bank activity was its primary focus.

20.   The Bank grew to become the seventh largest savings association and ninth largest servicer of mortgages in the United States.  From June 2005 to March 2008, IndyMac grew from approximately $18.3 billion to $32 billion in assets.  Growth was due

largely to an aggressive growth strategy that was pursued in many of its business units, including HBD.  IndyMac operated in 50 states.  At its peak, the Bank had 33 retail branches located in Southern California and 182 loan production offices throughout the country.

21.    Between 2000 and 2006, loan production increased from approximately $10 billion to almost $92 billion.  Production decreased to approximately $77 billion in 2007 and $10 billion in 2008.

22.    IndyMac qualified for and received deposit insurance from the FDIC and was thereby obligated to conform to the rules and regulations issued by the FDIC regarding its lending policies, management, financial policies, capitalization and loan reserves.  In addition, because IndyMac was a federally chartered thrift under a charter from the OTS, the Bank was also obligated to follow OTS policies, rules and regulations.  Such rules and regulations were designed by the regulatory agencies to prevent loss of the depositor's funds due to imprudent actions by the insured institutions and to protect the FDIC insurance fund.

23.    On July 11, 2008, IndyMac was closed by the OTS with $28 billion in assets.  On July 17, 2008, the OTS appointed the FDIC as receiver of the Bank.  Bancorp filed a Chapter 7 bankruptcy petition on July 31, 2008.  The estimated losses to the FDIC stemming from IndyMac's collapse are currently $12.75 billion.  The portion of these losses stemming from the operation of HBD exceeds $500 million.

**B.    The Organizational History of HBD.**

24.    HBD was the successor by name change of CLCA.  Van Dellen assumed responsibility for HBD in 2002 when he was appointed head of the Specialty Products Division, of which HBD was a part.  On September 16, 2002, Van Dellen assumed direct responsibility for HBD becoming president and CEO of the division.  Ken Shellem became CCO of HBD at the same time.  Koon arrived at HBD no later than July 1, 2001 and was already CLO when Van Dellen arrived.

25.     When Van Dellen arrived at HBD in 2002, his first year or so involved crisis management. Among other things, HBD had received poor OTS and internal asset and audit reviews.  The function of credit officers was not separate from the function of production groups, and appraisals were not being properly obtained.

26.     From 2001 to 2002, new loan volume at HBD had declined from a little over $1 billion to approximately $520 million.  The decline was a part of HBD's crisis management strategy that ended a mezzanine lending (subordinate loans) and equity program carried over from when HBD was part of a REIT.  In addition, lending on income property, lending for pure land acquisition, and lending in 23 "noncore" lending markets was halted by HBD.  HBD began efforts to revise its credit policies and procedures.  The strategy implemented prior to Van Dellen's arrival to shrink HBD in the face of losses was part of a "Castor Oil" strategy devised by Michael Perry ("Perry"), Chairman and CEO of the Bank and Bancorp.  The goal of that strategy was to lower HBD's risk profile in the face of anticipated market declines, to enhance its return on equity ("ROE"), and to use construction lending to developers as a means of obtaining more residential mortgage business.  The strategy sought a temporary reduction in construction lending that would be followed by growth in HBD.

27.     The Castor Oil strategy of 2002, and HBD's decision to decrease new business at that time, reflected management's awareness, as expressed by Perry, that "Every prudent bank has to 'pull in the reigns' (sic) from time to time." It was for this reason that the Bank "deliberately reduced this business' [HBD's] size" after 1999.

28.     Van Dellen's leadership of HBD provided only nominal separation of the credit department from loan production.  Van Dellen did little to provide a strong and independent credit department.  Production officers remained on the Junior Loan Committee and the credit department ultimately lost its veto authority on that committee. During Van Dellen's tenure, HBD's credit officers received no formal training, had considerably less experience and received significantly lower compensation than HBD's

production or "account" officers.  In sum, HBD's credit officers and credit department appear to have had little authority other than to require that information be placed in the credit approval memorandum ("CAM").

29.     HBD was significantly reorganized in the middle of 2006.  On July 15, 2006, Koon retired from HBD.  He was replaced by Rothman who had been acting as a co-CLO with Koon starting in January 2006.  In the latter part of 2006, Van Dellen created the Major Builders Group ("MBG") as a counterpart to the Professional Builders Group ("PBG"), which had been in existence for at least one year.  MBG targeted larger builders that built projects of at least 25 units and which required loans in excess of $5 million.  PBG typically lent to builders of projects totaling up to 25 units, with a loan of no more than $5 million on any one project.

30.     The 2006 reorganization of HBD also resulted in the removal of Shellem as a Junior Loan Committee member.  Van Dellen replaced Shellem on the Junior Loan Committee with a credit administrator, Todd Camp ("Camp"), who reported directly to Rothman.  Van Dellen proposed that Shellem remain as CCO for HBD without voting authority on the Junior Loan Committee and without credit officers reporting to him.  Shellem refused and ultimately left HBD.

31.     Prior to the reorganization of HBD in 2006, Shellem had the power to object to a loan being approved by the Junior Loan Committee.  Shellem's objection would then force the Senior Loan Committee (consisting of Van Dellen and, for most of the time, IndyMac's President Richard Wohl ("Wohl")) to consider a loan which did not otherwise require Senior Loan Committee approval.  After the reorganization, Shellem's nominal replacement on the Junior Loan Committee, Camp, was never appointed CCO and never attained the authority that Shellem previously had.  Effectively, with Shellem's departure, HBD ceased to have a CCO.  Although Van Dellen claimed to be acting as CCO, he lacked the experience to do so.  Van Dellen also directed credit officers to report to a single head credit administrator, Camp, who in turn was reporting to the CLO and lead

production officer, Rothman.  This reorganization of HBD created the very blurring between credit and production functions that existed when Van Dellen first arrived at HBD in 2002, and about which regulatory agencies had previously complained.  Both Koon and Shellem described Van Dellen's reorganization as having created a serious conflict of interest.

32.    Late in 2007, HBD finally began to decrease loan production, and began layoffs of personnel.  At least three account officers accepted offers of voluntary buyouts in place of layoffs.  All loan production was discontinued at HBD on October 22, 2007.  At that same time, the production side of HBD, as well as the credit side, were reorganized into workout assignments to deal with HBD's troubled portfolio.

### C.    HBD Followed A High Risk Growth Strategy.

33.    Shortly after assuming command of HBD, Van Dellen announced a plan to grow HBD.  Production goals increased for account officers every year under Van Dellen until the latter part of 2007.  This was true despite a broad consensus amongst HBD production officers that production targets needed to be lowered.  Account officers who did not meet their annual production targets were often terminated or encouraged to leave.  Van Dellen continued to push for growth and took no steps to reduce or end production.  In November 2004, Van Dellen, Koon and Shellem, as HBD's top management, identified residential construction lending as involving "increasing competition, current customers getting bigger and demanding lower returns."  Their response was to "grow geographically and by moving downstream to smaller, less price competitive builders."  At the same time, HBD's management projected 100% growth in HBD's net commitments over a five-year term projected through the end of 2008.  The growth was to come from a strategy that targeted medium and small builders as opposed to large public builders.  HBD attempted to offset the risks associated with its borrowers by demanding higher returns on its equity.

34.    In the fall of 2005, Van Dellen, Shellem and Koon were being warned by

**COMPLAINT**

IndyMac's upper management of deteriorating conditions for home builder lending.  In September 2005, Perry suspended mezzanine lending and equity investments through one of Bancorp's subsidiaries that had been used to assist HBD's borrowers.  Responding to complaints by an HBD account officer, Perry explained that "construction lending is always going to be perceived by any financial institution and its regulators as risky . . . especially in this environment . . . therefore construction lending cannot go 'business as usual' in all markets . . . every prudent bank has to 'pull in the reigns' (sic) from time to time."

35.     Perry frequently forwarded news articles warning of deteriorating conditions in the home builder market and cautioning Van Dellen to "be careful."  In particular, Perry forwarded articles to Van Dellen such as the following:

a.      March 3, 2006 article in <u>The Wall Street Journal.</u>  Perry underlined portions of this article that discussed reduced sales in single-family homes and the highest level of unsold new homes in nearly a decade.  Perry made a handwritten note on the article stating "Be careful, especially on our new construction projects."

b.      July 26, 2006 article in <u>MBA NewsLink</u>.  Perry forwarded this article noting Weyerhauser's plans to scale back its home builder unit.  Perry cautioned Van Dellen to "err on the side of being 'safe' . . . as it is not a time to stretch for volume."

c.      September 11, 2006 article in the <u>Los Angeles Business Journal</u>. Perry sent this article to highlight declining sales rates.  He circled a portion of the article that addressed a steep 32% decline in sales from the same month of the prior year.

d.      October 2, 2006 article in <u>Outfront.</u>  The first paragraph in the article states that the "bad news keeps on coming from the home front."  The article notes that KB Home slashed earnings forecasts for the second time since June, and that

shares had fallen 40% over the past year.  Perry made a handwritten note on the article stating "I am in the middle of this one… I definitely think the economy will slow due to home prices abating."

   e.   November 8, 2006 article from an unknown publication.  The article came from Bloomberg News and discussed declining sales experienced by home builders Toll Bros, Inc. and Beazer Homes USA, Inc.  Once again, Perry made a handwritten note on the article stating "Be careful."

   f.   May 4, 2007 article in <u>US Economics Analyst.</u>  Perry circled a portion of the article that warned that a housing downturn in Florida was likely to cause an outright recession.  Perry also wrote a note on the article stating "Sell Florida.  Your first loss is your best loss."

