**Count 11**

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem and Koon Related to the Underwriting and Administration of an Acquisition & Development Loan to Corinthian Homes (Williams), L.P. for the Valley Ranch Project)**

167.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 166 of this complaint, as though fully set forth herein.

168.   Van Dellen, Shellem, and Koon approved a loan to Corinthian Homes (Williams), L.P. for a project known as the Valley Ranch Project.  This loan was entered into on December 27, 2005.  The loan involved the acquisition and development of 152 single-family-residence lots in Williams, California, located in Colusa County about 54 miles north of Sacramento.  The lots were to be used to construct 152 single-family residences for eventual sale.  The loan commitment totaled over $14.2 million and had a 24-month term.  Losses on this loan exceed $6.6 million.

169.   Van Dellen, Shellem, and Koon approved this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

a.   The Sacramento, California market was extremely overheated, with prices having increased nearly 70% over a four-year period, and there was recent data at the time of the loan approval that sales had slowed by nearly 50%.

b.   Profit margin on the loan was less than the 10% HBD policy minimum.

c.   Williams was an outlying, commuter-based community located approximately 54 miles outside of downtown Sacramento and thus extremely susceptible to a slowing market.

d.   The total amount of IndyMac loans to the principals and guarantors of the borrower had grown to approximately $143 million, nearly double the HBD

1    policy limit.

2        e.    Financial information for the two guarantors was not consolidated and

3    was comprised of many inter-related partnerships and limited liability companies,

4    making it difficult to accurately evaluate the guarantors' true financial strength and

5    liquidity.   The contingent liabilities of the guarantors' various companies were

6    not carefully considered in evaluating the guarantors' financial strength, meaning

7    their reported debt-to-worth ratios were understated.  One of the guarantor's

8    already had a debt-to-worth ratio of 1.74 to 1 as of June 2004, while the other had a

9    ratio of 1.32 to 1.

10        f.    The principal guarantor had extremely low liquidity and was heavily

11    invested in land throughout Sacramento and its surrounding areas, including riskier

12    raw, unentitled land assets, leaving him particularly susceptible to a demonstrated

13    market slow down.  The guarantors combined liquidity was only two percent of

14    their total debt, much less than an ideal number of 10% of total debt as conceded

15    by the account officer for this loan.

16        g.    The combined liquidity covenant of $2 million was extremely low

17    given the size of this loan, and the significant obligations of the guarantors, which

18    only six months after loan approval included contingent liabilities of over $250

19    million for one guarantor and combined liabilities of over $500 million.  Further,

20    the principal guarantor's liquidity had dropped to nearly 0% of his total assets.

21    170.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence

22    should have known, that their practices and the practices of IndyMac's employees who

23    reported to them and over whom they exercised supervisory control, were improper,

24    imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van

25    Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the

26    following:

27        a.    Causing or allowing a loan to be made to a borrower and guarantors

28

393199.1_DOC                    -63-
**COMPLAINT**

who were or should have been known to be not creditworthy and/or in financial difficulty.

   b.   Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

   c.   Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

   d.   Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

   e.   Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

   f.   Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

   g.   Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

   h.   Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

   i.   Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

   171.   Van Dellen, Shellem, and Koon, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

**COMPLAINT**

172.    By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

173.    As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

174.    With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 12

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem and Koon Related to the Underwriting and Administration of Two Construction Loans to Corinthian Homes (Edgewater), L.P. for the Edgewater Project)

175.    Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 174 of this complaint, as though fully set forth herein.

176.    Van Dellen, Shellem, and Koon approved two loans to Corinthian Homes (Edgewater), L.P. for a project known as the Edgewater Project.  These loans were entered into on May 31, 2006 and December 7, 2006.  The loans involved the construction of 55 single-family residences in Linda, California, located in Yuba County nearly an hour away from Sacramento.  The loan commitment for both loans totaled over $14.3 million, and each loan had a 24-month term.  Total losses on these loans exceed $1.9 million.

177.    Van Dellen, Shellem, and Koon approved these loans despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

a.    The Sacramento, California market was extremely overheated, with prices having increased nearly 70% over a four-year period, and there was recent

1  data at the time of each loan approval that sales had slowed by nearly 50%.

2        b.    Linda was an outlying community located nearly one hour outside of

3  downtown Sacramento and thus extremely susceptible to a slowing market.

4        c.    Another substantial client of IndyMac, namely Reynen & Bardis

5  (whose principal, Christo Bardis, was also a principal of many Corinthian

6  borrowers and a major guarantor of Corinthian loans), was also building single-

7  family residences in the Edgewater community, creating a scenario where two

8  HBD clients were competing against each other.

9        d.    The total amount of IndyMac loans to the principals and guarantors of

10  the borrower had grown to approximately $160 million, nearly double the HBD

11  policy limit.

12        e.    Financial information for the two guarantors was not consolidated and

13  was comprised of many inter-related partnerships and limited liability companies,

14  making it difficult to accurately evaluate the guarantors' true financial strength and

15  liquidity.  The contingent liabilities of the guarantors' various companies were

16  not carefully considered in evaluating the guarantors' financial strength, meaning

17  their reported debt-to-worth ratios were understated.  One of the guarantor's

18  already had a debt-to-worth ratio of 1.74 to 1 as of June 2004, while the other had a

19  ratio of 1.32 to 1.

20        f.    The principal guarantor had extremely low liquidity and was heavily

21  invested in land throughout Sacramento and its surrounding areas, including riskier

22  raw, unentitled land assets, leaving him particularly susceptible to a demonstrated

23  market slow down.  The guarantors combined liquidity was only two percent of

24  their total debt, much less than an ideal number of 10% of total debt as conceded

25  by the account officer for this loan.

26  178.  Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence

27  should have known, that their practices and the practices of IndyMac's employees who

28

**COMPLAINT**

reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

a.     Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.     Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.     Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.     Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.     Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.     Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

g.     Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h.     Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

i.   Causing or allowing a loan to be made, renewed or extended where there

**COMPLAINT**

was very little likelihood of the loan repaying within the term of the loan.