   36.   Koon and Shellem also warned Van Dellen of the deteriorating market of which they were well aware beginning in 2005.  In early 2005, CLO Koon warned against the creation of PBG and its lending to smaller borrowers based entirely on the strength of the project rather than the credit worthiness of the borrower.  Koon was opposed to such "project based" lending.  He also warned against HBD's creation of a mezzanine lending and equity program in early 2005.  Koon warned that the then-current up cycle in the market was the longest in the last four decades and it was too late in the cycle to take risks on smaller "project based" borrowers and on mezzanine loans.

   37.   On September 15, 2005, an article entitled "Banks' Capacity To Withstand Housing Bubble Burst; So Far So Good" discussed a stress test of financial institutions conducted by Standard & Poor's.  The article concluded that IndyMac would suffer the largest loss because of its sizable residential construction loan portfolio.  The article also noted that construction loans financing real estate development and loans to home builders carried the greatest exposure to credit losses should housing prices trend downward.

   38.   As early as 2005, HBD's management indicated repeatedly to the Bank's

board, the regulators, and outside consultants that it was taking steps to tighten underwriting, even though, as discussed following, it was not in practice doing so. HBD's management even acknowledged "bubble-related concerns."  HBD's management's statements at least showed its awareness of deteriorating market conditions.

39.     On April 6, 2006, CCO Shellem sent an e-mail to all HBD personnel warning about concessions being offered by builders which he believed could mask a softening market.  Shellem encouraged HBD personnel to do a better job of looking at the borrower's entire financial picture as opposed to just a single project.  Shellem suggested detailed questions to borrowers designed to learn about the progress of a borrower's others projects, the borrower's overall financial condition, and the condition of the markets in which the borrowers operated.  Shellem's suggestions evidence HBD's failure to ask these "detailed questions" at least up to this point in time.  Shellem summed up his advice as follows:  "I guess, in short, we need to think more like credit lenders than project lenders.  It may be fine if the borrower has one project and it is with us, but if the borrower has multiple projects and other investments that require attention, cash and capital, we need to totally understand the borrower's situation."

40.     On June 30, 2006, CLO Koon wrote a memorandum to all HBD account officers about changing market conditions sounding a clear alarm.  Koon noted:

It's time for us to proactively deal with the changing housing market.  Many of the loans recorded over the last year will not be able to live up to their expectations for sales and closings.

I'm asking every account officer to have a face-to-face meeting with each borrower within the next 30 days, during your 2nd quarter status reviews, to discuss their revised plan for each loan.

You are about to have the toughest conversation you've had with the borrower in the last 11 years.  This is the time where we find out whether the borrower has <u>integrity</u> and how good your negotiation skills are.  Anyone can make a loan – relationships are in fact made or broken in difficult times. (Emphasis in original.)

41.     Koon and Shellem were not the only HBD officers sounding an alarm in 2006.  Account officer Geoffrey Ramirez ("Ramirez") had discussions with Van Dellen and Rothman in 2006 regarding declines in real estate values.  Senior account officer Douglas Koerber ("Koerber") noted that, toward the latter part of 2006, he approached prospective borrowers to discuss new loans only to have the borrowers indicate that they were not interested in any new deals because of market conditions.  Koerber shared these comments with HBD's Junior Loan Committee members Rothman and Van Dellen. Other account officers also were recognizing that the housing market was beginning to slow.  Account officer Cressa Cruzan stated that it was "insane" for HBD to keep growing year after year when the real estate cycle was already at its peak.  Financial analyst David Cannon also observed the real estate market beginning to soften in the Inland Empire area of California during the summer of 2006.

42.     Despite the warnings detailed above, Van Dellen continued to push for growth, announcing his strategic initiative for 2007 in an October 20, 2006 e-mail.  Van Dellen asserted that HBD needed to "grow, expand and diversify faster to keep up with the bank and leverage our very solid platform.  Our competitors may be retreating or exiting.  Now is the time to pounce. . . ."  Among other things, Van Dellen called for "quick, informative and flexible loan structuring and servicing [and] creative solutions." He suggested that HBD "[p]ut as many decisions as possible in the hands of account officers and even borrowers."

43.     Only five weeks later, on November 30, 2006 at a meeting of the Bank's senior managers, which included Van Dellen, corporate management warned of the declining market, describing among other things, a decline of 9.7% in the median price of new homes  since September 2005 and mentioning that home builder volumes and margins were "under pressure."  The presentation was entitled the "wall of worry." Nonetheless, Van Dellen continued, as late as the first quarter of 2007, to push for HBD to "grow production at double digit rates over the next five years."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### D.     HBD Followed A High Risk Underwriting Strategy.

#### 1.     HBD violated its own credit policies.

44.     HBD disregarded many of its own internal credit policies and regulatory guidance in approving loans.  At least in theory, HBD's written credit policies were designed to "maintain the integrity of the Bank's loan origination process and . . . ensure the quality of its loan portfolio."  HBD considered its written credit policy "critical to its success in providing a specialized lending product."  Despite this, the vast majority of loans at issue in this action involved at least one significant credit policy exception.  On information and belief, FDIC alleges that less than 1% of the loans approved by HBD were approved without a credit policy exception.

45.     Policies designed to reduce the Bank's overall risk exposure were often ignored.  For example, HBD had a minimum equity policy requiring the borrower to provide minimum cash equity of 10% of total project costs at or prior to closing.  For condominium projects, not less than 15% of total project costs was required as borrower equity.  Yet, in many cases, this "cash" equity requirement was satisfied with mezzanine loans, third party equity investments, and deferred equity contributions (to be paid after loan closing by the borrower).  Of particular significance in a rising market, borrowers were often allowed to rely upon "market equity."  HBD's policy indicated that market equity would be allowed if the borrower owned the property for more than two years or controlled the property for more than three years.  Nonetheless, market equity was frequently allowed without the time requirement having been satisfied.  With land development or construction loans, HBD's decision to permit a borrower to use market equity resulted in a higher loan-to-value ("LTV") ratio, because the borrower no longer had to contribute cash to the project.  Moreover, in a rising market, the use of short-term market equity was particularly risky, since the equity that was a result of recent run-ups in prices was the very equity most likely to vanish when the market turned.  Third party equity was also risky and was only to be allowed where projects were less speculative

1  (meaning more pre-sales).  It was, however, often allowed in other circumstances.

2      46.    A second internal policy closely tied to borrower equity was HBD's

3  requirement of a minimum profit margin.  HBD required a profit margin of 10% or

4  greater based upon the budget set forth in the CAM.  Where a lower profit margin was

5  accepted, a higher amount of equity was to be required.  This requirement too was

6  frequently waived in circumstances where waiver was not warranted.

7      47.    To limit its exposure on any given loan commitment, HBD set the maximum

8  number of dwelling units at 125 for any loan commitment.  A cap on the maximum

9  number of units, particularly in the case of condominium developments, limited HBD's

10  exposure if sales rates slowed.  For larger projects, this requirement could compel a

11  borrower to seek multiple construction loans, limiting the Bank's exposure and requiring

12  careful underwriting of each phase of the project.  This requirement too was frequently

13  waived.

14      48.    HBD's policy recognized condominium financing as exceptionally risky.  Its

15  policy provided that the initial loan advance for purchase could not exceed 100% of

16  appraised apartment "as-is" value based on a 1.0 debt coverage ratio ("DCR").  If

17  enforced, this policy meant that the rental stream from the apartment building would

18  service the debt on the condominium conversion loan if the conversion failed.  The policy

19  further specified that condominium conversion loans must include re-margining

20  requirements *at origination* if the DCR (excluding construction or rehabilitation costs)

21  was less than 1.0.  This policy also was frequently waived.

22      49.    HBD's policies placed importance on the strength of the borrower and its

23  guarantors as well as on market conditions and the project.  In particular, full recourse

24  guarantees were generally required for all transactions.  Full recourse included personal

25  guarantees from controlling parties of the borrowing entity.  Exceptions were considered

26  on a case-by-case basis.  Personal guarantees from the borrower's principals, like

27  requirements of cash equity, required the borrower to have some downside risk, giving

28

HBD a better assurance of repayment.  The guarantees policy was frequently waived, however, even in the face of weak market conditions and even for marginal projects.