179.   Van Dellen, Shellem, and Koon, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

180.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

181.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

182.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 13

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem and Rothman Related to the Underwriting and Administration of Three Construction Loans to Corinthian Homes (Williams), L.P. for the Valley Ranch Project)

183.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 182 of this complaint, as though fully set forth herein.

184.   Van Dellen, Shellem, and Rothman approved three construction revolver loans to Corinthian Homes (Williams), L.P. for a project known as the Valley Ranch Project.  These loans were entered into on August 23, 2006, December 7, 2006, and January 30, 2007.  The loans involved the construction of 152 single-family residences in Williams, California, located in Colusa County about 54 miles north of Sacramento.  The loan commitment for the three loans totaled $6.7 million and had a 24-month term. Losses on these three loans total approximately $2.1 million.

185.   Van Dellen, Shellem, and Rothman approved these loans despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

a.   The Sacramento, California market was extremely overheated, with prices having increased nearly 70% over a four-year period, and there were clear signs at the time of each loan approval that sales had slowed by nearly 50%.

b.   Profit margin on the loans was less than the 10% HBD policy minimum.

c.   Williams was an outlying, commuter-based community located approximately 54 miles outside of downtown Sacramento, and thus extremely susceptible to a slowing market.

d.   The total amount of IndyMac loans to the principals and guarantors of the borrower had grown to approximately $143 million, nearly double the HBD policy limit.

e.   Financial information for the two guarantors was not consolidated and was comprised of many inter-related partnerships and limited liability companies, making it difficult to accurately evaluate the guarantors' true financial strength and liquidity.   The contingent liabilities of the guarantors' various companies were not carefully considered in evaluating the guarantors' financial strength, meaning their reported debt-to-worth ratios were understated.  One of the guarantor's already had a debt-to-worth ratio of 1.74 to 1 as of June 2004, while the other had a ratio of 1.32 to 1.

f.   The principal guarantor had extremely low liquidity and was heavily invested in land throughout Sacramento and its surrounding areas, including riskier raw and unentitled land assets, leaving him particularly susceptible to a demonstrated market slow down.   The guarantors combined liquidity was only two percent of their total debt, much less than an ideal number of 10% of total debt

as conceded by the account officer for this loan.

g.    The combined liquidity covenant of $2 million was extremely low given the size of the loans, and the significant obligations of the guarantors, which only six months after loan approval included contingent liabilities of over $250 million for one guarantor and combined liabilities of over $500 million.  Further, the principal guarantor's liquidity had dropped to nearly 0% of his total assets.

186.   Van Dellen, Shellem, and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Rothman in regard to these loans include, but are not limited to, the following:

a.    Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.    Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.    Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.    Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.    Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.      Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

g.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h.      Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

i.      Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

187.    Van Dellen, Shellem, and Rothman, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

188.    By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

189.    As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

190.    With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**G.    Count Based on Allegations Related to the Loan Made By HBD in the Christopherson Homes Borrower Relationship.**

## Count 14

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem and Koon Related to the Underwriting and Administration of a Loan to West Roseville Investors, L.P. for the Fiddyment Ranch Project)**

191.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 190 of this complaint, as though fully set forth herein.

192.   Van Dellen, Shellem, and Koon approved a loan to West Roseville Investors, L.P. for a project known as Fiddyment Ranch.  This loan was entered into on July 11, 2005.  The loan involved the acquisition and development of 127 lots in Roseville, California located in Placer County, California about 15 miles northeast of Sacramento.  Once the lots were completed, the borrower planned to start construction of 127 single-family homes to be financed by an IndyMac construction revolver.  The loan commitment totaled approximately $24,000,000 and had a 24-month term.  Losses on this loan are nearly $16 million.

193.   Van Dellen, Shellem, and Koon approved this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

a.    The borrower's total cost for the acquisition and development of the subject 127 lots equaled the appraised projected market value upon completed construction, so there was no profit for the borrower in developing only the lots. The borrower was relying on prospective sales of 127 single-family homes into a market rife with competition to turn a profit (and repay the subject A&D loan).

b.    There was significant competition in the Roseville area, including nearly 8,400 residential dwellings in the West Roseville Specific Plan and nearly 4,200 within the Fiddyment Ranch master plan.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

c.    Loan term of 24 months was double the HBD policy maximum for acquisition and development loans, creating a greater risk that the extended term would expose the Bank to a downturn in the real estate market

d.    Loan guarantors had a low liquidity to debt ratio of 0.04:1, creating a substantial risk that this secondary source of repayment would not be sufficient to pay off this loan.

e.    Two previous loans to another borrower within the Christopherson Homes borrower relationship, namely Villa La Michele, L.P., had also been made for a project in an extremely remote area of Northern California.  This project involved the acquisition, development and construction of 151 single family residence lots in Orland, California, which is located 107 miles north of Sacramento.  Orland was a very small, rural community with a population barely over 6,000 and a high unemployment rate, and was located in one of the smallest counties in all of California.  The A&D loan was entered into on January 31, 2005 with a 24-month loan term that was double the HBD policy maximum, and had a total commitment of over $7.9 million.  The loan relied on the same guarantors as a second source of repayment, and inappropriately valued the guarantors' assets by including the projected market value upon completion of the very projects that were being financed by the Bank instead of the as-is value.  The loan had fallen behind schedule by up to 60 days.  The construction revolver loan was entered into on November 21, 2005 with an approximately 12-month loan term and a total commitment of $9 million.  The absorption rate for the project had dropped by 25% since the A&D loan had been booked, resulting in a delayed payoff of the loan.

194.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper,

imprudent, and harmful to IndyMac. The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

     a.     Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

     b.     Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

     c.     Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

     d.     Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

     e.     Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

     f.     Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

195.   Van Dellen, Shellem, and Koon, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

196.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

197.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other

**COMPLAINT**

1  compensatory and consequential damages, in amounts to be established at trial.