50.     HBD also ignored regulatory guidance in its underwriting as much as it ignored its own internal credit policies.  The handbook of the Office of the Comptroller of the Currency ("OCC") entitled "Commercial Real Estate and Construction Lending" (March 1998) lists warning signs for problem real estate loans, many of which were apparent at the outset of borrowers' applications and were described in CAMs presented to HBD loan committees.  These warning signs include:

> a.     An excess of similar projects under construction are completed and not leased/sold.

> b.     A pattern of increasing the marketing period or, increasing concessions and declining effective rents for similar projects.

> c.     Construction delays or other events that could lead to cost overruns that may require renegotiation of loan terms.

> d.     A feasibility study or analysis that fails to reflect current and reasonably anticipated market conditions.

> e.     Slow leasing, the lack of sustained sales activity, or sale cancellations that could reduce a project's income potential, thereby leading to protracted repayment or default on the loan.

> f.     Land values that assume future rezoning or road improvements.

51.     The OCC described other warning signs for problem real estate loans as being common in loans that "were originated on an unsound or liberal basis."  These other warnings include:

> a.     Loans with no or minimal borrower equity.

> b.     Loans on speculative, undeveloped property where the borrower's only source of repayment is the sale of the property.

> c.     Loans based on land values that have been inflated by rapid

turnover of ownership without any corresponding improvements to the property or supportable income projections to justify an increase in value (commonly referred to as "land flips").

d.     Additional advances to service an existing loan that lacks credible support for full repayment from reliable sources.

e.     Loans to borrowers with no development plans, or development plans that are outdated or no longer viable.

f.     Renewals, extensions and refinancings that lack credible support for full repayment from reliable sources and that do not have a reasonable repayment schedule.

52.     Each of the "warning signs" detailed above summarize problems commonly found in most of the loans at issue in this action.

**2.     HBD's consideration of loan applications was superficial and hasty.**

53.     Throughout Van Dellen's management of HBD, the CAM was supposed to contain all information relevant to the consideration of a loan application.  Draft CAMs were submitted to the credit department which prepared credit review memoranda noting questions and concerns about the CAMs.  Once a CAM was revised in response to the credit review memorandum, the CAM would be transmitted to the Junior Loan Committee.  CAMs are lengthy documents averaging about 80 pages of single-spaced type in small fonts.  Loan committee members received the CAMs only a day or two before committee meetings.  On occasion, Van Dellen's initial reading of a CAM occurred during the Junior Loan Committee meeting.

54.     One of IndyMac's "core values" was that "speed rules at IndyMac."  This was a firmly ingrained culture at IndyMac and, for example, was implemented by Perry through his "Flamingo Rule" requiring employees seeking his guidance to "pop in my office, quickly present the issue (in the amount of time you can 'stand on one leg!') and

get my feedback."  Van Dellen implemented a similar arbitrary rule limiting discussions of loans in the loan committee to 20 minutes.  At one point, Van Dellen even attempted to implement a policy abolishing loan approval memoranda altogether.

55.   Hasty loan committee meetings left committee members little time to properly discuss complicated multi-million dollar transactions or thoroughly question account officers and credit officers about the details of the transactions.

### 3.   HBD's credit matrix led to poor underwriting decisions.

56.   HBD substituted a rigid and formulaic approach toward underwriting residential construction loans in place of careful subjective consideration of the merits of each loan.  Central to its underwriting practices, which were designed to speed consideration of loan applications, HBD, under Van Dellen's leadership and Shellem's input, developed a "credit risk matrix."  In late 2003 or early 2004, HBD implemented this credit risk matrix scoring methodology.  It replaced a previous methodology that was qualitative in nature with one that was quantitative in nature.  A single numerical score was assigned to each credit risk which then controlled loan underwriting and loan pricing. The credit risk matrix assumed a linear relationship between an asset classification category and the loss potential on the loan, with "Pass 5" assets assigned five times the loss potential of "Pass 1" and "watch" assigned five times the loss potential of Pass 5. The assumed loss levels were arbitrary.

57.   The credit risk matrix was developed to score each loan and each loan application.  The attributes of a loan or proposed loan were divided into project, borrower, and market.  Each attribute was further divided into various types of statistical data relating to the project, the borrower, or the market.  Each item of data was assigned a numerical score and a weighting that led to an overall score for the asset or proposed loan.  The score resulted in a grade (Pass 1, 2, 3, 4 or 5) being assigned.  The matrix imposed no minimum score for loan approval.  Instead, the very lowest category of loans was classified as Pass 5 regardless of how low the score.  At a score of "25" or Pass 4, the

credit was considered a "good" credit and represented the highest risk tolerance allowed by HBD policy.  Also at various points in time, explanations of the credit risk matrix suggest that Pass 4 or 5 credits required better market gradings (such as Pass 1 or 2) to be approved.

58.    The scores on the credit risk matrix were designed to determine the acceptability of a credit, or so HBD management represented.  HBD assured the OTS that the credit risk matrix was "strictly" applied for approval decisions at least for some of HBD's loans.

59.    From the time that it was first implemented in CAMs, through the end of loan production at HBD in 2007, the credit risk matrix was used to assign credit scores and grades to loan applications.  A resulting grade of Pass 1, 2, 3, 4 or 5 dictated benchmark ROE, which then determined the pricing of the loan.  Over time, HBD continually increased its ROE targets.  Koon noted that this priced HBD out of the market for lower risk borrowers.  Nonetheless, HBD kept increasing its ROE targets throughout its existence despite Koon's concerns.

60.    The application of the credit risk matrix was rigidly formulaic such that a weakness in a key area would often end up being only a minor factor in grading the loan and therefore not have much impact on how the loan was considered in underwriting. For example, a borrower could have no liquidity but could still get a loan approved if everything else on the credit risk matrix scored well.  Thus, high scores on the credit risk matrix became an excuse to approve loans with critical weaknesses, while low scores were disregarded despite weaknesses by using supposed "mitigants" that excused policy exceptions.  HBD's credit risk matrix was little more than window dressing for what in reality were very risky and poorly managed underwriting practices.

### 4.    HBD's compensation of officers encouraged risky loans.

61.    HBD's compensation of its account officers rewarded risk taking and encouraged production without regard for loan quality.  Taken together with HBD's other

underwriting practices, HBD's compensation of its account officers further worsened its situation.  In essence, HBD encouraged "adverse selection" through underwriting and loan pricing practices and compensation of its account officers that rewarded account officers who brought the riskiest loans to HBD, and made it possible for those loans to be approved as long as customers were willing to pay a higher price.  Of course, only customers rejected by other banks were willing to pay HBD's prices.

62.     HBD's compensation plan for its account officers was designed to advance its strategy of increasing production of higher risk, higher return loans.  Account officers received a significant portion of their compensation based upon the projected profitability of loans.  The commission payments consisted of both a "front-end payout" and a "back-end payout" and were set forth in annual compensation plans for the account officers.  Although some compensation plans purported to "claw back" some of the commission payments for loans that became nonperforming, these claw back provisions were only rarely enforced.  As a result, account officers received their front-end payout, typically 50% of the anticipated commission on the loan, regardless of the performance of the loan.  If the loan performed well, account officers also had the prospect of a back-end payout.

63.     Account officers' commission plans also were administered in a way that encouraged them to take additional risks.  For example, account officers received an additional 1% of the net income after tax for loans that produced ROEs of 24% or more.  Higher ROEs were typically available on riskier loans with lower credit scores.

64.     Similarly, account officers were encouraged through increased compensation to extend or modify loans.  Loans that were extended or modified resulted in increased interest income, which in turn increased account officers' compensation.  Moreover, if an account officer failed to timely obtain extensions or modifications such that a loan appeared on the 30-day-past-due-loan report, the account officer was subject to a 10% reduction in all incentives paid in that quarter.  HBD's compensation system thus encouraged extending non-performing loans.  This proved detrimental to HBD's

collateral values after the real estate market was in decline.

### 5.    IndyMac recognized HBD's flaws.

65.    IndyMac's upper management discussed serious problems in HBD, albeit not until early 2008 after HBD had ended new loan production.  In February 2008, IndyMac commissioned an internal asset review report of examination ("IAR Report"). The IAR Report reviewed 10 problem loans originated by HBD, nine of which are among the loans which are the subject of this action.  An outside consultant subsequently reviewed the report and summarized his conclusions to Perry.  "Of the ten loans [criticized in the IAR Report], I looked at four [that] were condo conversions, which are a higher risk segment of the housing market.  Two of these were in Florida, a long recognized overheated market.  Mezzanine financing was part of one of the deals. Together the two deals represent a high dollar concentration with the single borrower. Two deals represented an IndyMac refinance of another lender.  In one instance, the previous lender took a second back.  These deals deteriorated quickly."  The consultant also commented that the weaknesses in the loans "were present at the origination of these deals.  *I don't think I'm using hindsight here.*"  (Emphasis added.)