2  198.   With respect to all of their actions and inactions in managing and

3  administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common

4  plan or design with each other, and therefore are jointly and severally liable for all losses.

**H.   Counts Based on Allegations Related to the Loans Made By HBD in the Dr. Gansean Visvabharathy ("Dr. Vish") Borrower Relationship.**

**Count 15**

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem and Koon Related to the Underwriting and Administration of a Loan to Villas Development Corp. and TBD LLC for the Bluff House/Anastasia Shores Project)**

199.   Plaintiff incorporates by reference and re-alleges each of the allegations in

paragraphs 1 through 198 of this complaint, as though fully set forth herein.

200.   Van Dellen, Shellem, and Koon approved a loan to Villas Development

Corp. and TBD LLC for a project known as the Bluff House/Anastasia Shores Project.

This loan was entered into on July 28, 2005.  The loan involved a condominium

conversion of two existing apartment developments: (a) the Bluff House apartment

project consisting of 292 units in 30 buildings, 20 miles inland on a bluff just off the St.

Johns River in Orange Park, Florida; and (b) the Anastasia Shores project consisting of

164 two-bedroom-apartment units in 41 buildings with 4 units per building located on

13.5 acres of land one block west of the Atlantic Ocean in St. Augustine Beach, Florida.

The loan commitment was $46,850,000 and had a 21-month term.  Losses on this loan

exceed $13 million.

201.   Van Dellen, Shellem, and Koon approved this loan despite substantial

known risks and/or risks that should have been known in the exercise of due diligence,

including, but not limited to, the following:

a.   The South Florida real estate market was extremely overheated and

very susceptible to a significant downturn.

b.     The principal of the borrower was new to the South Florida condominium conversion market and new to IndyMac.  HBD also lacked recent experience in the South Florida market.

c.     Very marginal cash investment by the borrower and marginal profitability, leaving little capability to absorb any downward movement in the market.

d.     The loan anticipated an absorption period of nearly three years, and the profitability projections required annual price appreciation of 3.8% for the years 2005-2008.

e.     Investor sales were anticipated to be as high as 20-30% of the sales, a very risky proposition given that investors could pull out and drive the sale prices down.

f.     The Bluff House and Anastasia Shores projects were combined to evade the loan-to-value limits set forth in HBD policies governing condominium conversions.

g.     Together with another South Florida condominium conversion project (discussed below), the two deals represented a high dollar concentration with a single borrower.

h.     Perry was opposed to the loan but was pushed by HBD management to proceed forward with it.  Perry expressed that there was a disturbing lack of management judgment and discipline regarding the loan.

i.     The initial loan advance for the acquisition of Bluff House and Anastasia Shores was 115% of their appraised "as-is" values as apartments, in contravention of HBD's credit policy limit of 100% of appraised apartment "as-is" value.

j.     No reasonable steps were taken to assure the strength of the personal guarantee, including a failure to analyze the guarantor's contingent liabilities and

the financial strength of the guarantor's wife, who turned out to actually be the sole titleholder of many of the assets shown on the guarantor's financial statement. The guarantor's wife was never asked to co-sign the guarantee.

202.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac. The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

a.   Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.   Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.   Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.   Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.   Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.   Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

g.   Causing or allowing a loan to be made, renewed, and/or extended

despite poor and deteriorating market conditions.

      h.    Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

      i.    Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

203.   Van Dellen, Shellem, and Koon, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

204.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

205.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

206.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 16

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem and Koon Related to the Underwriting and Administration of a Loan to Villas Development Corp. and TBD LLC for the Hawthorne Grande Project)

207.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 206 of this complaint, as though fully set forth herein.

208.   Van Dellen, Shellem, and Koon approved a loan to Villas Development Corp. and TBD LLC for a project known as Hawthorne Grande.  This loan was entered

**COMPLAINT**

into on May 6, 2006.  The loan involved a condominium conversion of an apartment project previously known as the Alta Grande apartments, consisting of 306 one, two and three bedroom units located in Orlando, Florida.  The loan commitment was $46,295,000 and had a 24-month term.  Losses on this loan are nearly $9 million.

209.   Van Dellen, Shellem, and Koon approved this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

a.   The Florida real estate market was extremely overheated and very susceptible to a significant downturn.

b.   The principal of the borrower was new to the Florida condominium conversion market and new to IndyMac.  HBD also lacked recent experience in the South Florida market.

c.   Very marginal cash investment by the borrower and marginal profitability, leaving little capability to absorb any downward movement in the market.

d.   The existing poor performance of the Bluff House/Anastasia project (discussed above), which was selling at only about 50% of the expected rate, was ignored at the time this loan was approved.  There is an indication that the loan for the Bluff House/Anastasia project was in technical default at the time the loan for Hawthorne Grande was approved.

e.   Lenders on central Florida condominium conversions were tightening some requirements while being more selective about borrowers and projects, contrary to HBD's decision-making in approving this loan.

f.   The equity for the project relied primarily upon third party equity from Dutch Capital Partners, LLC, which would have significant control over the project but at the same time provided no guarantee on this loan.  Much of the remaining equity was to be provided by a mezzanine loan.

g.     The 306-unit project violated HBD's policy governing the maximum number of units to be developed, resulting in an increased risk that it would take longer to sell out the entire project and thus pay off the loan.

h.     Investor sales were anticipated to be as high as 20-30% of the sales, a very risky proposition given that investors could pull out and drive the sale prices down.

i.     Together with the Bluff House/Anastasia Shores project (discussed above), the two deals represented a high dollar concentration with a single borrower.

j.     Perry was opposed to the loan but was pushed by HBD management to proceed forward with the loan.  Perry expressed that there was a disturbing lack of management judgment and discipline regarding the loan.

k.     The loan had extensive variations from the original term sheet disclosed as part of the loan approval process, some of which appeared to be adjustments made to make an otherwise marginal loan meet underwriting requirements.  For example, cash flows assumed an increase in net operating income from the rental of unsold units from the $802 assumption in the term sheet to $1,011.  Indirect costs were assumed to have decreased from $813,200 to $323,500.  Taxes, insurance, bonds and miscellaneous were assumed to have decreased from $1,086,075 to $660,391.  The changes from the term sheet reflected changes that were less conservative and increased risk to the Bank.

l.     No reasonable steps were taken to assure the strength of the personal guarantee, including a failure to analyze the guarantor's contingent liabilities and the financial strength of the guarantor's wife, who turned out to actually be the sole titleholder of many of the assets shown on the guarantor's financial statement.  The guarantor's wife was never asked to co-sign the guarantee.