66.    Perry responded with an indictment of HBD's management:  "That is good feedback. . . .  I was aware of the condo deals (and was opposed to them . . . but the management in this unit [HBD] kept pushing and pushing) and also on the concentration limits (again . . . pushing . . . and we cut these way back last year).  To me, it shows you can't be in this business . . . because you are always getting screwed every down cycle and losing all your profits for years . . . because the management and loan officers are too 'in bed' with the builders and always will be.  I was not aware of the other issues and they represent a disturbing lack of management, judgment and discipline in a business that was supposed to be all about credit risk management (unlike mortgage banking) and in a business that was not core and not supposed to be stretching for growth . . . especially at the peak of the market.  The refinances of other lenders . . . where they

carried back paper is especially disturbing."  A few months later on May 7, 2008, Perry wrote a note to Wohl and Van Dellen attaching a copy of Koon's June 30, 2006 memorandum on "changing market conditions."  Perry told Wohl and Van Dellen that Koon's departure and his memorandum "should have been the signal we needed to batten down the hatches and stop production."

### 6.   Summary.

67.   HBD pursued both a negligent growth strategy and negligent underwriting practices from the time of Van Dellen's arrival in 2002 until production at HBD was ultimately halted on October 22, 2007.  HBD's overall strategy reflected a conscious effort to move "downstream" to higher risk credits to grow loan production and increase management and account officer compensation.  HBD rewarded imprudent risk taking to fuel growth.  HBD's management felt that it could expand market share even though HBD could not compete on price because of IndyMac's higher cost of funds.  HBD did this by accommodating borrowers with higher loan advances as a percentage of collateral value and looser underwriting standards reflecting its "creative" and "flexible" approach designed to minimize restrictions imposed by HBD's credit policies.  HBD's high risk growth strategy and careless underwriting continued despite signals from Perry and others that HBD should take a more cautious approach and despite HBD management's growing awareness of the decaying housing market from 2005 onward.  These practices resulted in losses exceeding $300 million, and only a handful of performing loans out of roughly 220 loans in HBD's portfolio at the time of IndyMac's seizure.

## V.   DEFENDANTS' DUTIES TO INDYMAC.

68.   The individual Defendants, as officers of IndyMac, owed a duty to IndyMac to carry out their responsibilities by exercising the degree of care, skill, and diligence that ordinarily prudent persons in like positions would use under similar circumstances.  The individual Defendants breached their duties to the Bank.  These duties encompass certain fiduciary, statutory, and common law duties, including, but not limited to, the following:

a.      To conduct the business of IndyMac in compliance with all applicable state and federal laws and regulations, and to abide by its own internal policies, including but not limited to loan policies and lending limitations;

b.      To establish, enforce and follow careful, reasonable, prudent, and non-negligent lending policies and sound business judgment and candor;

c.      To ensure the careful, reasonable, prudent and non-negligent underwriting and administration of IndyMac's loans;

d.      To ensure that IndyMac did not engage in unsafe, unsound, unreasonable and imprudent practices;

e.      Upon receiving notice of an unsafe or unsound practice, to make a reasonable investigation thereof and to exercise reasonable business judgment with respect to all facts which a reasonable investigation would have disclosed;

f.      To ensure that loans not be made to non-creditworthy borrowers and/or borrowers in financial difficulty.

g.      To ensure that loans not be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

h.      To ensure that loans not be made on the basis of inadequate or non-existent appraisals.

i.      To ensure that loans not be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application.

j.      To ensure that loans not be renewed or extended without taking proper steps to obtain security or otherwise protect the Bank's interests.

k.      To ensure that loans not be made outside the normal and prudent trade areas of the Bank.

l.      To ensure that loans not be made where there was very little likelihood of the loan repaying within the term of the loan.

m.      To properly inform themselves and each other about the true nature and condition of the Bank's loan portfolio, and to adequately review and inquire into the Bank's loan transaction.

n.      To recognize problem assets and to establish adequate loss reserves therefore;

o.      To carefully review reports of examinations conducted by, and other directives of, regulatory agencies, to carry out the instructions and orders contained therein, to investigate and cure problems and deficiencies noted therein, and to prevent any repetition of such problems and deficiencies; and

p.      To otherwise pursue financial policies that are reasonable, safe and consistent with the purposes of the insurance of IndyMac's accounts.

## VI.     CLAIMS FOR RELIEF.

### A.      Count Based on Allegations That Loan Production at HBD Should Have Been Reduced or Eliminated No Later Than Early 2006.

#### Count 1

#### (Claim for Negligence and Breach of Duty of Care Against All Defendants)

69.     Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 68 of this complaint, as though fully set forth herein.

70.     Each of the Defendants, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

71.     By their actions and inactions, as generally and specifically described above, the Defendants failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

393199.1_DOC                              -24-
                                     **COMPLAINT**

72.     Defendants knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  In particular, Defendants were being warned by IndyMac's upper management as early as 2005 of deteriorating conditions for home builder lending.  Defendants were well aware beginning in 2005 of deteriorating market conditions for home builder lending.  Defendants were also aware of the perils of "project-based" lending as early as 2005.  In 2005, there was also a growing consensus amongst HBD's account officers regarding declines in real estate values; these concerns were shared with the Defendants.  Loan production in HBD from 2006 onward should have been substantially limited or eliminated altogether.  Despite this knowledge, and even despite written warnings and acknowledgements by Koon and Shellem of an impending market decline and a need to tighten credit standards, all of the Defendants continued to underwrite and approve risky, speculative, and "project-based" loans into mid-2007.  HBD's strategic initiative for 2007 asserted that HBD needed to "grow, expand and diversify faster to keep up with the bank and leverage our very solid platform.  Our competitors may be retreating or exiting.  Now is the time to pounce. . . ."

73.     As a direct and proximate result of the negligence and breach of fiduciary duties of Defendants, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

74.     With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, the Defendants pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**B.     Counts Based on Allegations Related to The Loans Made By HBD in the Fiesta Development, Inc. Borrower Relationship.**

**<u>Count 2</u>**

**<u>(Claim for Negligence and Breach of Duty of Care Against All Defendants Related to the Underwriting, Administration, Extension and Modification of a Loan to Fiesta Development, Inc. for the Country View Estates (Model Homes) Project)</u>**

75.     Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 74 of this complaint, as though fully set forth herein.

76.     Van Dellen, Shellem, and Koon approved a loan to Fiesta Development, Inc. for a project known as Country View Estates (Model Homes).  This loan was entered into on February 12, 2004, with extensions approved by Van Dellen, Shellem, and Koon in 2006, and Van Dellen, Shellem, and Rothman in 2007.  The loan involved five model homes and 21 finished lots.  The loan commitment totaled $2,409,550 and had a 24-month term.  Losses on this loan are estimated to exceed $1.5 million.

77.     Defendants approved and/or extended this loan despite the following:

a.     There was substantial competition in the market area.

b.     HBD already financed 210 lots within the same project in contravention of HBD policy

c.     There were deteriorating market conditions.

d.     The borrower and guarantors had very low liquidity, low net worth, high debt, and high contingent liabilities.

78.     Defendants knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Defendants in regard to this loan include, but are not limited to, the following:

a.     Causing or allowing a loan to be made to a borrower and guarantors

who were or should have been known to be not creditworthy and/or in financial difficulty.

b.      Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.      Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.      Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.      Causing or allowing a loan to be made, renewed, and/or extended with inadequate or problematic appraisals.

f.      Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h.      Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

i.      Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

j.      Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

79.     Defendants, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

80.     By their actions and inactions, as generally and specifically described above, the Defendants failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

81.     As a direct and proximate result of the negligence and breach of fiduciary duties of Defendants, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

82.     With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, the Defendants pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## <u>Count 3</u>

### <u>(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Koon Related to the Underwriting, Administration, Extension and Modification of a Loan to Fiesta Development, Inc. for the Area Drainage Plan ("ADP") Project)</u>

83.     Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 82 of this complaint, as though fully set forth herein.

84.     Van Dellen, Shellem, and Koon approved a loan to Fiesta Development, Inc. for a project known as ADP.  This loan was entered into on August 31, 2006, and was structured as a land loan, but was actually an 18-month, $40.7 million declining development loan that was to provide $19.925 million in flood control and drainage infrastructure improvements needed for further residential/commercial development in the Homeland/Romoland market area in Riverside County about 25 miles southeast of Riverside.  The improvements would provide two retention basins and approximately 13 miles of flood control channels.  These improvements would traverse several properties

not owned or controlled by the borrower.  Thus, HBD recorded priority liens on two pieces of land: (1) 106 tentatively mapped lots at Country View Estates that were owned free and clear by Fiesta Development, Inc., and (2) the "Friedman Property" which was owned by R&D Investors, LLC (an affiliate of Fiesta Development, Inc.) and consisted of 114 acres that had 217 tentatively mapped lots with an additional 210 lots projected to be tentatively mapped within a couple of months.  HBD had a land loan on the Friedman Property totaling $13.2 million, which was rolled into the ADP loan.  In addition, the loan budget included $4.25 million in contingency funds to account for possible cost increases.  The balance of the loan funds related to interest and costs.  Fiesta Development and R&D Investors, LLC were co-borrowers on this loan, which was subject to a maximum loan to value of 65% based on the "as-is" value of the land collateral purportedly totaling over $60 million.