210.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence

should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

a.    Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.    Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.    Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.    Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.    Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.    Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

g.    Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h.    Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

i.    Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

211.   Van Dellen, Shellem, and Koon, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

212.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

213.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

214.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## I.    Counts Based on Allegations Related to the Loans Made By HBD in the Cambridge Homes Borrower Relationship.

### Count 17

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Koon Related to the Underwriting, Administration, Extension and Modification of a Loan to Cambridge Homes, Inc. for the Vineyards Project)

215.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 214 of this complaint, as though fully set forth herein.

216.   Van Dellen, Shellem, and Koon approved a loan to Cambridge Homes, Inc. for a project known as The Vineyards.  This loan was entered into on September 16, 2005, and provided financing for site development and construction of 63 single-family homes in Apple Valley, California.  Phases 1 through 7 were financed by Union Bank.

393199.1_DOC                                    -82-

**COMPLAINT**

HBD provided financing for phases 8 through 10.  This loan was to finance phases 11 through 13.  The project had tentative map approval, and a covenant for final map approval was set for 90 days after funding.  The loan commitment totaled $13,350,000 and had a 12-month term.  Losses on this loan are estimated at $400,000.

217.   The primary source of repayment of this loan was stated to be unit closings in the project.  While the CAM identifies the financial capacity of the borrower and guarantors as a secondary source of repayment, it also states that this loan was based on the quality of the transaction and not the financial strength of the borrower and guarantors.

218.   On January 31, 2006, HBD authorized a hard cost disbursement totaling nearly $85,000 through waiver of a covenant requiring an approved final tract map.  On February 15, 2006, HBD authorized another hard cost disbursement totaling nearly $116,000 despite not having a recorded final tract map.  HBD subsequently approved a number of draw requests despite the borrower not being in compliance with a minimum insurance requirement.  The insurance was inadequate because the borrower continued to build homes despite slow absorption, which resulted in too many completed and unsold homes.  In May 2006, there was standing inventory of 18 units despite a 10-unit maximum under a loan covenant.  On August 15, 2006 and August 29, 2006, HBD authorized draw requests despite the borrower not providing verification of compliance with the sales covenant.

219.   On September 18, 2006, HBD approved a six-month extension and reduced the sales covenant from five units per month to two units.  The loan modification memorandum noted slowing market conditions.

220.   On October 13, 2006 and October 31, 2006, HBD funded draw requests totaling approximately $685,000 despite the borrower being in noncompliance with the new sales covenant.

221.   On March 15, 2007, HBD approved a three-month extension to allow time

for a new appraisal, and new price reductions and incentives to produce more sales. The loan modification noted that the project was completed, but was not selling as projected. The borrower was to pay interest out of pocket. At that time, 22 closings were still required to repay this loan.

222. As of March 27, 2007, the "as-is" value of the property was $10,560,000. On September 28, 2007, HBD waived the borrower's inability to comply with the $2 million minimum liquidity requirement; the borrower's liquidity had dropped to $914,000.

223. On June 28, 2007, Van Dellen approved a 12-month extension at a reduced commitment of $5,754,000. There were 30 units remaining to be closed. The extension increased the size of this loan by $317,815 to fund the loan fee and interest reserve. HBD reduced the minimum liquidity covenant from $2 million to $1 million. There were nearly 30 months of supply in the submarket at the subject price point. As of November 30, 2007, the "as-is" value was $6.88 million. On July 11, 2008, HBD foreclosed on the property.

224. Van Dellen, Koon, and Shellem approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence. These risks include, but are not limited, to the following:

a. The CAM notes that the Apple Valley was a commuter market. In addition, the CAM notes that the area was hit hard during the last recession, and that "history sometimes repeats itself." The CAM specifically notes that land and homes were not easy to sell during the last downturn.

b. The borrower had very little cash in this transaction (2.23%), and was permitted to use appraised/appreciated equity despite having controlled the land for only two years. HBD's credit policy required three years of control. Despite using appraised equity, the borrower and guarantors were still unable to provide the minimum 10% equity required under policy. Van Dellen's, Koon's, and Shellem's

decision to approve a loan with very little cash equity, insufficient overall equity, and a weak sponsorship resulted in a gamble that the project would be successful.

c.     The CAM notes that the borrower had built its phases ahead of closings.  In addition, this project was priced higher than comparable sales in the market.  Thus, there was a potential for absorption to be adversely impacted.

d.     Van Dellen's, Koon's, and Shellem's approval of this loan exceeded HBD's geographic concentration limit by nearly $85 million, and thus, exposed HBD to greater risk through lack of diversification.

e.     The net worth covenant required the guarantors to maintain a combined minimum net worth of $10 million.  This covenant was too low given the fact that the combined net worth of the borrower and guarantors was $28.7 million.  In other words, the borrower and guarantors could not only lose two-thirds of their net worth, but they could permit their net worth to decline below the loan commitment amount.  HBD's decision to approve a loan with an insufficient net worth covenant significantly impaired the beneficial impact of having the covenant.