85.     The borrowers were members of Homeland Romoland, Inc., a California corporation comprised of landowners in the area who pooled resources to construct flood control improvements needed in the Riverside County Flood Control and Water Conservation District Master Drainage Plans and Area Drainage Plan.  The borrowers were required by the corporation to provide a Standby Letter of Credit in an amount equal to its share of the flood control improvements, i.e. $19.925 million (39.57%), which was established based on the percentage of land ownership impacted by the flood control improvements.  HBD provided the Standby Letter of Credit using the land set forth above as collateral.  The cost of the flood control improvements were to be repaid through a to-be-created Community Facilities District ("CFD"), and the residual balance on HBD's loan was to be paid through subsequent development financing.  Proceeds from the CFD would not be disbursed until the flood control improvements were operational, as determined by the Riverside County Flood Control and Water Conservation District.  This loan was cross-paid with HBD loan number 52-883000, which was a construction loan relating to Country View Estates.  The cross-pay provision

only afforded a principal curtailment payment of $3.3 million if the CFD was not formed by April 1, 2007, and was to be rescinded upon formation of the CFD.

86.    The primary source of repayment on this loan was stated to be proceeds from the CFD, which were to repay the portion of this loan that was financing flood control improvements.  The balance of this loan was to be repaid through the sale or development of the land collateral.  HBD anticipated financing the development and construction of the 106 lots in Country View Estates.  HBD had not decided whether it would finance the Friedman lots, but had a first right of refusal if the borrowers decided to develop them.

87.    The secondary source of repayment on this loan was stated to be guarantees by Richard Ashby ("Ashby") and Lawrence Redman ("Redman").  The CAM stated that the guarantors had a combined liquidity of $19 million, an unused line of credit totaling $1.5 million (not reflected in their liquidity), extensive car collections valued at over $2.5 million, and interest income from tax increment revenue bonds from the Fontana Redevelopment Agency generating $1.8 million per year.  Redman and Ashby had contingent liabilities totaling $62,464,000 and $44,354,000, respectively.  The combined debt to worth of the borrowers and guarantors was 209.99%.

88.    On July 13, 2007, HBD Regional Manager Bruce Beck sent an e-mail to Rothman and Camp noting that the collateral value dropped as follows:  $62,780,000 at underwriting to $50,224,000 as of May 22, 2007, and an estimated $25,580,000 as of July 13, 2007.  This reflected a loan to value of 159.36% on the land collateral, and 89.58% if the CFD provided $19,925,000 in reimbursement proceeds.  The new account officer, Greg Shamlian ("Shamlian"), reported on July 16, 2007, that $24 million was required to re-margin this loan back to its original loan to value of 65%.

89.    On August 15, 2007, HBD workout officer John Terwilliger ("Terwilliger") learned that periodic payments through the CFD were improbable and that CFD formation was going to take longer than anticipated.  Terwilliger prepared a Classified

Asset Report ("CAR") for the related Country View Estates production loan and model loan on January 31, 2008.  The report noted that the borrowers were unwilling to rebalance the ADP loan or pay interest out of pocket.  Terwilliger also noted that the guarantors' liquidity and secondary support had deteriorated.

90.     On March 27, 2008, the collateral value had deteriorated to $12,330,000.  On March 31, 2008, HBD collapsed this loan to the current outstanding sum of $26,374,602, and a notice of default was filed.  HBD initiated a guarantor lawsuit against Redman and Ashby on April 1, 2008.  Terwilliger subsequently discovered that there was a significant change in the guarantors' cash flow, as the guarantors pledged the interest receivable on a tax increment bond issued by the Fontana Redevelopment Agency to another lender.  The cash flow had been $1.88 million per year.  HBD agreed to underwrite this loan without asking the guarantors to pledge the bonds, or at least conduct sufficient due diligence to ensure that they had not already been pledged.

91.     On April 25, 2008, HBD learned that Downey Savings had foreclosed on a portion of the land that was attached to the borrower's interest in the CFD, and that it may have reduced the borrower's interest to proceeds from the CFD from nearly 40% to approximately 12%.  On May 20, 2008, counsel for Homeland/Romoland ADP, Inc. sent HBD a letter stating that proceeds from the CFD would be disbursed based on the shares of stock owned by each member of the corporation.  Shares of stock were distributed in accordance with the percentage ownership of land upon which flood control improvements were constructed.  Thus, the letter implied that the ADP executive committee would distribute funds in accordance with the goals, intent, spirit, and language of the Shareholders Operating Agreement dated January 1, 2006.  Put simply, there was a real possibility that HBD's share of the CFD, which was its primary source of repayment on this loan, had decreased from just over 39% to roughly 12%, as the borrower may have been forced to turn over a percentage of the shares of stock to Downey Savings as the new property owner.  This discovery resulted in HBD seeking a

temporary restraining order to prevent the borrowers from transferring any portion their shares of Homeland/Romoland ADP, Inc. to Downey Savings or anyone else.  Within hours before the hearing, the borrowers agreed to give HBD all 39.57% of the shares with HBD's stipulation that it would not negotiate the shares without an additional judicial hearing.  The borrowers also agreed to give HBD 24 hours notice of deciding to vacate the project to enable HBD to get a receiver in place.  Finally, HBD agreed to pay the borrowers $5,000 in marketing costs and $3,300 in sales commissions on future home sales in the County View Estate project.  It is very questionable whether HBD will realize all 39.57% of the proceeds from the CFD, as the future judicial hearing has uncertain results.  Moreover, the CFD has had difficulty selling bonds due to deteriorated market conditions.  Thus, it is very uncertain whether there will be any proceeds from the CFD.

92.     On June 4, 2008, counsel for Redman sent Terwilliger a letter requesting a meeting to discuss resolution of IndyMac's claims against Redman relating to his guarantee of the various HBD loans.  Redman was noted to have over $160 million in guarantees to IndyMac and numerous other lenders.  A meeting took place on June 17, 2008, during which Redman offered roughly five cents on the dollar for the deficiency.

93.     Van Dellen, Koon, and Shellem approved and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.     Van Dellen, Koon and Shellem failed to discover that the appraisal report for the Friedman property did not consider the impact of a CFD assessment.  Van Dellen, Koon and Shellem were in possession of the appraisal report, and the CFD was not a mystery as it was an integral component to this loan's primary source of repayment.  HBD simply did not communicate the existence of the CFD to its appraiser, who indicated plainly in his report that his opinion of value assumed there was no CFD-related assessments.  HBD's failure to identify this incorrect appraisal assumption resulted in a collateral value that, according to the

appraiser for this loan, was overstated by $10 million to $15 million.  In addition, the sale of the Friedman property for $4 million less than two years prior to its underwriting value of over $50 million was not properly considered -- particularly where the property was still not entitled for development.  HBD was unable to offer any cogent explanation for the prior sale price.  This further reduced HBD's collateral value.  This loan would not have been approved by Van Dellen, Koon, and Shellem if they had discovered these appraisal errors, as the LTV ratio for this loan was at the 65% regulatory and policy limit for a land loan.  In fact, it appears HBD originated this loan at an actual LTV of at least 90%.  The losses incurred on this loan would not have been suffered had Van Dellen, Koon, and Shellem properly evaluated the appraisal and decided against approving the loan.

b.      Van Dellen, Koon and Shellem failed to acknowledge HBD's limitations and the limitations of its underwriting staff.  In fact, the financial analyst on this loan conceded that he and the account officer were both inexperienced.  There is widespread consensus amongst HBD officers and analysts that this loan was simply too complicated, and that HBD lacked the qualifications to make it.  Indeed, HBD failed to understand the complexities with the primary source of repayment for this loan, and did not consider the possibility that the borrowers' interest in the CFD proceeds could diminish by virtue of actions taken by other lenders.

c.      Van Dellen, Koon and Shellem had unrealistic expectations as to the borrowers' ability to overcome the numerous entitlement/development hurdles within the 18-month-loan term.  HBD already had widespread warning that the project was located in a market that was at its peak, and potentially in decline.  HBD took an undue gamble that the market would remain viable into 2009 and 2010.

d.      The borrowers were heavily concentrated in the Inland Empire, and

owned or controlled nearly 20,000 lots in at least 12 projects.  HBD failed to adequately consider the substantial risks associated with making a $40 million loan to borrowers who had a large volume of land holdings in a largely commuter market.  This was particularly true given that the borrowers and guarantors were highly leveraged and had combined adjusted and contingent liabilities that exceeded their combined adjusted equity by over $125 million.  Thus, Van Dellen, Koon and Shellem were negligent and breached their duty of care by approving a loan that had no viable secondary source of repayment, particularly when the primary source of repayment was inundated with uncertainty.  This issue was compounded when they approved this loan without reasonable safeguards such as requiring a minimum-net-worth covenant or a maximum-debt-to-worth covenant.

e.     Van Dellen, Koon and Shellem failed to engage in sufficient due diligence to ensure that the income generated from the guarantors' interest in the Fontana tax increment bonds would be available as a secondary source of repayment.  While this is simply another example of HBD's failure to secure a viable secondary source or repayment, the failure to ask the guarantors to pledge the bonds or otherwise safeguard HBD's entitlement to the assets was negligent.