f.     The combined liquidity of the borrower and guarantors was $2.76 million.  However, $2,385,289 of that amount was established through lines of credit.  The CAM stated bluntly that "support for this deal is based on the success of the previous phases and the current sales rate of the subject's phases, not the financial support of the borrower/guarantors."  HBD's approval of this loan to a borrower and guarantors who possessed virtually no cash liquidity was incredibly risky.  Van Dellen, Koon, and Shellem appear to have placed sole reliance on past project performance, and showed no concern for a change in market conditions.

g.     HBD approved this transaction despite missing K-1s from the guarantors.  Thus, HBD performed inadequate due diligence in assessing the financial capacity of the sponsorship.  As a mitigant, the CAM stated that the

commitment was "based on the quality of the transaction not the financial strength of the borrower/guarantors."  This was evident as both guarantors had FICO scores below 700, and had a history of numerous tax liens and delinquencies.  In addition, there was no real analysis performed of the borrower's or guarantors' contingent liabilities.

225.   Van Dellen, Koon, and Shellem  knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Koon, and Shellem in regard to this loan include, but are not limited to, the following:

a.    Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.    Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.    Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.    Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.    Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

f.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

g.      Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

h.      Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

i.      Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

226.   Van Dellen, Koon, and Shellem  as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

227.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

228.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

229.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon  pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 18

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Koon Related to the Underwriting, Administration, Extension and Modification of a Loan to Cambridge Homes, Inc. for the Mira Monte Project)**

230.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 229 of this complaint, as though fully set forth herein.

231.   Van Dellen, Shellem, and Koon approved a loan to Cambridge Homes, Inc. for a project known as Mira Monte.  This AD&C loan was entered into on June 15, 2006, and provided financing for site development and construction of 84 single-family homes in Apple Valley, California.  The loan commitment totaled $23,700,000 and had an 18-month term.  The loan was projected to be fully repaid by December 2007.  Losses on this loan are estimated to exceed $5.5 million.

232.   The primary source of repayment of this loan was stated to be unit closings in the project.  While the CAM identifies the financial capacity of the borrower and guarantors as a secondary source of repayment, it also states that this loan was based on the quality of the transaction and not the financial strength of the borrower and guarantors.  Thus, this was essentially a project-only loan.

233.   At the time this loan was approved, the borrower had already required waivers of its covenant for a final tract map in the Cambridge Vineyards loan with HBD. The borrower also had more standing inventory than permitted, which rendered insurance on that project insufficient.  In May 2006, there was standing inventory of 18 units despite a 10 unit maximum under a loan covenant.  Thus, this borrower was already not performing to expectations.

234.   On February 2, 2007, HBD authorized Cambridge to start ten production homes and move the requirement related to funding a CFD to July 15, 2007.  A condition of this loan was to fund the Apple Valley CFD.

235.   In April 2007, the project was experiencing cost overruns requiring

**COMPLAINT**

adjustments to the construction budget.  This loan was ultimately over disbursed in several areas.

236.   As of June 15, 2007, the borrower and guarantors were past due in producing their tax returns, minimum liquidity reports, and unit closings.

237.   On June 26, 2007, HBD waived the closing requirement of 110 homes on the Vineyards project, as 99 of those homes had closed.  The borrower was allowed to start construction on 10 additional production homes for a total of 20 production homes, and four models in the Mira Monte project.

238.   On June 29, 2007, HBD approved a draw of $113,000 despite this loan not being in compliance with a sales covenant.  There were numerous waivers of loan covenants that occurred subsequent to this date where additional draws were authorized.  HBD also did not obtain updated appraisals expeditiously.

239.   In August 2007, HBD decided to reduce the number of homes in the project from 84 to 24.  This decision occurred too late, as loan maturity was only 60 days away.

240.   On September 6, 2007, HBD discussed the borrower's delinquent taxes, which appeared related to payroll.  This evidences HBD's failure to engage in adequate due diligence over the borrower's and guarantors' financials, including K-1 statements.

241.   On October 30, 2007, HBD account officer Shamlian finally concluded that "to continue with the vertical construction may not be a smart move at this time."

242.   Van Dellen, Koon, and Shellem approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.      The CAM notes that it would take 73 closings to repay the loan.  As the 73rd closing was to occur in the last month of the loan, any delay in closings would prevent this loan from paying off timely.  Accordingly, Van Dellen, Koon, and Shellem gave HBD a six-month option to extend.  The decision to approve a

loan that could commit HBD to two years of market exposure was unduly risky given the borrower's performance on existing loans with HBD.

b.      The CAM notes that absorption in San Bernardino County was showing signs of slowing.  In addition, the borrower was selling an inventory of competing homes only two miles away.  This competition could adversely impact absorption.  In addition, the property was located in an outlying market, which rendered it more susceptible to a softening market.

c.      The borrower had very little cash in this transaction.  Van Dellen's, Koon's, and Shellem's decision to approve a loan with very little cash equity, insufficient overall equity, and a weak sponsorship resulted in a gamble that the project would be successful.

d.      The advance rates for this loan were fairly high given the illiquid borrower and guarantors.  As Van Dellen, Koon, and Shellem were essentially wagering that the market would remain strong, they should have taken steps to create a bigger cushion for market declines.

e.      Van Dellen, Koon, and Shellem knew the borrower's Vineyards project (financed by HBD) was having difficulties, and yet agreed to fund this loan.

f.      Van Dellen, Koon, and Shellem  approved this loan despite the borrower's and guarantors' weak financial condition.  In addition, Van Dellen, Koon, and Shellem did not require a guarantee from Dave Faylor, who was a one-third owner of the borrower entity.

g.      The net worth covenant required the guarantors to maintain a combined minimum net worth of $10 million.  This covenant was too low given the fact that the combined net worth of the borrower and guarantors was $48.9 million.  In other words, the borrower and guarantors could not only lose 80% of their net worth, but they could permit their net worth to decline below the loan

commitment amount.  Van Dellen's, Koon's, and Shellem's decision to approve a loan with an insufficient net worth covenant significantly impaired the beneficial impact of having the covenant.