94.     Van Dellen, Koon and Shellem knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Koon and Shellem in regard to this loan include, but are not limited to, the following:

a.     Causing or allowing a loan to be made to borrowers and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.     Causing or allowing a loan to be made in violation of applicable laws,

regulations, and/or HBD's internal policies.

      c.      Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrowers and/or guarantors, and the prospective source of repayment, and the security provided for the loans.

      d.      Causing or allowing a loan to be made with deficient collateral;

      e.      Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

      f.      Causing or allowing a loan to be made, renewed, and/or extended with inadequate or problematic appraisals.

      g.      Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

      h.      Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

      i.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

      j.      Causing or allowing a loan to be made, extended, and/or renewed despite the Bank having a high geographic concentration of loans in the same market.

      k.      Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

      l.      Causing or allowing a loan to be made, renewed or extended where

there was very little likelihood of the loan repaying within the term of the loan.

95.     Van Dellen, Koon, and Shellem, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

96.     By their actions and inactions, as generally and specifically described above, Van Dellen, Koon, and Shellem failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

97.     As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Koon, and Shellem, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

98.     With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Koon, and Shellem pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 4

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Rothman Related to the Underwriting, Administration, Extension and Modification of a Loan to Fiesta Development, Inc. for Country View Estates – Phases 6&7)

99.     Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 98 of this complaint, as though fully set forth herein.

100.     Van Dellen, Shellem, and Rothman approved a loan to Fiesta Development, Inc. for a project known as Country View Estates – Phases 6&7.  This loan was entered into on September 18, 2006, and was an AD&C loan for the development of 59 single-family-residential units.  The loan commitment totaled $16,832,500 and had a 12-month term.  Losses on this loan are estimated to exceed $1.5 million.

101.     This loan replaced an existing HBD loan and had additional costs related to site development, permits/fees, and developer overhead.  Country View Estates was a

318-unit single-family-detached-residential-housing tract that was divided into seven phases.

102.   The primary source of repayment of this loan was stated to be unit closings in the project.  The secondary source of repayment was the personal guarantees of Redman and Ashby.

103.   This loan matured on September 17, 2007, and was in violation of covenants limiting the number of finished spec units allowed in the project.  A default letter was sent to the borrower and guarantors on November 29, 2007.  On March 31, 2008, HBD collapsed this loan to its then-current-outstanding balance of $5,910,543.54.  A notice of default was filed the same day, and guarantor suits were initiated on April 1, 2008.  HBD subsequently agreed to pay the borrowers $5,000 in marketing costs and $3,300 in sales commissions on future home sales in the County View Estate project in exchange for the borrowers agreeing to give HBD 24 hours notice of deciding to vacate the project.

104.   On June 4, 2008, counsel for Redman sent Terwilliger a letter requesting a meeting to discuss resolution of IndyMac's claims against Redman relating to his guarantee of the various HBD loans.  Redman was noted to have over $160 million in guarantees to IndyMac and numerous other lenders.  These settlement discussions resulted in a preliminary settlement under which HBD would have received $500,000 at settlement closing, and $500,000 four months later.  The second payment was to be secured by a lien on Redman's ranch and by a life insurance policy.  Redman, however, was forced into involuntary bankruptcy by his other creditors.  As a result, HBD discontinued its negotiations with Redman.  An effort to sell the units was undertaken with the borrower until it abandoned the project in September 2008.

105.   Van Dellen, Rothman, and Shellem approved and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.      There were deteriorating market conditions where the total months of supply in the greater market area and submarket increased by roughly three months since the CAM for Fiesta ADP had been submitted roughly three months earlier. The CAM notes that overall inventory levels in West Riverside County increased in the first quarter of 2006 by 6% to 17,818 units, and that 2,642 of those units were offered and unsold reflecting a 12% increase from the prior quarter.  In addition, net sales were down 16% from the fourth quarter of 2004 and down 10% from 2005.

b.      The borrower owned or controlled nearly 20,000 lots in at least 12 projects throughout Riverside and San Bernardino Counties, which reflected added risk due to the concentration of assets within the same market area.  The CAM also notes that the borrower and guarantors were heavily weighted in land inventory at a time when the market was slowing and land values were dropping.

c.      The CAM reflects a drop of nearly $100 million in adjusted assets for Ashby as compared to the CAM for Fiesta ADP, which was drafted approximately three months earlier.  Liabilities appear to have dropped a similar amount, which resulted in a similar adjusted equity value.  But there was no explanation provided in the CAM for what appears to be a conspicuous accounting change.  Notably, both Redman's and Ashby's cash positions declined substantially.  There was no mention of this in the CAM.  These changes were reflective of a weakening borrower and guarantors.

d.      The borrower and guarantors had in excess of $275 million in other loan commitments with over $200 million outstanding.  In addition, Ashby had contingent liabilities totaling over $44 million, and Redman had contingent liabilities totaling over $62 million.

e.     HBD did not require a minimum-tangible-net-worth covenant or a maximum-debt-to-worth covenant, which created greater risk given the leverage of the borrower and guarantors.

f.     Ashby had a FICO score of 692 which was below the policy limit of 700.  There was no explanation for this provided in the CAM.

106.   Van Dellen, Shellem, and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Rothman in regard to this loan include, but are not limited to, the following:

a.     Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.     Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.     Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.     Causing or allowing a loan to be made with deficient collateral.

e.     Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

f.     Causing or allowing a loan to be made with inadequate or problematic appraisals.

g.     Causing or allowing a loan to be renewed or extended with inadequate

or problematic appraisals.

h.   Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

i.   Causing or allowing a loan to be made, renewed, or extended despite poor and deteriorating market conditions.

j.   Causing or allowing a loan to be made, renewed, or extended despite the Bank having a high geographic concentration of loans in the same market.

k.   Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

l.   Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

107.   Van Dellen, Rothman, and Shellem, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

108.   By their actions and inactions, as generally and specifically described above, Van Dellen, Rothman, and Shellem failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

109.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Rothman, and Shellem, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

110.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Rothman, and Shellem pursued a common plan or design with each other, and therefore are jointly and severally liable for

all losses.

## C. Count Based on Allegations Related to the Loan Made By HBD in the Main Street Partners, Inc. Borrower Relationship.

### Count 5

### (Claim for Negligence and Breach of Duty of Care Against All Defendants Related to the Underwriting, Administration, Extension and Modification of a Loan to Lake Mathews Venture, LLC for the Lake Mathews Golf and Country Club Project)

111.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 110 of this complaint, as though fully set forth herein.

112.   Van Dellen, Shellem, and Koon approved a loan to Lake Mathews Venture, LLC for a project known as the Lake Mathews Golf and Country Club Project.  This loan was entered into on September 8, 2004, with extensions approved by Van Dellen, Shellem, and Koon in March 2006, Van Dellen, Shellem, and Rothman in October 2006, and Van Dellen and Rothman in December 2007.  The loan involved the acquisition and final entitlement of 362 acres in Riverside, California for eventual development of 295 lots and a proposed 18-hole-public golf course.  The initial loan commitment totaled $8,550,000 and had an 18-month term.  Subsequent extensions and a modification of the loan increased the loan commitment to $11,100,000 and extended the term a total of 30 months.  Losses on this loan approximate $7.3 million.

113.   Defendants approved, extended and/or modified this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

     a.   Numerous entitlements and governmental approvals remained to be obtained before the borrower could effectively market the land for sale because the borrower had no intention of building on the property.

     b.   The borrower (and its principal investor) had no prior experience in land development or construction.

c.     Deteriorating market conditions.

d.     Deteriorating creditworthiness and financial strength of the borrower and guarantors.

e.     One guarantor that lacked the liquidity to completely repay the loan.

f.     There was a significant decrease in the appraised value of the land.

114.   Defendants knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Defendants in regard to this loan include, but are not limited to, the following:

a.     Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.     Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.     Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.     Causing or allowing a loan to be made with deficient collateral;

e.     Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

f.     Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

g.     Causing or allowing a loan to be renewed or extended to borrowers

who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

       h.     Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

       i.     Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

       j.     Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

115.   Defendants, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

116.   By their actions and inactions, as generally and specifically described above, the Defendants failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

117.   As a direct and proximate result of the negligence and breach of fiduciary duties of the Defendants, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

118.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, the Defendants pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**D.     Counts Based on Allegations Related to the Loans Made By HBD in the Pinn Brothers Borrower Relationship.**

**<u>Count 6</u>**

**<u>(Claim for Negligence and Breach of Duty of Care Against All Defendants Related to the Underwriting, Administration, Extension and Modification of a Loan to PBP Limited Partnership for the Brentwood/Palmilla Project)</u>**

119.    Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 118 of this complaint, as though fully set forth herein.