h.    The combined liquidity of the borrower and guarantors was weak. The CAM stated bluntly that "support for this deal is based on the success of the previous phases and the current sales rate of the subject's phases, not the financial support of the borrower/guarantor."  HBD's approval of this loan to a borrower and guarantors who possessed virtually no cash liquidity was incredibly risky.  Van Dellen, Koon, and Shellem appear to have placed sole reliance on past project performance, and showed no concern for a change in market conditions.

i.    Van Dellen, Koon, and Shellem  approved this transaction despite missing K-1s from the guarantors.  This is particularly shocking as they also did so with the prior Vineyard loan that was approved months earlier.  Van Dellen's, Koon's, and Shellem's failure to insist on obtaining these financials before approving this loan is inexplicable.  The due diligence was woefully inadequate in assessing the financial capacity of the sponsorship.  As a mitigant, the CAM stated that the commitment was "based on the quality of the transaction not the financial strength of the borrower/guarantors."  This was evident as both guarantors had FICO scores below 700, and had a history of numerous tax liens and delinquencies. In addition, there was no real analysis performed of the borrower's or guarantors' contingent liabilities.

243.   Van Dellen, Koon, and Shellem  knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Koon, and Shellem in regard to this loan include, but are not limited to, the following:

a.      Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.      Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.      Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.      Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.      Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.      Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h.      Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

i.      Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

**COMPLAINT**

j.      Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

244.   Van Dellen, Koon, and Shellem  as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

245.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

246.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Koon, and Shellem, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

247.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Koon, and Shellem pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 19

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem and Rothman Related to the Underwriting, Administration, Extension and Modification of a Loan to Lancaster-33rd  Street L.P. for the Jamestown Project)

248.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 247 of this complaint, as though fully set forth herein.

249.   Van Dellen, Shellem, and Rothman approved a loan to Lancaster-33rd Street, L.P. for a project known as Jamestown.  This AD&C loan was entered into on September 15, 2006, and provided financing for 18 single-family homes in Lancaster, California.  A tentative map was in place, which was projected to be final within two months of loan recordation.  The loan commitment totaled $4,640,000 and had an 18-month term.  Losses on this loan are estimated to exceed $750,000.

**COMPLAINT**

250.   The primary source of repayment of this loan was stated to be unit closings in the project.  The secondary source of repayment of this loan was stated to be the financial capacity of the borrower and guarantors.

251.   At the time this loan was approved, the borrower had already required waivers of its covenant for a final tract map in the Cambridge Vineyards loan with HBD. The borrower also had more standing inventory than permitted, which rendered insurance on that project insufficient.  In May 2006, there was standing inventory of 18 units despite a 10-unit maximum under a loan covenant.

252.   As of February 27, 2007, the borrower and guarantors were 58 days past due on their minimum net worth requirement; vertical construction was two months past due; and sales start date was already past due.

253.   As of July 16, 2007, HBD noted that the final map was recorded and sales had started.  Vertical construction was to finally commence.  On August 14, 2007, HBD approved a reduction of the minimum liquidity covenant from $2 million to $1 million. On August 14, 2007, the "as-is" value for the property was $1,557,121.

254.   This loan had numerous instances of default.  Specifically, it defaulted on liquidity on September 10, 2007; net worth on December 31, 2007; past due interest on November 30, 2007; tax returns on November 15, 2007; and unit closings on February 2008.

255.   As of April 3, 2008, the project was 65% complete.  The timeline on the project was pushed out due to a 9-month delay in recording the final map.  A receiver was in place.  The "as-is" value was $1,843,000, and the outstanding amount was $1,570,702.

256.   Van Dellen, Shellem, and Rothman approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.      The CAM quotes from an appraisal report dated August 11, 2006. Specifically, it notes that absorption levels had slowed, and that there was downward pressure on pricing in the Antelope Valley.  The report states an opinion that absorption would remain at or below an average of 4.0 units per month, and that there would continue to be pressure on pricing with price decreases likely in many of the projects.

b.      The CAM notes that the project was located in an outlying market, which could impact absorption and pricing if market conditions continued to soften.

c.      At the time this loan was approved, Van Dellen, Shellem, and Rothman knew that the borrower had three other projects that were performing more slowly than expected.  Van Dellen, Shellem, and Rothman did not appreciate the risks associated with these underperforming projects.  This was true despite the CAM noting that one of the earlier projects had 19 unsold units and an absorption rate that was only 50% of projections.  This was particularly risky because HBD acknowledged that these loan approvals were based on the strength of the projects and not on the strength of the guarantors.

d.      The credit officer for this transaction observed that two other HBD projects with the borrower were not meeting absorption projections.  In addition, the credit officer noted that two other unrelated projects to other borrowers that were funded by HBD in the same market were not meeting absorption projections. Despite all of these warnings through first-hand experience, and the warning presented in the appraisal, Van Dellen, Shellem, and Rothman chose to issue a loan where there was little financial backing to constitute a meaningful secondary source of repayment.

e.      The credit officer's review memo states "Based on the borrower's existing two projects with IndyMac not meeting the absorption projections,

**COMPLAINT**

absorption and pricing pressures in the subject's market, and low liquidity of the guarantors, approval is not recommended based on the way the transaction is currently structured.  Account officer to consider tying the start date of vertical construction of the subject project to some minimum number of closings in the existing two projects."  Van Dellen, Shellem, and Rothman disregarded the credit officer's suggestion and approved the loan.

       f.     The borrower had very little cash in this transaction.  Van Dellen's, Shellem's, and Rothman's decision to approve a loan with very little cash equity, insufficient overall equity, and a weak sponsorship resulted in a gamble that the project would be successful.

       g.     Van Dellen, Shellem, and Rothman approved this loan despite the borrower's and guarantors' weak financial condition.  In addition, Van Dellen, Shellem, and Rothman did not require a guarantee from Dave Faylor, who was a one-third owner of the borrower entity.

       h.     The net worth covenant required the guarantors to maintain a combined minimum net worth of $10 million.  This covenant was too low given the fact that the combined net worth of the borrower and guarantors was $33.3 million.  In other words, the borrower and guarantors could lose one third of their net worth.  Van Dellen's, Shellem's, and Rothman's decision to approve a loan with an insufficient net worth covenant greatly limited any beneficial impact of having the covenant.

       i.     The borrower's and guarantors' combined net worth had declined approximately $15 million since HBD approved the Cambridge Mira Monte loan in June of 2006.  Van Dellen, Shellem, and Rothman did not demonstrate the requisite concern for this financial condition given the deteriorating market conditions, and the poor performance on the existing loans.