120.    Van Dellen, Shellem, and Koon approved a loan to PBP Limited Partnership for a project known as the Brentwood/Palmilla Project.  This loan was entered into on February 17, 2005, with an extension and modification approved by Van Dellen and Rothman in May 2008.  The loan involved the construction of 114 homes and acquisition of an additional 460 lots in the master planned community of Marseilles in Brentwood, California (Contra Costa County).  This loan was subsequently restructured and renewed to provide financing for the construction of 105 homes and acquisition and development of 108 apartment lots and 343 single family residence paper lots in May 2008.  The initial loan commitment totaled $45,000,000 and had a 24-month term.  The May 2008 loan modification reduced the commitment to approximately $19.6 million with a new, 24-month term.

121.    Defendants approved, extended and/or modified this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

            a.      The planned number of units for the project represented nearly five times the HBD policy maximum.

            b.      HBD had already loaned to the borrower's principals funds nearly three times the maximum amount permitted to one borrower under HBD policy.

            c.      Very low cash equity from the borrower and cash support from the

1    guarantors.

2          d.     Delays in obtaining final entitlements and other governmental

3    approvals.

4          e.     Deteriorating market conditions, particularly at the time of the May

5    2008 loan extension and modification.

6          f.     A high concentration of HBD's portfolio in Northern California that

7    had exceeded the HBD policy maximum as of May 2008.

8          g.     Relaxing of borrower and guarantor financial reporting requirements

9    in violation of HBD policy.

10          h.     Failure to obtain additional guarantees to compensate for the reduced

11    liquidity of the existing guarantors.

12    122.   Defendants knew, or in the exercise of due diligence should have known,

13    that their practices and the practices of IndyMac's employees who reported to them and

14    over whom they exercised supervisory control, were improper, imprudent, and harmful to

15    IndyMac.  The negligence and breaches of duty by Defendants in regard to this loan

16    include, but are not limited to, the following:

17          a.     Causing or allowing a loan to be made to a borrower and guarantors

18    who were or should have been known to be not creditworthy and/or in financial

19    difficulty.

20          b.     Causing or allowing a loan to be made in violation of applicable laws,

21    regulations, and/or HBD's internal policies.

22          c.     Causing or allowing a loan to be made with inadequate or inaccurate

23    financial information regarding the creditworthiness of the borrower and/or

24    guarantor, and the prospective source of repayment, and the security provided for

25    the loans.

26          d.     Causing or allowing a loan to be made where one or more of the

27    sources of repayment of the loan were not likely to be sufficient to fully retire the

28

debt.

e.     Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.     Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g.     Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h.     Causing or allowing a loan to be renewed or extended despite the Bank having a high geographic concentration of loans in the same market.

i.     Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

123.   Defendants, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

124.   By their actions and inactions, as generally and specifically described above, the Defendants failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

125.   As a direct and proximate result of the negligence and breach of fiduciary duties of the Defendants, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

126.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, the Defendants pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 7

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Koon Related to the Underwriting and Administration of a Loan to Bay Colony Investors II, Inc. for the Portola Road Project)

127.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 126 of this complaint, as though fully set forth herein.

128.   Van Dellen, Shellem, and Koon approved a loan to Bay Colony Investors II, Inc. for a project known as the Portola Road Project.  This loan was entered into on September 4, 2006.  The loan was issued to provide the borrower with funds for the acquisition, development and construction of 70 townhomes in the Portola subdivision in Livermore, California (Alameda County).  The loan commitment totaled approximately $30.4 million and had a 24-month term.  Losses on this loan total approximately $250,000.

129.   Van Dellen, Shellem, and Koon approved this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

a.      A loan term that was seven months shorter than needed to pay off this loan based on cash flow projections at the time of approval.

b.      Cash equity and expected profit margin below HBD policy limits, creating a higher risk that a project already facing market challenges would not be able to effectively react to those challenges and reduce sales prices.

c.      Inadequate verification of the liquidity of the two guarantors, together with evidence at the time of loan approval that their liquidity was declining rapidly.

d.      Many of the guarantors' assets were held in trusts, and access to these assets was limited by the trust agreements.

e.      Deteriorating market conditions.

130.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

a.   Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.   Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.   Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.   Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.   Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.   Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

g.   Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

131.   Van Dellen, Shellem, and Koon, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like

1    positions would use under similar circumstances in the management, supervision and

2    conduct of IndyMac's business and financial affairs.

3          132.   By their actions and inactions, as generally and specifically described above,

4    Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as

5    officers of IndyMac and breached their fiduciary duties of care to IndyMac.

6          133.   As a direct and proximate result of the negligence and breach of fiduciary

7    duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other

8    compensatory and consequential damages, in amounts to be established at trial.

9          134.   With respect to all of their actions and inactions in managing and

10   administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common

11   plan or design with each other, and therefore are jointly and severally liable for all losses.

12       **E.      Count Based on Allegations Related to the Loan Made By HBD in the**

13             **Ralph Giannella Borrower Relationship.**

14                         <u>**Count 8**</u>

15   <u>**(Claim for Negligence and Breach of Duty of Care Against All Defendants Related**</u>

16   <u>**to the Underwriting, Administration, Renewal, Extension and Modification of a**</u>

17   <u>**Loan to North Coastal, LLC for the Woodland Townhomes (Phase 2) Project)**</u>

18         135.   Plaintiff incorporates by reference and re-alleges each of the allegations in

19   paragraphs 1 through 134 of this complaint, as though fully set forth herein.

20         136.   Van Dellen and Koon approved a loan to North Coastal, LLC for a project

21   known as Woodland Townhomes (Phase 2).  This loan was entered into on April 26,

22   2005, and was a condominium conversion loan for the development of 65 condominium

23   units.  Shellem withheld approval of the original loan.  The loan commitment totaled

24   $14,705,000 and had a 13-month term along with two three-month extensions.  It was

25   renewed by approval of Van Dellen, Shellem, and Koon on June 8, 2006.  The LTV ratio

26   at original underwriting was nearly 80% and the loan to cost ratio was 85%.  Losses on

27   this loan are estimated at $600,000.

28

137.   This loan provided financing for the second phase of a 112-unit condominium conversion project located in Escondido, California in northern San Diego County, 30 miles north of San Diego.  Phase 1's borrower was Broadway Coastal, LLC, and the project consisted of 47 units.  Phase 2's borrower was North Coastal, and the project consisted of 65 units.  The 47 units in Phase 1 were made up of 10 two-story buildings situated on approximately 3.7 acres of land.  The 65 units in Phase 2 were made up of 13 two-story buildings situated on approximately 4.4 acres of land.

138.   Phase 1 was scheduled to commence conversion approximately 60 days after closing, while Phase 2 would commence in October 2005 depending on how well the units in Phase 1 had sold.  Phase 2 was to be converted in two phases -- 40 units in the first, and 25 units in the second.

139.   The borrower requested two separate loans.  The first loan provided financing for Phase 1, and involved a $10,750,000 commitment.  The second loan was the subject loan, and involved a $14,705,000 commitment.  The two loans, which were approved concurrently, were cross-defaulted, but were not cross-paid or cross-collateralized.  Both loans were originally financed by a second trust deed loan provided by Bancorp totaling $1,897,287 and $2,664,357 for Phases 1 and 2, respectively.

140.   The primary source of repayment of this loan was stated to be unit closings in the project.  There was no identified secondary source of repayment.

141.   On May 31, 2006, a CAM requesting a 12-month extension for Phase 2 was submitted.  The CAM indicates that the loan for Phase 1 was paid off in mid-May of 2006.  The extension for Phase 2 was requested due to slower than expected sales.  Phase 1 averaged 5.5 units per month versus the appraiser's original estimate of 10 units per month.  The borrower requested an increased commitment amount to $16,079,000 to cover additional finance costs and some hard cost increases.  The increased commitment was also funding the interest reserve on the second trust deed loan issued by Bancorp.

142.   On June 6, 2007, the maturity date on the renewal loan was extended from

June 7, 2007 to August 1, 2007, to coincide with the maturity of the second trust deed loan.  The extension was requested to allow the borrower time to sell the remaining units to retail buyers.  At this time, HBD noted that Ralph Giannella ("Giannella") was still a strong guarantor with $44 million in net worth and $6.8 million in liquidity.  But it appears to have virtually ignored the fact that his contingent liabilities had swelled to over $84 million.  In addition, the Escondido market continued to be impacted by the level of supply and slowing sales.  On July 30, 2007, the borrower informed HBD that he did not have any available cash to support the subject project or his other three projects.

143.   On August 3, 2007, HBD's regional manager, account officer, and financial analyst met with the borrower and discovered that he had spent the majority of his $7 million in cash on his four remaining projects.  Giannella's liquidity had dropped to essentially zero.  HBD concluded that Giannella's only way out of his remaining four condo projects was to determine a price that would sell at a pace of more than three units per month.