**COMPLAINT**

j.      The combined liquidity of the borrower and guarantors was weak. Van Dellen's, Shellem's, and Rothman's approval of this loan to a borrower and guarantors who possessed low liquidity was incredibly risky.  Van Dellen, Shellem, and Rothman appear to have placed sole reliance on past project performance, and showed no concern for a declining market conditions.

k.      Van Dellen, Shellem, and Rothman did not engage in sufficient due diligence to assess the borrower's and guarantors' contingent liabilities, which greatly increased risks in a down market.

257.   Van Dellen, Shellem, and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Rothman in regard to this loan include, but are not limited to, the following:

a.      Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.      Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.      Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.      Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.      Causing or allowing a loan to be made without taking proper and

393199.1_DOC                                    -97-
**COMPLAINT**

reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.     Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g.     Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h.     Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

i.     Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

j.     Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

258.   Van Dellen, Shellem, and Rothman as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

259.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

260.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Rothman, and Shellem, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

261.   With respect to all of their actions and inactions in managing and

administering the affairs of IndyMac, Van Dellen, Rothman, and Shellem pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**J.     Counts Based on Allegations Related to the Loans Made By HBD in the McComic Consolidated, Inc. Borrower Relationship.**

**Count 20**

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Koon Related to the Underwriting, Administration, Extension and Modification of a Loan to Darby Road 19, LLC for the Darby Road Project)**

262.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 261 of this complaint, as though fully set forth herein.

263.   Van Dellen, Shellem, and Koon approved a loan to Darby Road 19, LLC for a project known as Darby Road.  This loan was entered into on November 3, 2005, and provided financing for the acquisition, development, and construction of 19 homes (16 production and 3 models) situated on 4.77 acres in the unincorporated community of Bermuda Dunes, which was in the sphere of influence of the City of La Quinta.  The loan commitment totaled $9,155,000 and had a 19-month term.  Losses on this loan are estimated at $300,000.

264.   The primary source of repayment of this loan was stated to be unit closings in the project.  The secondary source of repayment of this loan was stated to be a full recourse guarantee from R. Barry McComic ("McComic").

265.   On May 23, 2007, this loan was extended 90 days to September 1, 2007.  A final tract map had not yet been approved.

266.   On September 24, 2007, a new CAM was submitted by account officer Terwilliger to extend this loan an additional three months.  On October 11, 2007, the 90-day extension was approved, but all future disbursements apart from interest payments were suspended.  In addition, this loan's debt-to-equity covenant and reporting

requirements became more stringent.  On December 27, 2007, this loan was collapsed to the unpaid balance.  On February 1, 2008, a notice of default was filed.

267.   Van Dellen, Shellem, and Koon approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.   The project had a number of hurdles to development that created uncertainty and risk.  For example, a final tract map could not be approved until annexation into the City of La Quinta, and the borrower intended to seek a zone change from R1-12,000 to R-L in order to reduce the minimum lot size.

b.   At the time of underwriting, the borrower's improvement plans and final budget for the project were a few months away from completion.  In fact, the improvement infrastructure and home plans were not completed at the time this loan closed, and everything was based on estimates.  The appraisal of the homes would not be completed until after annexation and after the improvement plans were completed.  There was a possibility that the budget would have to be revised.  Thus, the CAM notes that this loan may need to be rebalanced to maintain a loan amount of the lesser of 85% loan-to-cost or 85% loan-to-value.  This uncertainty carried additional risk.  Nonetheless, Van Dellen, Koon, and Shellem committed to a construction loan well in advance of home construction, and prior to receiving final plans and a final budget.

c.   The profit margin for the project was 7% versus a 10% policy requirement.  This left little room for the borrower to cut prices in order to respond to potential market declines.

d.   This loan contemplated a single phase consisting of all 19 homes, which resulted in greater risk to HBD due to potential absorption difficulties and greater exposure of loan funds.

e.     Terwilliger acknowledged that the loan per unit of $481,842 was high and may not have been that high anywhere else in Riverside County.

f.     McComic and McComic Consolidated had total adjusted assets of $200.5 million, and net worth of $60.2 million.  But they had total contingent liabilities of approximately $253.3 million, and current outstanding balances of $87.4 million.  In addition, the majority of their debt was for projects that were in the early phases of development.  Thus, the guarantors were heavily leveraged, and may not have offered a meaningful secondary source of repayment.  In fact Terwilliger acknowledged that the contingent liabilities of $234 million and the level of liquidity rendered the guarantors unable to repay this loan given a market decline.

g.     Van Dellen, Koon, and Shellem established a minimum net worth covenant of $7.5 million, which was low given the stated net worth of the borrower/guarantor at underwriting totaling $60.2 million.  In fact, the assigned credit officer noted this concern, but Van Dellen, Koon, and Shellem approved this loan nonetheless.

h.     The borrower had to rely on The Price Group to provide 90% of the cash equity required for the project.  The Price Group secured its investment with a second trust deed.  Thus, the borrower had very little of its own cash in the transaction, which increased risk.

i.     The borrower was heavily concentrated in the Riverside Desert submarket, which increased risk to the Bank.  The financial analyst on this loan noted that HBD was aware of McComic's high concentration in the submarket at the time this loan was originated.  That market area would later experience substantial market declines.