144.   On September 13, 2007, Van Dellen and Rothman approved another 90-day extension of the first and second trust deed loans.  The first trust deed loan involved $487,281 of additional funds for interest reserve, a loan fee, and to pay off outstanding accounts payable.  It also included an additional $507,948 for costs going forward (property taxes, sales and marketing, overhead, HOA dues).

145.   Defendants approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence. These risks include, but are not limited, to the following:

a.   The borrower was permitted to keep all profits associated with the nine additional sales closed in Phase 1 after repayment of the first loan.  This would net the borrower $1.8 million after repayment of the second trust deed loan. HBD's decision to underwrite two separate loans for the same project without a cross-payment agreement permitted the borrower to net all profits associated with

the sale of Phase 1, which transferred risk to HBD. HBD's decision to do so effectively prolonged its exposure on this transaction, and increased the number of units the borrower needed to sell in Phase 2 to retire the debt. Shellem was in favor of requiring the borrower to use Phase 1 proceeds to devote against the Phase 2 loan. In fact, Shellem withheld his approval on this transaction. Van Dellen and Koon decided to approve this loan over Shellem's objections. It is likely that no loss would have occurred had the two loans contained a cross-pay provision.

b.     The CAM for the renewal loan indicates that there were 16 months of supply of condo conversion units in the subject submarket. It also notes that there were 13 months of supply for the subject project. This was an increase of 7 months from the original loan, and exceeded the 12-month term of the renewal. While this loan was projected to payoff prior to the sale of the last unit, there was substantial risk that this loan would not pay off by the end of the term if there were further declines in absorption.

c.     The 112-unit project had an "as-is" market value as condominiums of $21,840,000 versus a purchase price of $21,800,000. In addition, the market value in use as post-renovation apartments was $19,100,000. Under an income approach, the project had a value of $15,626,180. These figures indicated that any softening in the real estate market would render the purchase price higher than the property's value under any analysis. In addition, the DCR as an apartment was well below 1.0. These factors naturally presented substantial risk to HBD if the builder was unable to complete the conversion.

d.     At the time of the renewal of this loan for Phase 2, the absorption rate had dropped from 10 units per month to 5 units per month. HBD's decision to renew this loan at an increased commitment level in the face of obvious market softening was irresponsible. HBD placed emphasis on the fact that the appraiser concluded that there was a price increase in the units at the time of renewal. HBD

also took comfort in the borrower's decision to price the units over the appraised value.  But the slowing absorption and other market indicators in the summer of 2006 should have caused HBD to view the price increases with caution.

e.     The borrower had to rely on a second trust deed loan from Bancorp for both loans.  The borrower only put up 10% of the required cash equity for both loans, and relied on Bancorp to come up of with the balance.  Thus, the borrower was engaged in virtually 100% financing, and the loan to cost for both loans exceeded 97%.  The loan to cost without considering the second trust deed loan was still 85%, which was at the policy limit.

f.     The CAM for the original loan notes that there were potentially 438 units under conversion and starting sales at the same time in the subject market.  In addition, this project exceeded HBD's policy limit for speculative units.  These factors evidenced a risk that absorption would be negatively impacted.  In fact, the CAM for the renewal loan notes that sales were impacted by the supply of condominium/townhome conversion units available for sale in the market area.

g.     The borrower and guarantor had five other condominium conversion projects ongoing in the San Diego area.  This evidenced a lack of diversification by the borrower in terms of geography and product type, which resulted in greater risk that the borrower would encounter difficulties if the condominium market in San Diego softened.

146.   Defendants knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Defendants in regard to this loan include, but are not limited to, the following:

a.     Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial

difficulty.

b.    Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.    Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.    Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.    Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.    Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g.    Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h.    Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

i.    Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

j.    Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

**COMPLAINT**

147.   Defendants as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

148.   By their actions and inactions, as generally and specifically described above, Defendants failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

149.   As a direct and proximate result of the negligence and breach of fiduciary duties of Defendants, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

150.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Defendants  pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**F.   Counts Based on Allegations Related to the Loans Made By HBD in the Corinthian Homes Borrower Relationship.**

**Count 9**

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem and Koon Related to the Underwriting and Administration of a Loan to RKB Communities (The Greens), L.P. for the Crest & Greens Project)**

151.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 150 of this complaint, as though fully set forth herein.

152.   Van Dellen, Shellem, and Koon approved a loan to RKB Communities (The Greens), L.P. for a project known as the Crest & Greens Project.  This loan was entered into on June 22, 2005.  The loan involved the construction of 87 single-family homes in Rancho Murieta, California, located in Sacramento County about 25 miles east of Sacramento.  The loan commitment totaled $9,500,000 and had a 12-month term.  Losses on this loan exceed $76,000.

153.   Van Dellen, Shellem, and Koon approved this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

a.   The Sacramento, California market was extremely overheated, with prices having increased nearly 70% over a four-year period, and there were clear signs at the time of the loan approval that sales were slowing.

b.   Rancho Murieta was a rural community located more than 25 miles outside of downtown Sacramento and thus more susceptible to a slowing market.

c.   The land appraisal relied on only one comparable sale from Rancho Murieta because it was such a small community, with the remainder of comparable sales coming from the City of Elk Grove, located over thirty minutes away.

d.   The total amount of IndyMac loans to the principals and guarantors of the borrower had grown to approximately $160 million, nearly double the HBD policy limit.

e.   Financial information for the two guarantors was not consolidated and was comprised of many interrelated partnerships and limited liability companies, making it difficult to accurately evaluate the guarantors' true financial strength and liquidity.   The contingent liabilities of the guarantors' various companies were not carefully considered in evaluating the guarantors' financial strength, meaning their reported debt-to-worth ratios were understated.  One of the guarantor's already had a debt-to-worth ratio of 1.74 to 1 as of June 2004, while the other had a ratio of 1.32 to 1.

f.   The principal guarantor had extremely low liquidity and was heavily invested in land throughout Sacramento and its surrounding areas, including riskier raw and unentitled land assets, leaving him particularly susceptible to a market slow down.  The guarantors combined liquidity was only two percent of their total debt, much less than an ideal number of 10% of total debt as conceded by the

account officer for this loan.

154.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

a.   Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.   Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.   Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.   Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.   Causing or allowing a loan to be made, extended, and/or renewed with inadequate or problematic appraisals.

f.   Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

g.   Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

h.   Causing or allowing a loan to be made, renewed, and/or extended

despite poor and deteriorating market conditions.

      i.     Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

      j.     Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

155.   Van Dellen, Shellem, and Koon, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

156.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

157.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

158.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 10

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem and Koon Related to the Underwriting and Administration of a Loan to Corinthian Homes (Anatolia), L.P. for the Anatolia Project)

159.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 158 of this complaint, as though fully set forth herein.

160.   Van Dellen, Shellem, and Koon approved a loan to Corinthian Homes (Anatolia), L.P. for a project known as the Anatolia Project.  This loan was entered into

on November 16, 2005.  The loan involved the acquisition and development of 75 single-family-residence lots in Rancho Cordova, California, about nine miles east of Sacramento.  The lots were to be used to construct 75 single-family residences for eventual sale.  The loan commitment totaled $10,350,000 and had a 24-month term. Losses on this loan exceed $5.8 million.

161.   Van Dellen, Shellem, and Koon approved this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

a.     The Sacramento, California market was extremely overheated, with prices having increased nearly 70% over a four-year period, and there were clear signs at the time of the loan approval that sales were slowing.

b.     Profit margin on the loan was less than the 10% HBD policy minimum.

c.     Significant competition existed from six other builders in the Anatolia master planned community, and the appraiser believed that the borrower's pricing was higher than the competition.

d.     Groundwater contamination near the project site had caused a plume under most of the project site, and a rendering plant was located close to the site causing bad odors, each of which created a substantial hurdle for development, and constituted potential sources of cost increases and absorption problems.

e.     The total amount of IndyMac loans to the principals and guarantors of the borrower had grown to approximately $155 million, nearly double the HBD policy limit.

f.     Financial information for the two guarantors was not consolidated and was comprised of many inter-related partnerships and limited liability companies, making it difficult to accurately evaluate the guarantors' true financial strength and liquidity.   The contingent liabilities of the guarantors' various companies were

not carefully considered in evaluating the guarantors' financial strength, meaning their reported debt-to-worth ratios were understated.  One of the guarantor's already had a debt-to-worth ratio of 1.74 to 1 as of June 2004, while the other had a ratio of 1.32 to 1.

g.    The principal guarantor had extremely low liquidity and was heavily invested in land throughout Sacramento and its surrounding areas, including riskier raw, unentitled land assets, leaving him particularly susceptible to a demonstrated market slow down.   The guarantors combined liquidity was only two percent of their total debt, much less than an ideal number of 10% of total debt as conceded by the account officer for this loan.

162.    Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

a.    Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.    Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.    Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.    Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the

debt.

e.     Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.     Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

g.     Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

h.     Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

163.   Van Dellen, Shellem, and Koon, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

164.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

165.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

166.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.