268.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who

reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

a.     Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.     Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.     Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.     Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.     Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.     Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g.     Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h.     Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same

market.

      i.     Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

      j.     Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

269.   Van Dellen, Koon, and Shellem as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

270.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

271.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Koon, and Shellem, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

272.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Koon, and Shellem pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 21

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Koon, and Shellem Related to the Underwriting, Administration, Extension and Modification of a Loan to Apple Valley Homes 26, LLC for the Apple Valley 26 Project)**

273.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 272 of this complaint, as though fully set forth herein.

274.   Van Dellen, Shellem, and Koon approved a loan to Apple Valley Homes 26, LLC for a project known as Apple Valley 26.  This loan was entered into on March 7,

**COMPLAINT**

2006, and provided financing for the acquisition, development, and construction of 26 homes on approximately 15 acres in Apple Valley, California.  This project was located adjacent to the borrower's 130-lot project known as Apple Valley 130.  The loan commitment totaled $8,762,000 and had an 18-month term with one six-month extension at HBD's option.  Losses on this loan are estimated to exceed $310,000.

275.   The primary source of repayment of this loan was stated to be unit closings in the project.  The secondary source of repayment of this loan was stated to be financial support by the guarantors.

276.   The project had two separate parcel maps that were expected to be consolidated into one final map.  The borrower planned to build all 26 production homes in one phase that would range in size from 2,412 square feet to 3,422 square feet, and would be priced between $435,000 and $535,000.  The property had an approved tentative map, and the borrower anticipated receiving a final map and complete improvement plans by September 31, 2006, at which time it would start site and lot improvements.  Vertical construction was planned to commence around January 2007, and sales would open in February 2007.

277.   As of September 17, 2007, the borrower had not yet received a final map.  HBD noted that it would likely convert Apple Valley 26 to an A&D loan because the borrower was no longer likely to build out the homes.  Thus, HBD approved removing the sales and closing covenants and agreed to extend the covenant to receive a final map from July 31, 2007 to January 31, 2009.

278.   On October 11, 2007, a first letter agreement extended the maturity date from September 6, 2007 to December 6, 2007.  In addition, no further disbursements would be made except for interest payments that would be paid from the interest reserve.  The CAM requesting this extension noted that the Riverside Desert submarket and San Bernardino High Desert submarket were both experiencing a significant correction in home prices, demand, and absorption.  This caused supply to rise, high levels of builder

incentives, and weak absorption.  The San Bernardino Desert had over 46 months of supply.  The CAM further noted that the borrower and guarantors had only about $4.5 million of cash and approximately $218 million in liabilities.

279.   HBD filed a Notice of Default on February 1, 2008.  At that time, the property had not yet received final tract maps, and was still raw land.

280.   Van Dellen, Shellem, and Koon approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.   The borrower's final map, improvement plans, and final budget for the project were a few months away from completion when this loan was approved.  There was a possibility that the budget would have to be revised following a cost review.  Thus, the CAM noted that this loan may need to be rebalanced to maintain a loan amount of the lesser of 85% loan to cost or 80% loan to value.  This uncertainty carried additional risk.

b.   The CAM noted that there were a total of 543 lots/units that were unsold, unreleased, or would be developed and sold over the next two to three years in Apple Valley and Hesperia.  That sum included the 130-unit project being developed by McComic.  These units would have constituted competition for the Apple Valley 26 project, which would have had an adverse effect on absorption and pricing.  Account officer Terwilliger acknowledged that this project being located adjacent to Apple Valley 130 was a weakness because there were two competing projects in the same area.

c.   The property had an approved tentative map, and the borrower anticipated receiving a final map and completed improvement plans by September 31, 2006, at which time it would start site and lot improvements.  Vertical construction was planned to commence around January 2007, and sales would

open in February 2007.  Thus, vertical construction was not scheduled to commence until nine months after this loan was approved.

d.     This loan contemplated a single phase consisting of all 26 homes, which resulted in greater risk to HBD due to potential absorption difficulties and a greater exposure of loan funds.

e.     The project was located in a commuter market, and thus, would have been one of the first markets to be adversely impacted in a down market.

f.     McComic and McComic Consolidated had 1,091 units in their portfolio, including 655 lots.  Including this loan, and the 15 existing projects in McComic's portfolio, McComic had remaining commitments of approximately $260.7 million, with approximately $122.3 million outstanding.  Of the $260.7 million, $226.9 million had recourse to McComic.  The borrower's and guarantor's total assets were $231.7 million, total liabilities were $142.1 million, and net worth was $89.6 million.  Thus, the sponsorship was heavily leveraged, and did not offer a meaningful secondary source of repayment.

g.     The borrower had to rely on The Price Group to provide 90% of the cash equity required for the project.  The Price Group secured its investment with a second trust deed.  Thus, the borrower had very little of its own cash in the transaction, which increased risk.

h.     The CAM noted that of the combined net worth of $82.7 million for the borrower and guarantors, the investors' share was $37.6 million, which understated leverage if the investors' share was treated as liabilities.

i.     Van Dellen, Shellem, and Koon established a minimum-net-worth covenant of $7.5 million, which was low given the stated net worth of the borrower/guarantor at underwriting totaling $82.7 million.

j.     The borrower was heavily concentrated in the Riverside Desert submarket, which increased risk to the Bank.  The financial analyst for this loan

acknowledged that HBD was aware of McComic's high concentration in the submarket at the time this loan was approved.

281.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

a.   Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.   Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.   Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.   Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.   Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.   Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h.      Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

i.      Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

j.      Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

282.   Van Dellen, Koon, and Shellem as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

283.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

284.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Koon, and Shellem, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

285.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Koon, and Shellem pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**COMPLAINT**