1

**<u>Count 22</u>**

2

**<u>(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem and</u>**

3

**<u>Koon Related to the Underwriting, Administration, Extension and Modification of a</u>**

4

**<u>Loan to Apple Valley Homes 130, LLC for the Apple Valley 130 Project)</u>**

5

    286.   Plaintiff incorporates by reference and re-alleges each of the allegations in

6

paragraphs 1 through 285 of this complaint, as though fully set forth herein.

7

    287.   Van Dellen, Shellem, and Koon approved a loan to Apple Valley Homes

8

130, LLC for a project known as Apple Valley 130.  This A&D loan was entered into on

9

July 6, 2006, and provided financing for a 129-lot-subdivision project located in Apple

10

Valley, California.  The property was vacant land that had an approved tentative map.

11

The borrower intended to complete site development by December of 2006, at which

12

time the borrower would secure a construction loan to finance the construction of 129

13

homes.  The 12-month loan term was requested as a buffer for potential development

14

delays.  The loan commitment totaled $13,445,000.  Losses on this loan are estimated to

15

exceed $6.5 million.

16

    288.   The CAM stated that the borrower only wanted an A&D loan because the

17

cash equity requirement was $4 million less than an AD&C loan.  This project was

18

located adjacent to the borrower's 26-unit project known as Apple Valley 26.  While the

19

floor plans for the two projects were identical, the homes in Apple Valley 130 appraised

20

higher because they were part of a gated community, and because of market appreciation.

21

Apple Valley 130, LLC was a project-specific-California-limited-liability company

22

formed on April 25, 2005.  The members of Apple Valley 130 LLC consisted of:  (1) The

23

Price Group – Member with 51% interest; (2) McComic Consolidated, Inc. – Member

24

and Manager with 30.6% interest; (3) Allen Weingarten, member with 17.8% interest; (4)

25

Weitzen Trust, member with 2.0% interest.

26

    289.   The primary source of repayment of this loan was to be a construction loan

27

from IndyMac or another financial institution.  The secondary source of repayment of this

28

**COMPLAINT**

1   loan was stated to be the financial support of McComic Consolidated, Inc. and McComic.

2      290.   Approval of a final map was delayed and lot development did not begin until

3   March 2007.  On July 27, 2007, a first letter agreement was executed that extended this

4   loan's maturity to October 5, 2007.  It also required that monthly interest be paid from the

5   interest reserve until depleted, at which time the interest reserve would be replenished

6   from contingency loan funds.

7      291.   On September 27, 2007, an updated appraisal revealed an impairment based

8   on the "as-is" value totaling $5,610,000.  This loan matured on October 5, 2007.

9   On December 7, 2007, the borrower executed a forbearance agreement that expired on

10  February 5, 2008.  The loan maturity was not extended and the loan commitment was

11  collapsed and reduced to $12,269,346.  On January 9, 2008, a notice of default was filed,

12  and HBD subsequently foreclosed on the property.  The unpaid balance at the time of

13  foreclosure was $10,762,968, and the foreclosure bid was $2,491,360.  Thus, the initial

14  charge off was $8,271,608.  HBD subsequently sold the Bank owned property ("REO")

15  for $4,242,774, which resulted in a net gain on sale of $1,751,414.  Thus, the net loss was

16  $6,520,194.

17     292.   Van Dellen, Shellem and Koon approved, renewed and/or extended this loan

18  despite substantial known risks and or risks that should have been known in the exercise

19  of due diligence.  These risks include, but are not limited, to the following:

20        a.   This loan contemplated repayment by a construction loan up to one

21     year after approval.  The substantial competition in the market area and the added

22     risk attributable to deteriorating market conditions resulting from a prolonged loan

23     commitment were significant.  It was unrealistic for Van Dellen, Shellem, and

24     Koon  to expect repayment by a subsequent construction loan.  In fact, the

25     appraisal projected 18.43 months of supply for this 129-unit project, which

26     translated to at least two years to build and sell the project.  The size of the project

27     was itself a policy exception for which no mitigant was provided.

28

b.      The CAM notes that there were a total of 666 lots/units that were unsold, unreleased, or would be developed and sold over the ensuing two to three years in Apple Valley and Hesperia.  That sum included the 156 units being developed by McComic in the two Apple Valley projects.  These units would constitute competition, which would have an adverse effect on absorption and pricing.

c.      The project's average appraised price placed it at the higher price point for the market area.  This would also have adversely impacted absorption.

d.      The project violated HBD's credit policy as it had a low 2.58% profit margin, which provided little flexibility for the borrower to reduce prices if the market declined and the borrower was unable to repay this loan with a subsequent construction loan.

e.      The assigned credit officer noted that this loan had high advance rates for lots that were designated for move-up housing.

f.      Terwilliger noted that the CAM stated that the project was located in a commuter market in order to inform the Junior Loan Committee of this weakness.  Terwilliger stated that if the market changed, one of the first markets to get hit would have been a commuter market.

g.      McComic and McComic Consolidated had 1,122 units in their portfolio.  Including the subject loan, and the 14 existing projects in McComic's portfolio, McComic had remaining commitments of approximately $265.9 million, with approximately $135.9 million outstanding.  Of the $265.9 million, $234.9 million had recourse to McComic.  The borrower's and guarantors' total assets were $250.1 million, total liabilities were $155.6 million, and net worth totaled $94.5 million.  Thus, the sponsorship was heavily leveraged, and did not offer a meaningful secondary source of repayment.  While the CAM attempts to mitigate McComic's contingent liabilities by pointing to $13.9 million in cash and

marketable securities, those liquid assets had actually declined nearly $7 million over the past four months.  Van Dellen, Shellem, and Koon did not appear to recognize the borrower's and guarantors' deteriorating financial condition at the time they approved this A&D loan.

h.     The borrower had to rely on The Price Group to provide a substantial portion of the cash equity required for the project.  The Price Group was the 51% owner of the borrower entity and controlled the borrower LLC such that it had the power to remove the manager, McComic Consolidated, at any time with or without cause.  Despite the substantial control maintained by The Price Group, no financial analysis or relationship analysis of The Price Group was conducted by HBD.  In addition, Van Dellen, Shellem, and Koon violated HBD credit policy by not requiring a personal guarantee from The Price Group; The Price Group was not a signatory on the promissory note, the building loan agreement, or the deed of trust.  In fact, Terwilliger commented that The Price Group was not even asked to guarantee this loan.  The financial analyst on this transaction, James Pham, noted that HBD would ordinarily not make a loan if the controlling interest of the LLC was not guaranteeing the loan because it was a matter of "prudent underwriting."

i.     Van Dellen, Koon, and Shellem established a minimum-net-worth covenant of $7.5 million, which was low given the stated net worth of the borrower and guarantor at underwriting totaling $94.5 million.

j.     The CAM noted that of the combined net worth of $94.5 million for the borrower and guarantors, the investors' share was $37.6 million, which understated leverage if the investors' share was treated as liabilities.

k.     The borrower was heavily concentrated in the Riverside Desert submarket, which increased risk to the Bank.  The financial analyst for this loan noted that HBD was aware of McComic's high concentration in the submarket at the time this loan was originated.

293.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

a.   Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.   Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.   Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.   Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.   Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.   Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g.   Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h.    Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

k.    Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

l.    Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

294.   Van Dellen, Shellem, and Koon as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

295.   By their actions and inactions, as generally and specifically described above, Defendants failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

296.   As a direct and proximate result of the negligence and breach of fiduciary duties of Defendants, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

297.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Defendants pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 23

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen and Rothman Related to the Underwriting, Administration, Extension and Modification of a Loan to Lancaster Fields 35, LLC for the Lancaster 35 Project)

298.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 297 of this complaint, as though fully set forth herein.

299.   Van Dellen and Rothman approved a loan to Lancaster Fields 35 for a project known as Lancaster 35.  This loan was entered into on February 5, 2007, and provided financing for a 35-lot-subdivision project located in Lancaster, California.  This loan funded the land purchase, soft costs including architecture and engineering ($100,000), property taxes and insurance ($20,059), and other miscellaneous costs ($43,750).  Thus, while there were a few development aspects to this loan, it was underwritten as a land acquisition loan.  Approval of the final map was expected in April of 2008.  The loan had a 12-month term.  The loan commitment totaled $2 million and losses on this loan are estimated to exceed $1 million.

300.   The primary source of repayment of this loan was to be a highly speculative development and construction loan from IndyMac.  The secondary source of repayment of this loan was stated to be the financial support of the guarantors.

301.   An appraisal reported dated December 5, 2007 provided an "as-is" value of $450,000.  A notice of default was recorded on March 11, 2008.  HBD subsequently sold the note for this loan.  The outstanding loan balance on the date of sale was $1,685,222.31, and the sale price was $615,849.  Thus, the net loss on sale was $1,079,373.31.

302.   Van Dellen and Rothman approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.   The CAM stated that new home sales in the Antelope Valley plunged in the third quarter of 2006, falling to just one third of its level from the prior year.  At the same time, the number of active projects rose from 58 to 79.  The absorption rate dropped from 7.3 units per month to 1.8 units per month, and there were 17.5 months of supply in the project's submarket.  The CAM noted that the market had slowed significantly in recent months, which resulted in reduced demand for lots and lower land values.  The account officer observed that the market area was very

slow in sales and highly competitive.  These deteriorating market conditions rendered Van Dellen's and Rothman's decision to approve a loan that was to be repaid by a subsequent development and construction loan highly suspect.

b.      The "as-is" value for this loan was 76.2%, which violated the 65% policy limit applicable to land loans.  The stated mitigant was a limitation of the acquisition and soft costs (excluding financing costs) to $1.7 million prior to receipt of the tentative map.  While this effectively reduced the advance rate to 65%, Van Dellen's and Rothman's decision to approve a land loan at the maximum advance rate allowable by HBD credit policy given the deteriorating market conditions was irresponsible.

c.      This loan contemplated repayment by a development and construction loan up to one year after its approval.  The deteriorating market conditions and weakening sponsorship rendered it unreasonable for Van Dellen and Rothman to believe that such a loan would be approved in 2008.

d.      The project violated HBD's credit policy by having a low 0.41% profit margin, which provided little incentive for the borrower to build the project.  This was especially true because most of the cash equity came from other sources.

e.      The project's average price points were in the upper ranges for Antelope Valley, which would likely adversely impact absorption.

f.      McComic and McComic Consolidated had 1,437 lots in their portfolio.  In addition, McComic was in the process of purchasing 468 lots in Cool Springs, Texas, and 175 lots in King City, Oregon.  McComic had remaining commitments of approximately $305.4 million, with approximately $173.1 million outstanding.  In addition, his contingent liabilities totaled nearly $240 million.  Van Dellen and Rothman approved this loan despite a heavily leveraged sponsorship that did not offer a meaningful secondary source of repayment.

g.    The CAM noted that none of the three other IndyMac financed projects with McComic had started development.  Van Dellen and Rothman failed to take sufficient warning from McComic's failure to perform as expected on these other projects.

h.    The borrower had to rely on an investor and second trust deed lender to provide the bulk of the cash equity required for this loan.  The borrower was heavily concentrated in the Riverside Desert submarket which, according to the CAM, had 39.1 months of supply during the third quarter of 2006.

i.    Van Dellen and Rothman approved this loan without any covenants related to net worth, liquidity, or financial reporting.

303.   Van Dellen and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen and Rothman in regard to this loan include, but are not limited to, the following:

a.    Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.    Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.    Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.    Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.     Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.     Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g.     Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h.     Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

j.     Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

k.     Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

304.   Van Dellen and Rothman as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

305.   By their actions and inactions, as generally and specifically described above, Van Dellen and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

306.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

**COMPLAINT**

307. With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**K.      Counts Based on Allegations Related to the Loans Made By HBD in the Prosperity Real Estate Investors, Inc. Borrower Relationship.**

## Count 24

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Koon Related to the Underwriting and Administration of a Loan to Bordeaux SB, LLC for the Bordeaux Project)**

308. Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 307 of this complaint, as though fully set forth herein.

309. Van Dellen, Shellem, and Koon approved a loan to Bordeaux SB, LLC for a project known as Bordeaux. This loan was entered into on November 8, 2005. The loan involved the construction and renovation of 104 apartment units into for-sale condominiums in San Bernardino, California. The loan commitment was $15,385,000 and had an 18-month term. Losses on this loan exceed $2.2 million.

310. Van Dellen, Shellem, and Koon approved this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

   a.      The profit margin on the project was 8.83%, less than the 10% minimum required by HBD policy.

   b.      The value of the collateral as an apartment was less than the acquisition price paid by the borrower.

   c.      The borrower's principals had limited condominium conversion experience and less than the minimum experience of five years required by HBD policy.

   d.      The borrower was a single-purpose entity, so guarantor financial

support was critical.  Yet the guarantors had lower liquidity and lower assets, and their contingent liabilities do not appear to have been analyzed.

311.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

a.     Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.     Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.     Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.     Causing or allowing a loan to be made with deficient collateral.

e.     Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

f.     Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

g.     Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

312.   Van Dellen, Shellem, and Koon, as officers, owed IndyMac the obligation to

exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

313.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

314.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

315.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 25

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Koon Related to the Underwriting and Administration of a Loan to Spring Lake Anaheim, LLC for the Spring Lake Project)

316.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 315 of this complaint, as though fully set forth herein.

317.   Van Dellen, Shellem, and Koon approved a loan to Spring Lake Anaheim, LLC for a project known as Spring Lake.  This loan was entered into on June 27, 2006. The loan involved the conversion of 54 apartment units into for-sale condominiums in Anaheim, California.  The loan commitment was $14,960,000 and had a 15-month term. Losses on this loan exceed $3.1 million.

318.   Van Dellen, Shellem, and Koon approved this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

a.      The Southern California real estate market was known by Van Dellen,

Shellem, and Koon to be in decline at the time of loan approval.

b.     The profit margin on the project was 8.18%, less than the 10% minimum required by HBD policy.

c.     The initial loan advance for the acquisition of the apartments exceeded that which was allowed under HBD's credit policies such that the "as-is" apartment value of the project would not provide adequate debt coverage.

d.     The borrower's principals had limited condominium conversion experience and less than the minimum experience of five years required by HBD policy.

e.     The final tract map for the project was not expected until early 2007, well over six months after loan origination.

f.     The borrower was a single-purpose entity, so guarantor financial support was critical.  Yet the guarantors had lower liquidity and lower assets, and their contingent liabilities do not appear to have been analyzed.

319.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

a.     Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.     Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.     Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or

guarantor, and the prospective source of repayment, and the security provided for the loans.

       d.    Causing or allowing a loan to be made with deficient collateral.

       e.    Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

       f.    Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

       g.    Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

       h.    Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

320.   Van Dellen, Shellem, and Koon, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

321.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

322.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

323.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**L.** **Counts Based on Allegations Related to the Loans Made By HBD in the Reynen & Bardis Borrower Relationship.**

## Count 26

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Koon Related to the Underwriting and Administration of a Loan to Reynen & Bardis (Quail Hollow), L.P. for the Quail Hollow Project)

324.    Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 323 of this complaint, as though fully set forth herein.

325.    Van Dellen, Shellem, and Koon approved a loan to Reynen & Bardis (Quail Hollow), L.P. for a project known as Quail Hollow.  This loan was entered into on November 28, 2005.  The loan involved the acquisition and development of 181 single-family-residence lots in Linda, California, which is located approximately a one-hour drive from Sacramento.  The lots were to be used to construct 181 single-family residences for eventual sale.  The loan commitment totaled $21,000,000 and had a 20-month term.  Losses on this loan exceed $7.5 million.

326.    Van Dellen, Shellem, and Koon approved this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

a.    The Sacramento market was extremely overheated, with prices having increased nearly 70% over a four-year period, and there were clear signs at the time of the loan approval that sales were slowing.

b.    Linda was an outlying community located nearly one hour outside of downtown Sacramento and thus extremely susceptible to a slowing market.

c.    Although the project site was located over an hour's drive from Sacramento, the market conditions analyzed were for the Sacramento region, not the more relevant immediate area around Linda.  Further, the appraiser relied on comparable land sales that were between one and one and a half years old.

d.     A directly competing project less than half a mile away was an IndyMac-financed project under development by Corinthian Homes, whose principal, Christo Bardis, was also the principal and guarantor of the borrower, creating a scenario where two HBD clients were competing against each other and resulting in an unreasonably high concentration of future home supply to a relatively sparse local population.

e.     The loan term was nearly double the HBD policy maximum of 12 months for A&D loans, creating a risk that the extended term would lead to delayed construction and sale of the planned single-family residences.

f.     The total amount of IndyMac loans to the two key principals of the borrower (who were also the loan guarantors) equaled approximately $145 million, far exceeding the standard HBD policy maximum of loans to one borrower of $30 million.

g.     Financial information for the two guarantors was not consolidated and was comprised of many inter-related partnerships and limited liability companies, making it difficult to accurately evaluate the guarantors' true financial strength and liquidity.  Further, financial statements for the guarantors were at least one-year old.

h.     The liquidity of the two guarantors was extremely low, with one guarantor having a liquidity-to-debt ratio of .01:1 and the other at .00:1.  One guarantor had a very low credit score that fell well below HBD policy.  The principal guarantor was heavily invested in land throughout Sacramento and its surrounding areas, including riskier raw and unentitled land assets, leaving him particularly susceptible to a market slow down.

i.     The combined liquidity covenant of $1 million for each of the loan guarantors was very low, especially given the significant financial obligations they had undertaken, which as of June 20, 2005 included over $330 million in

contingent liabilities.  The account officer conceded that a $5 million liquidity covenant for each guarantor would have been better.

j.      The loan guarantee included language that arguably could be interpreted to actually extinguish the guarantee and render it totally ineffective as a means of enforcing a second source of repayment.

k.      The account officer conceded that if there was a downturn in the real estate market, the guarantors would be unable to repay the loan.

327.    Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

a.      Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.      Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.      Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.      Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.      Causing or allowing a loan to be made, extended, and/or renewed with inadequate or problematic appraisals.

**COMPLAINT**

f.      Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

g.      Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

h.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

i.      Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

j.      Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

328.   Van Dellen, Shellem, and Koon, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

329.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

330.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

331.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

COMPLAINT

## Count 27

## (Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Koon Related to the Underwriting and Administration of a Loan to Reynen & Bardis (Oak Valley) L.P. for the Oak Valley Project)

332.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 331 of this complaint, as though fully set forth herein.

333.   Van Dellen, Shellem, and Koon approved a loan to Reynen & Bardis (Oak Valley) L.P. for a project known as Oak Valley.  This loan was entered into on March 29, 2006.  The loan involved the acquisition and development of 161 single-family-residence lots and a 132-unit-multi-family site located in Chico, California.  The lots were to be used to construct 161 single family residences for eventual sale.  The loan commitment totaled nearly $16.7 million and had an initial 16-month term.  Losses on this loan are nearly $3.5 million.

334.   Van Dellen, Shellem, and Koon approved this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

   a.   Home prices had more than doubled in Chico since 2001, and the average sales price at the time of loan origination of $339,242 had led many potential home buyers to decide to rent instead, creating a risk that the lots and homes to be developed would not sell well enough to repay the loan.

   b.   New home sales in Chico had slowed by nearly 50% at the time of loan approval.

   c.   The total number of units to be developed was 293 units, more than double HBD's policy maximum of 125 units, resulting in a project that was more susceptible to a lengthy absorption process.

   d.   The project only had a proposed tentative tract map, and the borrower planned to seek an amendment to the tentative map with uncertain approval of such

a request or the final map.

e.     The loan term exceeded the HBD policy maximum of 12 months for A&D loans, creating a risk that the extended term would lead to delayed construction and sale of the planned single family residences.

f.     There was a significant risk that the loan term would expire long before the planned home sales would be completed and the loan could be paid off.

g.     The total amount of IndyMac loans to the two key principals of the borrower (who were also the loan guarantors) equaled approximately $145 million, far exceeding the standard HBD policy maximum of loans to one borrower of $30 million.

h.     Financial information for the two guarantors was not consolidated and was comprised of many inter-related partnerships and limited liability companies, making it difficult to accurately evaluate the guarantors' true financial strength and liquidity.

i.     The liquidity of the two guarantors was extremely low, with one guarantor having a liquidity to debt ratio of .01:1 and the other at .00:1.  One guarantor had a very low credit score that fell well below the HBD policy minimum score.

j.     The combined liquidity covenant of $1 million for each of the loan guarantors was very low, especially given the significant financial obligations they had undertaken, which as of June 20, 2005 included over $330 million in contingent liabilities.  The account officer conceded that a $5 million liquidity covenant for each guarantor would have been better.

k.     The loan guarantee included language that arguably could be interpreted to actually extinguish the guarantee and render it totally ineffective as a means of enforcing a second source of repayment.

l.     The account officer conceded that if there was a downturn in the real

estate market, the guarantors would be unable to repay the loan.

335.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

a.   Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.   Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.   Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.   Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.   Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.   Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

g.   Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h.   Causing or allowing a loan to be made, renewed or extended where

there was very little likelihood of the loan repaying within the term of the loan.

336.   Van Dellen, Shellem, and Koon, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

337.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

338.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

339.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 28

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Koon Related to the Underwriting and Administration of Three Loans to Reynen & Bardis Communities, Inc. for the Edgewater Unit 13, 14 & 15 Project)

340.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 339 of this complaint, as though fully set forth herein.

341.   Van Dellen, Shellem, and Koon approved three loans to Reynen & Bardis Communities, Inc. for a project known as Edgewater Unit 13, 14 & 15.  These loans were entered into on April 18, 2006 and March 29, 2007.  The loans involved the acquisition and development of 165 single-family-residence lots in Linda, California, which is located approximately a one-hour drive from Sacramento, and the construction of 165 single-family residences on those lots for eventual sale.  The total loan commitment for the three loans was just under $48 million, and the first two loans had an initial 15-month

term while the third loan had a term of 14 months.  Losses on these three loans exceed $5.3 million.

342.   Van Dellen, Shellem, and Koon approved these loans despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

a.   The Sacramento market was extremely overheated, with prices having increased nearly 70% over a four-year period, and there were clear signs at the time of the loan approval that sales were slowing.

b.   Linda was an outlying community located nearly one hour outside of downtown Sacramento and thus extremely susceptible to a slowing market.

c.   Although the project site was located over an hour's drive from Sacramento, the market conditions analyzed were for the Sacramento region, not the more relevant immediate area around Linda.

d.   A directly competing project less than half a mile away was an IndyMac-financed project under development by Corinthian Homes, whose principal, Christo Bardis, was also the principal and guarantor of the borrower, creating a scenario where two HBD clients were competing against each other and resulting in an unreasonably high concentration of future home supply to a relatively sparse local population.

e.   In violation of HBD policy, the borrower was to receive cash in excess of project costs upon closing and funding of the loan.

f.   The loan term for the loan originated in March 2007 was to expire approximately 15 months before the loan was projected to be paid off.

g.   The total amount of IndyMac loans to the two key principals of the borrower (who were also the loan guarantors) equaled approximately $145 million, far exceeding the standard HBD policy maximum of loans to one borrower of $30 million.

h.    Financial information for the two guarantors was not consolidated and was comprised of many inter-related partnerships and limited liability companies, making it difficult to accurately evaluate the guarantors' true financial strength and liquidity.

i.    The liquidity of the two guarantors was extremely low, with one guarantor having a liquidity to debt ratio of .01:1 and the other at .00:1.  One guarantor had a very low credit score that fell well below the HBD policy minimum score.  The principal guarantor was heavily invested in land throughout Sacramento and its surrounding areas, including riskier raw and unentitled land assets, leaving him particularly susceptible to a market slow down.

j.    The combined liquidity covenant of $1 million for each of the loan guarantors was very low, especially given the significant financial obligations they had undertaken, which as of loan approval included over $500 million in contingent liabilities.  The account officer conceded that a $5 million liquidity covenant for each guarantor would have been better.

k.    The loan guarantee included language that arguably could be interpreted to actually extinguish the guarantee and render it totally ineffective as a means of enforcing a second source of repayment.

l.    The account officer conceded that if there was a downturn in the real estate market, the guarantors would be unable to repay the loan.

343.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to these loans include, but are not limited to, the following:

a.    Causing or allowing a loan to be made to a borrower and guarantors

who were or should have been known to be not creditworthy and/or in financial difficulty.

b.     Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.     Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.     Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.     Causing or allowing a loan to be made, extended, and/or renewed with inadequate or problematic appraisals.

f.     Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

g.     Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

h.     Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

i.     Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

j.     Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

k.     Causing or allowing a loan to be made, renewed or extended where

there was very little likelihood of the loan repaying within the term of the loan.

344.   Van Dellen, Shellem, and Koon, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

345.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

346.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

347.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 29

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem and Rothman Related to the Underwriting and Administration of Two Loans to Reynen & Bardis Communities, Inc. for the Arbors at Edgewater Project)

348.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 347 of this complaint, as though fully set forth herein.

349.   Van Dellen, Shellem and Rothman approved two loans to Reynen & Bardis Communities, Inc. for a project known as Arbors at Edgewater.  These loans were entered into on November 30, 2006 and July 26, 2007.  The loans involved the acquisition and development of 77 single-family-residence lots in Linda, California, which is located approximately a one-hour drive from Sacramento, and the construction of 77 single-family residences on those lots for eventual sale.  The total loan commitment for the two loans was $15,775,000, and the first loan had an initial 19-month term while

the second loan had a term of 11 months.  Losses on these two loans are nearly $2.8 million.

350.   Van Dellen, Shellem and Rothman approved these loans despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

a.     The Sacramento market was extremely overheated, with prices having increased nearly 70% over a four-year period, and there were clear signs at the time of the loan approval that sales were slowing, including evidence that many new home builders were offering buyer incentives to sell the built-up inventory of homes in the area.

b.     Linda was an outlying community located nearly one hour outside of downtown Sacramento and thus extremely susceptible to a slowing market.

c.     Although the project site was located over an hour's drive from Sacramento, the market conditions analyzed were for the Sacramento region, not the more relevant immediate area around Linda.

d.     A directly competing project less than half a mile away was an IndyMac-financed project under development by Corinthian Homes, whose principal, Christo Bardis, was also the principal and guarantor of the borrower, creating a scenario where two HBD clients were competing against each other and resulting in an unreasonably high concentration of future home supply to a relatively sparse local population.

e.     The loan term for the loan originated in July 2007 was to expire approximately 13 months before the loan was projected to be paid off.

f.     The total amount of IndyMac loans to the two key principals of the borrower (who were also the loan guarantors) equaled approximately $145 million, far exceeding the standard HBD policy maximum of loans to one borrower of $30 million.

g.     Financial information for the two guarantors was not consolidated and was comprised of many inter-related partnerships and limited liability companies, making it difficult to accurately evaluate the guarantors' true financial strength and liquidity.

h.     The financial information reported for the two guarantors at the time of loan approval in November 2006 was stale because it only went back to June 30, 2005, which violated HBD policy requiring personal financial statements to be dated within 12 months of a credit request.  This was particularly troublesome given the already very low liquidity of the guarantors.

i.     The liquidity of the two guarantors was extremely low, with one guarantor having a liquidity to debt ratio of .01:1 and the other at .00:1.  One guarantor had a very low credit score that fell well below HBD policy.  The principal guarantor was heavily invested in land throughout Sacramento and its surrounding areas, including riskier raw and unentitled land assets, leaving him particularly susceptible to a market slow down.

j.     The combined liquidity covenant of $1 million for each of the loan guarantors was very low, especially given the significant financial obligations they had undertaken, which as of loan approval included over $565 million in contingent liabilities.  The account officer conceded that a $5 million liquidity covenant for each guarantor would have been better.

k.     The loan guarantee included language that arguably could be interpreted to actually extinguish the guarantee and render it totally ineffective as a means of enforcing a second source of repayment.

l.     The account officer conceded that if there was a downturn in the real estate market, the guarantors would be unable to repay the loan.

351.   Van Dellen, Shellem and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who

reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem and Rothman in regard to these loans include, but are not limited to, the following:

a.     Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.     Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.     Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.     Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.     Causing or allowing a loan to be made, extended, and/or renewed with inadequate or problematic appraisals.

f.     Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

g.     Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

h.     Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

i.     Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same

market.

j.      Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

k.      Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

352.   Van Dellen, Shellem and Rothman, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

353.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

354.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

355.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 30

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem and Rothman Related to the Underwriting and Administration of a Loan to Riverpark Properties, LLC for the River Park at Dayton Project)

356.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 355 of this complaint, as though fully set forth herein.

357.   Van Dellen, Shellem and Rothman approved a loan to Riverpark Properties,

LLC for a project known as River Park at Dayton.  This loan was entered into on August 31, 2006.  The loan involved the acquisition and development of 102 single-family-residence-finished lots and 125 single-family-residence-paper lots in Dayton, Nevada, which is located approximately 20 miles east of Carson City and an hour's drive from Reno.  The lots were to be used to construct 227 single-family residences for eventual sale.  The total loan commitment was $13,959,000 and had a 22-month term.  Losses on this loan exceed $6.5 million.

358.   Van Dellen, Shellem and Rothman approved this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

a.   Home prices had risen 116% in the Reno area since 2001, with an average sales price in early 2006 of $357,000, causing home sales to slow in the area from 5-15 units per month to 2-8 units per month.  In addition, sales rates had declined due to a lack of supply of water.

b.   Dayton was an outlying community located about an hour outside of downtown Reno and thus extremely susceptible to a slowing market.

c.   The market conditions analyzed were for the Reno region, not the more relevant immediate area around Dayton including Carson City.

d.   The total number of units to be developed was 227 units, nearly double the typical HBD policy maximum of 125 units.

e.   The profit margin on the project was expected to be only 7.6%, below the HBD policy minimum of 10%, and potentially leaving the borrower little room to lower prices in a slowing market.

f.   The total amount of IndyMac loans to the two key principals of the borrower (who were also the loan guarantors) equaled approximately $145 million, far exceeding the standard HBD policy maximum of loans to one borrower of $30 million.

g.     Financial information for the two guarantors was not consolidated and was comprised of many inter-related partnerships and limited liability companies, making it difficult to accurately evaluate the guarantors' true financial strength and liquidity.

h.     The financial information reported for the two guarantors at the time of loan approval in August 2006 was stale because it only went back to June 30, 2005, which violated HBD policy requiring personal financial statements to be dated within 12 months of a credit request.  This was particularly troublesome given the already very low liquidity of the guarantors.

i.     The liquidity of the two guarantors was extremely low, with one guarantor having a liquidity to debt ratio of .01:1 and the other at .00:1.  One guarantor had a very low credit score that fell well below the HBD policy minimum score.

j.     The combined liquidity covenant of $1 million for each of the loan guarantors was very low, especially given the significant financial obligations they had undertaken, which as of June 20, 2005 included over $330 million in contingent liabilities.  The account officer conceded that a $5 million liquidity covenant for each guarantor would have been better.

k.     The loan guarantee included language that arguably could be interpreted to actually extinguish the guarantee and render it totally ineffective as a means of enforcing a second source of repayment.

l.     The account officer conceded that if there was a downturn in the real estate market, the guarantors would be unable to repay the loan.

359.   Van Dellen, Shellem and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van

Dellen, Shellem and Rothman in regard to this loan include, but are not limited to, the following:

a.      Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.      Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.      Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.      Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.      Causing or allowing a loan to be made, extended, and/or renewed with inadequate or problematic appraisals.

f.      Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

g.      Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

h.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

360.   Van Dellen, Shellem and Rothman, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

361.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

362.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

363.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 31

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Koon Related to the Underwriting and Administration of a Loan to Reynen & Bardis (Spring Lake), L.P. for the Spring Lake Project)

364.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 363 of this complaint, as though fully set forth herein.

365.   Van Dellen, Shellem, and Koon approved a loan to Reynen & Bardis (Spring Lake), L.P. for a project known as Spring Lake.  This loan was entered into on July 18, 2005.  The loan involved the acquisition of 113 acres of vacant, agricultural land in Woodland, California, which is approximately 20 minutes from downtown Sacramento.  The land was to be entitled to accommodate 661 single-family-residence lots, with half of the lots expected to be sold to Lennar and the other half to be further developed with another IndyMac site-development loan.  The total loan commitment was $12,500,000 and had an 18-month term.  Losses on this loan exceed $2 million.

366.   Van Dellen, Shellem, and Koon approved this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

a.      The Sacramento market was extremely overheated, with prices having increased nearly 70% over a four-year period, and there were clear signs at the time of the loan approval that sales were slowing.

b.      The land was unentitled, and a tentative tract map still needed approval, creating a significant risk of delay in project development.

c.      The number of lots to be developed was more than triple the HBD policy maximum of 200 units, an extremely large and risky undertaking in a competitive real estate market that had grown at a feverish pace in the last four years.

d.      The appraiser relied on comparable sales data from a market 20 miles away from the project site.

e.      There was significant competition from other lot developers and builders within the Spring Lake Specific Plan.

f.      The total amount of IndyMac loans to the two key principals of the borrower (who were also the loan guarantors) equaled approximately $145 million, far exceeding the standard HBD policy maximum of loans to one borrower of $30 million.

g.      Financial information for the two guarantors was not consolidated and was comprised of many inter-related partnerships and limited liability companies, making it difficult to accurately evaluate the guarantors' true financial strength and liquidity.

h.      The liquidity of the two guarantors was extremely low, with one guarantor having a liquidity to debt ratio of .01:1 and the other at .00:1.  One guarantor had a very low credit score that fell well below the HBD policy minimum score.  The principal guarantor was heavily invested in land throughout Sacramento and its surrounding areas, including riskier raw, unentitled land assets, leaving him particularly susceptible to a demonstrated market slow down.

**COMPLAINT**

i.     The combined liquidity covenant of $1 million for each of the loan guarantors was very low, especially given the significant financial obligations they had undertaken, which as of June 20, 2005 included over $330 million in contingent liabilities.  The account officer conceded that a $5 million liquidity covenant for each guarantor would have been better.

j.     The loan guarantee included language that arguably could be interpreted to actually extinguish the guarantee and render it totally ineffective as a means of enforcing a second source of repayment.

k.     The account officer conceded that if there was a downturn in the real estate market, the guarantors would be unable to repay the loan.

367.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

a.     Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.     Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.     Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.     Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the

debt.

e.     Causing or allowing a loan to be made, extended, and/or renewed with inadequate or problematic appraisals.

f.     Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

g.     Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

h.     Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

i.     Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

j.     Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

368.   Van Dellen, Shellem, and Koon, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

369.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

370.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

371.   With respect to all of their actions and inactions in managing and

administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

### M.   Counts Based on Allegations Related to the Loans Made By HBD in the Decal Custom Homes and Construction, Inc. Borrower Relationship.

### Count 32

### (Claim for Negligence and Breach of Duty of Care Against All Defendants Related to the Underwriting, Administration, Extension and Modification of a Loan to Decal Custom Homes and Construction, Inc. for the Murray & Jenkins Project)

372.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 371 of this complaint, as though fully set forth herein.

373.   Van Dellen, Shellem, and Koon approved a loan to Decal Custom Homes and Construction, Inc. for a project known as Murray & Jenkins.  This land loan was entered into on December 12, 2005, and refinanced the borrower's costs of acquisition of a 9.65 acre site located in Beaverton, Oregon.  The planned use called for 468 units in a mixture of six eight-story towers and 27 two-story townhomes.  The loan had a 12-month term.  The original loan commitment totaled $5,890,519.  The losses on this loan are estimated to exceed $2.3 million.

374.   The CAM did not specifically discuss the anticipated source of repayment.  However, it appears the primary source of repayment of this loan was the sale of condominium units from the anticipated development of the property and/or the refinancing of the property as part of a construction loan offered by IndyMac or another bank.  In addition, Calvin Baty and John Schleining provided full-recourse guarantees.

375.   On December 22, 2006, this loan was extended by Van Dellen and Rothman.  HBD workout officer Anthony Ramsier indicated that banks were not contacted to verify a supposed $3.7 million in unused capacity in lines of credit used to establish the liquidity of guarantor John Schleining as part of the extension.  The purported reasons for allowing the extension were to allow the borrower to sell the subject property pursuant to a signed

sale agreement with Pacific Commercial Capital with the knowledge that a due diligence period could extend the purchase out to as late as April or May 2007.  The modification memorandum noted that the sale agreement was in the early stages and that "the earnest money has not gone [hard] yet".  The memorandum also noted that the borrower's Eagle's Loft condominium project (also financed by HBD) "experienced slow sales in closings and will need a new appraisal and loan modification."

376.    Subsequently, the borrower failed to close on the sale or a sale to other interested buyers.  The borrower also failed to complete entitlements necessary to obtain tentative mapping on the property.  This loan was downgraded on July 31, 2007 to Substandard Two.  The corporate borrower deteriorated and ceased to exist as a going concern due to contingent liabilities at other projects and the pending loss of its general contractors license as reported in the April 30, 2008 classified asset report.

377.    The note was sold to PNL High Country, LP in the Eastdil note sale which closed June 30, 2008 (prior to the seizure of the Bank).  The unpaid principal balance on the note at the date of sale was $5,644,600 and the net proceeds of the sale were $3,300,000, yielding a net loss of $2,344,600.

378.    Defendants approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.      The CAM indicated that the profit margin was negative on the work book.  This was not mitigated.  The CAM simply indicated that "once the borrower's proposed condominium project is approved, the value of the land and potential profit of a completed project will increase the profit."

b.      The borrower had less than 10% cash equity, which violated HBD's credit policy.

c.      The project did not have full entitlements.

d.      The future construction project to pay off the land loan would have over 40 months of absorption, which would render it difficult to secure financing, and added to the length of exposure to the loan.

e.      Guarantor John Shleining's liquidity was mostly in the form of unused lines of credit.   Guarantor Calvin Baty's FICO score averaged 619, below the policy requirement of 660.  The guarantors' contingent liabilities were not evaluated.

379.   Defendants knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Defendants in regard to this loan include, but are not limited to, the following:

a.      Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.      Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.      Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.      Causing or allowing a loan to be made with deficient collateral.

e.      Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

f.      Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with

the loan application and failing to control the disbursement of loan proceeds.

g.      Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

h.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

i.      Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

380.   Defendants as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

381.   By their actions and inactions, as generally and specifically described above, Defendants failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

382.   As a direct and proximate result of the negligence and breach of fiduciary duties of Defendants, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

383.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Defendants pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 33

### (Claim for Negligence and Breach of Duty of Care Against All Defendants Related to the Underwriting, Administration, Extension and Modification of a Loan to Eagles Loft Condominium LLC for the Eagles Loft Condominiums Project)

384.   Plaintiff incorporates by reference and re-alleges each of the allegations in

paragraphs 1 through 383 of this complaint, as though fully set forth herein.

385.   Van Dellen, Shellem, and Koon approved a loan to Eagles Loft Condominium LLC for a project known as Eagles Loft Condominiums.  This loan was entered into on February 7, 2006, and was an AD&C loan that took out two Community Financial loans that were in place to finance the land acquisition and phase 1 of the Eagles Loft condominium project.  The property consisted of 7.91 acres of land for a high-end-condominium project with approvals for 128 units in 17-four-story buildings. The loan had a 24-month term.  The original loan commitment totaled $35,751,304.  The losses on this loan are estimated to exceed $14.7 million.

386.   The CAM did not specifically discuss the anticipated source of repayment. However, the anticipated source of repayment of this loan was the sale of condominium units from the proposed development of the property.  In addition, Calvin Baty and John Schleining provided full-recourse guarantees.

387.   A loan modification was approved in early September 2006 by Van Dellen, Shellem and Rothman.  The requested modification noted slower than expected sales and closings, and constituted in part a request by the borrower to resize the loan commitment to build out the seven buildings and two foundation slabs currently under construction to result in a total of 53 units and two foundation slabs.  The modification included cross-collateralization, cross-default and cross-pay with the Murray & Jenkins loan.  The extension noted the then-outstanding balance of $18,953,087.

388.   Subsequently, the loan cap was proposed to be increased from the existing $19,759,131 to $22,759,131 with $2 million of the cap increase to be reserved for future direct construction invoices incurred after January 1, 2007, and with the remainder available to fund current outstanding direct construction draw requests.  The classified asset report dated December 31, 2007 noted a considerable decline in market values.

389.   This loan was downgraded to Substandard effective March 2007 "given continued lagging construction progress and an inability to formalize an updated budget."

This loan was further downgraded on July 31, 2007, to Substandard Two as a result of interest payments going past due and the deteriorating financial condition of the borrower and guarantors.  The CAR also noted the inability of the borrower and guarantors "to exist as a viable entity due to contingent liabilities at other projects and the pending loss of general contractors license."  The report also indicated a "decrease in sales performance and unit values versus the original underwriting."

390.   The note for this loan was sold to PNL High Country, LP in the Eastdil note sale which closed on June 30, 2008 (prior to the seizure of the Bank).  The unpaid principal balance on the note at the date of sale was $22,358,245 and the net proceeds of the sale were $7,576,303, yielding a net loss of $14,781,942.

391.   Defendants approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.    The appraisal report set forth an estimated absorption of three units per month, which resulted in an inadequate loan term and interest reserve.  The project cash flow used a higher absorption rate.

b.    The appraisal reported noted that the subject units were high-end units for the area and were untested for marketability.  The proposed units were "considered above the norm in the area and thus represent a high risk project."

c.    The value of the land was uncertain because it was determined using the "abstraction method" which "exceeds the highest value by a comparable sale."  The reason for this was the absence of relevant recent sales in the market.

d.    Although the CAM recognized that the sale of units was likely to exceed the term of this loan, the support for the project provided by the guarantors was not thoroughly considered.  The guarantors' contingent liabilities were not considered and their net worth was simply stated on an equity basis.  These failures resulted in understating the leverage of the borrower and guarantors.

e.    The project involved a condominium product that was untested in the market.

f.    Defendants violated a number of its own policies in making and modifying this loan – policies that were designed to protect HBD from the very risk that ultimately occurred, a loss on a speculative loan.  When this loan was extended, such that the Bank increased its exposure, the Defendants failed to follow HBD's policy of verifying available liquidity of the borrower. Significantly, as well, Defendants accepted a borrower whose FICO scores were low and did not investigate the borrower's other contingent liabilities.  Most notably, this project was for an untested type of product for the market – condominiums – and therefore was "high risk."  In underwriting this loan, Defendants took insufficient steps to mitigate that risk by ensuring that it had conservative advance rates and/or a very strong secondary source of repayment.

392.    Defendants knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Defendants in regard to this loan include, but are not limited to, the following:

a.    Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.    Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.    Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.      Causing or allowing a loan to be made with deficient collateral.

e.      Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

f.      Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

g.      Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

h.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

i.      Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

j.      Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

393.   Defendants as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

394.   By their actions and inactions, as generally and specifically described above, Defendants failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

395.   As a direct and proximate result of the negligence and breach of fiduciary duties of Defendants, Plaintiff has suffered losses and other compensatory and

**COMPLAINT**

consequential damages, in amounts to be established at trial.

396.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Defendants pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**N.    Counts Based on Allegations Related to the Loans Made By HBD in the J.P. Eliopulos Enterprises, Inc. Borrower Relationship.**

### Count 34

**(Claim for Negligence and Breach of Duty of Care Against All Defendants Related to the Underwriting, Administration, Extension and Modification of an A&D Loan to Joshua Ranch Development, Inc. for the Joshua Ranch Project)**

397.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 396 of this complaint, as though fully set forth herein.

398.   Van Dellen, Shellem, and Koon approved a loan to Joshua Ranch Development, Inc. for a project known as Joshua Ranch.  This loan was entered into on December 27, 2005, and provided financing for a 535-lot-subdivision project on 794 acres located in Palmdale, California.  This loan was a rewrite on an existing $17,160,706 A&D loan that was funded by HBD in May 2004 to finance the construction of 108 finished lots, four models, and the extension of Joshua Ranch Road, plus sewer and water infrastructure throughout the project.  The new loan was to be split into two notes: (1) A&D note totaling $36,571,000; and (2) additional advance note totaling $6,000,000 to facilitate the sale and transfer of the Joshua Ranch property to a newly formed S Corporation.  The scope of the A&D loan was expanded and changed to include a total of 183 finished lots.  The remaining 352 lots would remain raw land.  This loan included a new budget that reflected a cost increase of $3,587,443 for delays in construction and increased costs.  The loan had an 18-month term.  The original loan commitment totaled $42,571,000, but it was reduced to $36,571,000 prior to loan closing.  The losses on this loan are estimated to exceed $13 million.

399.   The primary source of repayment of this loan was to be the construction and/or the sale of lots as follows:  98 lots to merchant builders and 85 lots sold in bulk to public builders.  The lot sales were projected to generate revenues totaling $30,154,320.  The CAM indicated that the borrower intended to sell additional lots to merchant builders in subsequent phases of development.  However, the CAM noted that the current cash flow would leave a residual balance of approximately $4.4 million due to front loading of costs to complete the sewer and water infrastructure and Joshua Ranch loop road.  The cash flow indicated that it would take 306 lot sales and closings to retire the A&D loan and residual.  Thus, Van Dellen, Koon, and Shellem approved a loan with a structure that would not completely repay the loan through the sale of lots.  The secondary source of repayment of this loan was stated to be the financial support of the guarantors.  The CAM noted that the borrower offered only limited financial support by having only $3,549,000 in liquid assets.

400.   On June 21, 2007,  Rothman approved a reduction in the borrower's liquidity covenant from $5 million to $2 million due to the borrower's cash flow difficulties.  The reduction was to remain in effect for one quarter.

401.   On June 27, 2007, HBD approved a 60-day extension that would mature on September 1, 2007.  In addition, funds were transferred from soft cost contingency to cover interest reserve and the extension fee.  The extension was approved in order to allow sufficient time to negotiate and restructure this loan.  The transfer was approved so the borrower would not have to pay interest out of pocket.

402.   On September 4, 2007, Van Dellen and Rothman approved another 60-day extension that included the transfer of remaining funds to pay interest and extension fees.  In addition, there was a principal curtailment payment requirement of $1.28 million.  The extension was needed to finalize budget numbers and provide sufficient time for another review of the appraisal and a cost review.  It was noted at that time that the borrower's liquidity was not expected to improve until late 2008 or early 2009.

403.   On March 31, 2008, a Notice of Default was recorded.  A guarantor suit was filed on April 1, 2008.  On April 22, 2008, an attorney for the guarantors sent a letter to HBD stating that HBD had published extremely private and personal information about the guarantors (including tax returns, social security numbers, bank account numbers, and home addresses) in connection with HBD's attempt to sell the note in the Eastdil note sale.  It was reported that someone tried to steal approximately $2 million from the Eliopulos family.

404.   On September 16, 2008, a workout plan memorandum submitted by Bank account officer Geoffrey Ramirez ("Ramirez") recommended the following actions:  (1) borrower to pay $300,000 in cash; (2) IndyMac, the borrower, and guarantors would execute mutual releases, including dismissals with prejudice of the guarantor enforcement action and the cross-complaint in the action that alleged HBD's publication of personal information in connection with an attempt to sell the note in the Eastdil note sale; (3) the release would occur not less than 91 days (or as proposed by counsel) from execution of the transaction due to a possible bankruptcy; (4) HBD was to facilitate a deed-in-lieu of foreclosure and/or consensual foreclosure at its sole discretion; (5) the guarantors were to certify that financial statements dated June 30, 2008 were true and correct; (6) foreclosure subject to receipt and review of Phase I; and (7) the set-aside letter would remain in place and would be replaced as a consequence of a REO sale.  The FDIC would repudiate the set-aside letter if the City, borrower, guarantor, or other governing authority requested that HBD fund the remaining $1,836,951.

405.   On December 10, 2008, this loan was foreclosed with an outstanding loan balance at the time of foreclosure of $24,551,353.  A memo dated December 29, 2008 from Daris Buckler of HBD notes that the principal should be paid down $3,151,046 (the credit bid price) as of December 10, 2008.  Thus, the balance of $21,400,307 minus $150,000 (half of $300,000 paid by guarantors split between two loans) was charged off.  IndyMac's share of the charge off amount net of the participation was $13,068,938.81.

406.   Defendants approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence. These risks include, but are not limited, to the following:

a.   The CAM noted that the cash flow would leave a residual balance of approximately $4.4 million due to front loading of costs to complete the sewer and water infrastructure and Joshua Ranch loop road.  The cash flow indicated that it would take 306 lot sales and closings to retire the A&D loan and residual. Accordingly, Van Dellen, Shellem, and Koon approved this loan with a structure that would not completely retire the loan through the sale of lots.

b.   The projected profit margin was only 6.68% versus a 10% policy requirement.  This left little room for the borrower to cut prices in order to respond to market declines.

c.   The project consisted of 535 units versus a policy maximum of 125 units.  The size of this project increased the likelihood of delays and absorption problems, and exposed HBD to greater risk.  An HBD account officer commented that a policy limit existed for the maximum number of units on a project because the subdivision process is slow and based on many market factors (e.g. absorption, availability of financing, interest rate risk for permanent mortgages, etc.).  Thus, there are a number of variables that prevent being able to figure out how the variables would affect a project too far into the future.  The account officer further noted that if a project had 400 or 500 homes, it was very difficult to know what the future would hold, as it would take longer to build the homes, which increased risk to the Bank.

d.   The loan to cost for the finished lots was 84.45% versus a policy maximum of 75%.

e.   The loan term was 18 months versus a policy maximum of 12 months for an A&D loan.  This created a longer period of exposure to market declines,

which added risk.  This risk was compounded by the fact that (1) the lots/homes were noted to be at the upper end of the market; (2) there was an abundance of competition in the market; and (3) it was a commuter market.

    f.    The high loan commitment amount of $36,571,000 was over the suggested loan to one borrower limit, which created additional exposure and risk to HBD.  Despite an unproven developer in Andrew Eliopulos, Van Dellen, Koon, and Shellem approved this loan notwithstanding a weakness set forth in the CAM that this was the largest development undertaken by the borrower and was a large development for the size and financial strength of the borrower and guarantors.

    g.    J.P. Eliopulos Enterprises, Inc. was founded by John P. Eliopulos, a real estate broker and developer since 1957.  John Eliopulos passed away before this project was undertaken by his son, Andrew Eliopulos.  Van Dellen, Shellem, and Koon approved this loan without sufficient due diligence to assess the capability of Andrew Eliopulos to handle a project of this magnitude.  Had HBD engaged in proper due diligence, it would have discovered prior to loan approval that Andrew Eliopulos simply lacked the capacity to build this project.  In fact, Rothman acknowledged that one issue with the Joshua Ranch loan was the borrower was unable to properly budget, and that the borrower did not have "the real horsepower" to get a budget done.  He also noted that major items were left out of the budget.  Terwilliger also stated that the borrower did not provide a proper budget because it simply did not know how to put one together.  Similarly, Ramirez commented that he did not believe the borrower really knew what it would cost to build out the property, and that the borrower attempted unsuccessfully to prepare a budget at least 10 times.  Ramirez also stated that the borrower simply did not know how to prepare a proper budget for this project because the borrower was "outclassed" and did not have the capacity to put it together.  The borrower simply did not have his hands on what the infrastructure

on-site and off-site costs were.  Ramirez noted that the borrower did not know how much money it had put into the project out-of-pocket which demonstrated a lack of competence on the part of the borrower.  Ramirez also believed Andrew Eliopulos was an "airhead."  Van Dellen's, Shellem's, and Koon's failure to recognize these deficiencies in the borrower prior to loan approval evidences poor due diligence.

h.     Ramirez advised that while he was trying to restructure the Joshua Ranch loan, he discovered that the budgeting deficiencies were present in the original underwriting of this loan.  Van Dellen, Shellem, and Koon failed to catch these deficiencies before approving this loan.

i.     HBD permitted the borrower to utilize $9.67 million in appreciated equity despite the fact that the borrower only owned the property for 18 months and controlled it for 30 months.  This was a policy exception.  The use of market equity over cash equity rendered the transaction riskier.  Rothman acknowledged that there was a fair amount of concern expressed during the Junior Loan Committee relating to the appraised equity being considered in this loan.  Nonetheless, Van Dellen, Shellem, and Koon still approved this loan.

j.     All of the borrower's projects were located in Palmdale, which was a commuter market and particularly susceptible to a market downturn.  The concentration in one market area added significant risk.  Ramirez noted that this would have caused him concern because the borrower's developments were concentrated in one market, and they were not diversified in market or product type.

k.     The CAM noted that the borrower offered limited financial support by having only $3,549,000 in liquid assets.  In addition, the borrower had nearly $12 million outstanding on unrelated projects, which presumably created an equal amount of contingent liabilities.  Van Dellen could not point to anything specifically in the CAM that caused him to have the belief that the borrower had

the financial capacity to build out the project.  This weak financial support did not offer meaningful secondary support.  Van Dellen even agreed with the characterization in the CAM that the borrower's liquidity meant that it only provided limited support to the project.  Despite the borrower and guarantors' weak financial condition, Van Dellen, Shellem, and Koon approved this loan with only an annual financial reporting covenant.

l.      The credit review memo authored by credit officer David Boggs recommended increasing the loan pricing to a return on equity of 35% to 40%.  The original account officer on this loan commented that the recommendation was made due to the fact that the Joshua Ranch loan was a very high risk loan.

l.      Ramirez commented that had he been the originating account officer for Joshua Ranch, he would not have proposed this loan because the project was in Palmdale and involved a very big piece of land, and a lot of money to the builder.  Ramirez did not feel the builder had the financial capacity to build the project irrespective of its lack of competency.  Ramirez further stated that he would not have proposed the Joshua Ranch loan based both on hindsight and based on what was knowable at the time this loan was approved.

407.   Defendants knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Defendants in regard to this loan include, but are not limited to, the following:

a.      Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.      Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.     Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.     Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.     Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.     Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g.     Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h.     Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

i.     Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

j.     Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

408.   Defendants as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's

business and financial affairs.

409.   By their actions and inactions, as generally and specifically described above, Defendants failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

410.   As a direct and proximate result of the negligence and breach of fiduciary duties of Defendants, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

411.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Defendants pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**Count 35**

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen and Rothman Related to the Underwriting, Administration, Extension and Modification of a Construction Loan to Joshua Ranch Development, Inc. for the Joshua Ranch Project)**

412.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 411 of this complaint, as though fully set forth herein.

413.   Van Dellen and Rothman approved a loan to Joshua Ranch Development, Inc. for a project known as Joshua Ranch.  This loan was entered into on January 2, 2007, and provided financing for the construction of 23-single-family units located in Palmdale, California.   The loan had a 24-month term.  The loan commitment totaled $14,533,000. The losses on this loan are estimated to exceed $2.1 million.

414.   The primary source of repayment of this loan was to be the sale of the constructed units.  The secondary source of repayment of this loan was stated to be the financial support of the guarantors and cross-collateralization with the A&D loan described above.

415.   On September 11, 2007, HBD approved a second extension on the

construction start date, the sales start date, and closing start date due to construction delays.  Construction did not begin until November 2007 due to delays, and was stopped by HBD on December 31, 2007.  The outstanding loan balance as of that date was $3,909,292; the bulk of that amount ($3,179,980) was used to pay down the related A&D loan as release prices for the 23 lots.

416.   On March 31, 2008, a notice of default was recorded.  A guarantor suit was filed on April 1, 2008.  On April 22, 2008, an attorney for the guarantors sent a letter to HBD stating that HBD had published extremely private and personal information about the guarantors (including tax returns, social security numbers, bank account numbers, and home addresses) in connection with HBD's attempt to sell the note in the Eastdil note sale.  It was reported that someone tried to steal approximately $2 million from the Eliopulos family.

417.   On December 10, 2008, this loan was foreclosed with an outstanding loan balance believed to be $3,909,292.  A memorandum dated December 29, 2008 from Daris Buckler of HBD notes that the principal should be paid down $248,102 (the credit bid price) as of December 10, 2008.  Thus, the balance of $3,661,190 minus $150,000 (half of $300,000 paid by the guarantors split between two loans) was charged off.  IndyMac's share of the charge off amount net of the participation was $2,159,381.85.

418.   Van Dellen and Rothman approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  In addition to the risks set forth in the A&D loan described above, these risks include, but are not limited, to the following:

a.   Van Dellen and Rothman knew at loan origination that the borrower's other projects in the same market area, including the A&D loan, were not performing as expected.  Specifically, the A&D loan was scheduled to be restructured in September 2007 to repack interest resulting from lot sales not occurring as planned, and because initial delays and cost increases put the project

behind schedule.  In addition, 85 lots in the A&D loan were expected to be sold to a public builder in June/July 2006, but did not sell.  Finally, Beazer walked away from a 15% deposit for 130 lots in September 2006, which was noted as being similar to most public builders dumping land stock.  Van Dellen and Rothman appear to have ignored clear warnings relating to this borrower.

b.      The October 2005 CAM for the A&D loan noted 7.48 months of supply in the project's submarket.  The December 2006 CAM for the subject construction loan noted 23.49 months of supply in the project's submarket.  Van Dellen and Rothman appear to have disregarded the significance of a three-fold increase in supply.

c.      The projected profit margin was only 8.74% versus a 10% policy requirement.  The account officer attempted to mitigate this policy exception by suggesting that the land cost included appreciated equity which should be added back into the profit calculation to arrive at actual profit of 20.46%.  This appears improper, as substantial market equity was utilized for the borrower's equity contribution to the project.  Thus, it should no longer have been considered for profit.  The low profit margin left little room for the borrower to cut prices in order to respond to already existing market declines.

d.      The CAM noted that the units were an untested high price point for the area.  In fact, the account officer observed that average prices were $450,000, and the Joshua Ranch homes would average $850,000.  A price point that was nearly double the average prices would impact absorption and/or the economic viability of the project given the low profit margin.  This problem was exacerbated by the lack of comparable information.

e.      The borrower advised HBD of a possible liquidity crunch from the end of the 4th quarter 2006 to the end of the 1st quarter 2007 where it projected

liquidity between $2 million and $3 million.  Van Dellen and Rothman still approved the loan.

  f. The CAM noted that the borrower's cash flow was highly dependent on lot sales to merchant and public builders.  Thus, there was added risk in approving this transaction because market conditions evidenced that public and merchant builders were not adding to their land stock.

  g. Van Dellen and Rothman did not impose a minimum tangible net worth covenant.  In addition, HBD agreed to reduce a $5 million minimum liquidity covenant to $2 million for the 4th quarter of 2006 and waive it for the 1st quarter of 2007.  The borrower's need for this accommodation should have been viewed as evidence of a weak sponsorship.  Van Dellen's and Rothman's decision to accommodate this weakness in the face of deteriorating market conditions greatly increased risk.

  h. The borrower was not required to use any upfront cash equity. Instead, the equity requirement was satisfied by market and deferred equity.

419. Van Dellen and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen and Rothman in regard to this loan include, but are not limited to, the following:

  a. Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

  b. Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

  c. Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or

**COMPLAINT**

guarantor, and the prospective source of repayment, and the security provided for the loans.

d.    Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.    Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.    Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g.    Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h.    Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

i.    Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

j.    Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

420.    Van Dellen and Rothman as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

421.    By their actions and inactions, as generally and specifically described above,

Van Dellen and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

422.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

423.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**O.      Count Based on Allegations Related to the Loan Made By HBD in the Terrapin Group Borrower Relationship.**

## Count 36

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Koon Related to the Underwriting, Administration, Extension and Modification of a Loan to Terrapin Group for The Regal (Regal Pointe) Project)**

424.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 423 of this complaint, as though fully set forth herein.

425.   Van Dellen, Shellem, and Koon approved a loan to Terrapin Group for a project known as Regal Pointe.  This loan was entered into on February 16, 2006, and provided financing for the acquisition and conversion to condominiums of a newly completed 162-unit-apartment complex consisting of 18 separate two-story buildings located in Kanosia, Wisconsin approximately 50 minutes north of downtown Chicago just across from the Illinois border.  Units ranged in size from 1360 to 1520 square feet. Each unit had either one or two garage units.  The loan had a 24-month term.  The loan commitment totaled $17,760,939.  The losses on this loan are estimated to exceed $3.8 million.

426.   The primary source of repayment of this loan was to be the sale of the constructed condominium units.  The secondary source of repayment of this loan was

stated to be the support of the borrower and guarantors, and the sale or refinance of collateral.

427.    The project experienced slower sales than anticipated.  This loan was classified Substandard One on October 31, 2007, when the borrower indicated it would be unable to meet the second quarter curtailment payment due on November 1, 2007. One month later, this loan was downgraded to Substandard Two as a result of the borrower missing the November 1, 2007 interest payment and the borrower indicating it could no longer cover operating expenses.  Subsequent interest payments were also missed.  A complaint for foreclosure and breach of guaranty was filed on January 18, 2008.

428.   On May 29, 2008, this loan was sold through a note sale with proceeds of $9,108,016 and an unpaid balance as of that date of $12,929,672 for a loss on sale of $3,821,656.

429.   Van Dellen, Shellem, and Koon approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.    The guarantors had limited liquidity.  The combined cash assets of all four of the guarantors were only slightly above their minimum liquidity covenant of $1.6 million.  The purported mitigant that "guarantors will have additional sources of cash flow from ongoing unit closing and fees on a portfolio of other projects and numerous phases of development" was insufficient.  If anything, it shows that the borrowers were heavily leveraged and that their cash flow to repay this project would be endangered by the same market decline that could endanger this project.  Moreover, there was no meaningful analysis of the guarantors' contingent liabilities.

b.    This loan had a very high 90% loan to value based on the stabilized apartment value of $19.8 million.

c.      Only $100,000 of the $4.61 million of borrower equity was actual cash paid by the borrower at closing.  While $3.1 million was provided by a loan from Mercury Credit Corporation, the CAM noted that this debt to Mercury would be paid from "corporate cash flow," meaning cash flow from the Terrapin Group's various projects other than Regal Pointe.  The remaining $1.5 million in borrow equity was to be contributed post loan closing via project cash flow from rental income and from escrowing $15,000 from each condo unit closing.

d.      The guarantors had combined guarantees of $34.2 million on other construction loans.  The CAM did not analyze how this could affect the guarantors' liquidity.  If merely 0.2% of the contingent liabilities became due at or close to loan origination, the guarantors would have been in violation of this loan's liquidity covenant.

e.      The submarket where the property was located in Lake County had 22.23 months of supply.

430.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

a.      Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.      Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.      Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or

guarantor, and the prospective source of repayment, and the security provided for the loans.

      d.    Causing or allowing a loan to be made with deficient collateral.

      e.    Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

      f.    Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

      g.    Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

      h.    Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

      i.    Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

      j.    Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

    431.   Van Dellen, Shellem, and Koon as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

    432.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

433.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon,  Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

434.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**P.     Count Based on Allegations Related to the Loan Made By HBD in the Neumann Homes Borrower Relationship.**

**Count 37**

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Koon Related to the Underwriting, Administration, Extension and Modification of a Loan to Neumann Homes for the Borrowing Base)**

435.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 434 of this complaint, as though fully set forth herein.

436.   Van Dellen, Shellem, and Koon approved a borrowing base loan to Neumann Homes on March 17, 2006.  The loan was extended and modified on May 18, 2006.  This loan involved an additional advance of approximately $12.6 million on a borrowing base secured by existing collateral to help Neumann Homes meet a reported cash flow deficit triggered by, among other things, declining sales rates and Neumann Homes' then-recent acquisition of Tadian Homes (a Detroit home builder).  This loan was an advance of an additional $12,603,540 under an existing $100 million borrowing base facility.  The loan had a 150-day term.  The losses on this loan are estimated to exceed $12.6 million.

437.   The primary source of repayment of this loan was to be the sale of Neumann Homes' assets at two auctions.  The secondary source of repayment of this loan was stated to be support from collateral and guarantors.  However, there was no personal guarantee.

438.    In 2004, Neumann Homes acquired Tadian Homes in Detroit shortly after which sales in the Detroit market deteriorated and Neumann Homes ran into liquidity problems.  This liquidity problem triggered a request in early 2006 for a $20 million liquidity advance, which became the subject of this loan advance.  This advance was approved on March 17, 2006 in a rushed process that did not include a normal CAM analysis.  Although they were not members of the Junior Loan Committee at the time, Camp and Rothman were familiar with the consideration of this loan and objected to it. After discussions, only approximately $12.6 million was approved by Van Dellen, Shellem, and Koon for the advance instead of the $20 million requested by the borrower.

439.    After the original modification of March 17, 2006, the borrower conducted auction sales.  The borrower agreed to use those sales to repay the $12.6 million advance. However, on May 12, 2006, the borrower applied to further extend the $12.6 million advance and to release payments and collateral from various land sales at the auction. The justification for this was that "due to the projected timing of various land sales and the company's projected cash flow requirements for May-July, Neumann is requesting that the Bank allow Neumann to keep the proceeds from Huntley, Antioch, Mason and Hanover Park sales and receive its repayment from the sale of the largest property, Gilberts."  Neumann's request was approved on May 18, 2006.  HBD received nothing in return for this concession.

440.    On August 1, 2006, this loan was downgraded to Special Mention because of the borrower's continually deteriorating financial condition and its negative cash flow. In addition, Neumann had failed to sell the assets it had hoped to sell to fund repayment of the advance.  Neumann Homes filed for bankruptcy on October 31, 2007.

441.    Van Dellen, Shellem, and Koon approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.    Neumann Homes provided superficial financial reporting which was not closely examined by Van Dellen, Shellem or Koon to justify the request for this liquidity advance.  According to Rothman, then an HBD regional manager, Neumann Homes' financial statements were "so delayed and so thick with nonsense that it was hard to really derive a good picture of what was going on in the company until they ran into problems."

b.    The request for the funding to address liquidity problems was, in credit officer Camp's view, a "red flag."  He expressed this concern to Shellem and Koon during the Junior Loan Committee meeting.  According to Rothman, Shellem shared the concern that Neumann Homes' financial reporting was inadequate.  Camp also stated that Shellem thought this loan was a bad idea, but that Koon pressed for this loan because of Neumann's status as "one of HBD's best clients."

c.    Camp opposed the $12.6 million advance to Neumann Homes indicating that IndyMac should not have been a source of liquidity for Neumann Homes when Neumann Homes was clearly having problems with home sales in Michigan, which was experiencing a significant downturn.

d.    The Neumann Homes application was considered hastily without a normal CAM analysis.  The consideration process was characterized by Rothman as a rush in a very short period of time – a "fire drill."

e.    Van Dellen, Shellem, and Koon approved the borrower's requested liquidity line without obtaining a personal guarantee from Mr. Neumann.  Van Dellen, Shellem, and Koon knew Neumann Homes, Inc. was suffering from a liquidity crunch, and if Mr. Neumann truly believed in his company's ability to survive its decline, he should have executed a personal guarantee.  If Mr. Neumann refused to provide a personal guarantee, it would have signaled a substantial red flag to Van Dellen, Shellem, and Koon regarding Neumann Homes, Inc.'s viability.

**COMPLAINT**

f.      The participant on the borrowing base loan, LaSalle Bank, refused to fund its pro rata share of the additional advance.  Van Dellen, Shellem, and Koon disregarded this substantial warning relating to the wisdom of their decision to approve the borrower's request.

442.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

a.      Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.      Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.      Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.      Causing or allowing a loan to be made with deficient collateral.

e.      Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

f.      Causing or allowing a loan to be made, extended, and/or renewed with inadequate or problematic appraisals.

g.      Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with

the loan application and failing to control the disbursement of loan proceeds.

h.    Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

i.    Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

j.    Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

443.   Van Dellen, Shellem, and Koon as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

444.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

445.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

446.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**Q.    Counts Based on Allegations Related to the Loans Made By HBD in the WL Homes, LLC Borrower Relationship.**

## Count 38

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem and Koon Related to the Underwriting and Administration of a Loan to WL Homes, LLC for the Country Club Highlands Project)**

447.    Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 446 of this complaint, as though fully set forth herein.

448.    Van Dellen, Shellem, and Koon approved a loan to WL Homes, LLC for a project known as Country Club Highlands.  This loan was entered into on March 21, 2006.  The loan involved the acquisition and development of 118 single-family-residence lots in Westminster, Colorado, which is located in the northwestern part of the Denver metropolitan area.  Once the lots were completed, the borrower planned to start construction of the 118 single-family residences to be financed by an IndyMac construction revolver.  The loan commitment totaled $13,200,000 and had a 24-month term.  Losses on this loan are estimated at nearly $2.1 million.

449.    Van Dellen, Shellem, and Koon approved this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

a.    The appraiser noted that the residential market in the Denver/Boulder area was soft due to overbuilding and poor job growth and that rising inventories (31-month supply vs. healthy supply of 18 months) and interest rates raised serious questions about future pricing.

b.    The expected profit margin of 4.52% was well below the HBD policy minimum of 10%, leaving the borrower little room to lower prices in a slowing market.

c.    No project cost review was performed, casting into serious doubt the

accuracy of the reported loan-to-cost ratio.

      d.    The loan could not be paid off within the 24-month-loan term, which itself was double the HBD policy maximum of 12 months, but instead was projected to be paid off in month 56, a loan term nearly five times greater than the policy maximum.  It was virtually certain, then, that the extended term would lead to eventual sales of the planned single-family residences at a time when home prices were even more in decline than at the time of a loan maturity consistent with HBD policy.

      e.    The appraised absorption rate was nearly triple the actual absorption rate for similar projects in the area, meaning that the 56-month estimate for loan payoff discussed above was substantially understated.

      f.    The borrower expected to set sales prices of the single family residences in a range among the highest in the Denver area (and approximately double the median home sales price), and a potential buyer would need to make a 30% down payment in order to meet debt service on a loan, creating a serious risk that home sales would not be brisk enough to repay this loan even over an extended loan term.

450.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

      a.    Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

      b.    Causing or allowing a loan to be made, extended, and/or renewed with inadequate or problematic appraisals.

-178-

**COMPLAINT**

c.      Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

d.      Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

e.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

f.      Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

451.   Van Dellen, Shellem, and Koon, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

452.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

453.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

454.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 39

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem and Koon Related to the Underwriting and Administration of a Loan to WL Willow Springs 346 Associates, LLC for the Oaks at Willow Springs Project)

455.   Plaintiff incorporates by reference and re-alleges each of the allegations in

**COMPLAINT**

paragraphs 1 through 454 of this complaint, as though fully set forth herein.

456.   Van Dellen, Shellem, and Koon approved a loan to WL Willow Springs 346 Associates, LLC for a project known as Oaks at Willow Springs.  This loan was entered into on June 26, 2006.  The loan involved the construction of 70 single-family residences and 16 Duet units in the first phase of The Oaks at Willow Springs development in Folsom, California, which is 23 miles northeast of Sacramento.  The loan commitment totaled $17,000,000 and had a 24-month term.  Losses on this loan are approximately $2.2 million.

457.   Van Dellen, Shellem, and Koon approved this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

a.   The Sacramento real estate market had seen significant price depreciation (21% according to one published report), and builders were offering buyer incentives, indicating a rapidly slowing real estate market which would put pressure on an already reduced profit margin.

b.   The expected profit margin was below the HBD policy minimum of 10% due to a loss of revenue resulting from the sale of eight below-market units, leaving the borrower little room to lower prices in a slowing market.

c.   The reported loan-to-value ratio of 83%, only two percentage points below the HBD policy maximum, was highly suspect because there was not a defined product mix which the appraiser could rely upon to calculate an accurate value.

d.   No project cost review was performed as required by HBD policy, casting into serious doubt the accuracy of the reported loan-to-cost ratio.

e.   The borrower was a single-purpose entity, so guarantor financial support was critical, yet full recourse payment guarantees were not obtained.

458.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence

should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

a.    Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

b.    Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

c.    Causing or allowing a loan to be made, extended, and/or renewed with inadequate or problematic appraisals.

d.    Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

e.    Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

f.    Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

459.   Van Dellen, Shellem, and Koon, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

460.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

461.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

462.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 40

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem and Rothman Related to the Underwriting and Administration of a Loan to WL Willow Springs 346 Associates, LLC for the Oaks at Willow Springs Project)

463.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 462 of this complaint, as though fully set forth herein.

464.   Van Dellen, Shellem, and Rothman approved a loan to WL Willow Springs 346 Associates, LLC for a project known as Oaks at Willow Springs.  This loan was entered into on August 15, 2006.  The loan involved the acquisition and development of 258 additional lots contained in the second phase of The Oaks at Willow Springs development in Folsom, California, which is 23 miles northeast of Sacramento.  A portion of this loan was also used to refinance an existing A&D loan for the initial 86 lots within Phase I of the development.  Once the lots were completed, the borrower planned to start construction of single-family residences.  The loan commitment totaled just under $34.8 million and had a 24-month term.  Losses on this loan exceed $7.5 million.

465.   Van Dellen, Shellem, and Rothman approved this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

      a.   The Sacramento real estate market had seen significant price depreciation (21% according to one published report), and builders were offering buyer incentives, indicating a rapidly slowing real estate market which would put

pressure on an already reduced profit margin.  Further, the borrower was already pricing some of the single-family residences to be sold at below the appraised value to respond to these market pressures.

b.      The expected profit margin was below the HBD policy minimum of 10% due to high land costs, leaving the borrower little room to lower prices in a slowing market.

c.      The loan was approved based on a market analysis that admittedly did not focus on the area immediately surrounding the project site.

d.      No project cost review was performed as required by HBD policy, casting into serious doubt the accuracy of the reported loan-to-cost ratio.

e.      The project size of 344 lots was approximately triple the HBD policy maximum of 125 lots, and development of such a large project in a slowing market created a high risk of loan default due to a prolonged exposure resulting from a lengthier absorption period.

f.      The borrower was a single-purpose entity, so guarantor financial support was critical, yet full recourse payment guarantees were not obtained.

466.   Van Dellen, Shellem, and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Rothman in regard to this loan include, but are not limited to, the following:

a.      Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

b.      Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

c.      Causing or allowing a loan to be made, extended, and/or renewed with inadequate or problematic appraisals.

d.      Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

e.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

f.      Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

467.   Van Dellen, Shellem, and Rothman, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

468.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

469.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

470.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**COMPLAINT**

**R.      Counts Based on Allegations Related to the Loans Made By HBD in the Drake Development, LLC Borrower Relationship.**

<u>**Count 41**</u>

<u>**(Claim for Negligence and Breach of Duty of Care Against All Defendants Related to the Underwriting, Administration, Extension and Modification of a Loan to Northpark 19, LLC for the Northpark Project)**</u>

471.    Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 470 of this complaint, as though fully set forth herein.

472.    Van Dellen, Shellem, and Koon approved a loan to Northpark 19, LLC for a project known as Northpark.  This loan was entered into on March 27, 2006, and refinanced an existing HBD loan that provided financing for the acquisition, development, and construction of 19-single-family units on approximately 5.3 acres in the Inland Empire region of California.  At the time of underwriting, the project was roughly 19% complete.  The loan had a 12-month term, and the commitment totaled $7,190,000.  The losses on this loan are estimated at $300,000.

473.    The primary source of repayment of this loan was to be the sale of the units in the project.  The secondary source of repayment of this loan was stated to be the financial support from Drake Development and the guarantor, Victor Zaccaglin ("Zaccaglin").

474.    HBD's original loan to this borrower was originated on February 25, 2005 and matured on February 16, 2006.  That loan consisted of a $6.5 million commitment, and had $2,296,143 outstanding at the time of renewal.  The project incurred initial delays associated with the processing and recordation of a final map, which took ten months to obtain.  The borrower also encountered some minor delays with the local utility providers.

475.    As of November 28, 2006, the borrower had defaulted on a number of loan covenants including the sales start date, an absorption covenant, and a closing

requirement. The account officer noted that there were project delays in getting the homes started, the market had slowed, and a public builder, Richmond American, had reduced prices and offered incentives on a nearby tract.

476. On March 30, 2007, a first letter agreement was executed that extended this loan 30 days to allow for underwriting and closing of a 12-month extension.

477. On May 10, 2007, Van Dellen and Rothman approved a 12-month extension. The modification also included a new re-margining provision. The total months of supply in the project's market area ballooned to 30 months. In addition, the profit margin decreased to 5.15%. Zaccaglin's FICO score also dropped substantially to 669. In addition, HBD agreed to release one of the guarantors, Curci Investments.

478. Due to continued slow sales performance, the borrower was unable to meet the $3.6 million curtailments by September 30, 2007, but HBD issued waivers and funded draws under a reservation of rights.

479. In October of 2007, HBD learned that Zaccaglin's liquidity level was based on stock shares that could not be easily liquidated. Thus, the borrower could not meet the liquidity covenant.

480. In April of 2008, HBD rejected the borrower's request for another budget transfer to interest reserve, and the borrower quickly fell into interest default. On June 2, 2008, a notice of default was filed. On June 10, 2008, a guarantor suit was filed. Account officer Koerber indicated that there was a FAS 114 impairment on this loan totaling $3 million to $4 million as of spring 2008.

481. Defendants approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence. These risks include, but are not limited, to the following:

     a.    The CAM indicated a softening market. In particular, total new home sales in the Inland Empire decreased 7.9% during the fourth quarter of 2005 from the same period the prior year.

**COMPLAINT**

b.    The loan-to-value ratio was set at the policy maximum of 85%, and the loan-to-cost ratio was set very close to the policy maximum of 90%. These high advance rates provided far less insulation to the Bank in the event of a downturn in real estate values. This was particularly risky given the weak financial condition of the sponsorship.

c.    Van Dellen, Shellem, and Koon structured this loan with a sales covenant of three units per month starting April 1, 2006. Accordingly, the loan went into technical default almost immediately after it was approved. Yet, HBD failed to take heed of this warning, and did not move swiftly to protect its interests.

d.    Van Dellen's, Shellem's and Koon's decision to approve this loan caused HBD to be in violation of its geographic concentration limit for San Bernardino County. This evidenced overexposure to a single market area.

e.    This loan had an overall credit risk rating of Pass 4, and was in a Pass 4 market. Van Dellen, Shellem, and Koon appear to have not given HBD's risk rating system any credence.

f.    Zaccaglin had a large interest in Cal Prop Homebuilding, which had a very poor financial condition. Cal Prop had been a publicly traded corporation that went private because of its financial problems. In order to mitigate the risk associated with Zaccaglin's interest in Cal Prop, HBD simply eliminated Cal Prop's poor financials from consideration. But a Dun & Bradstreet report from 2005 for Cal Prop noted a moderate to high risk of severe delinquency over the next six months. Van Dellen's, Shellem's and Koon's decision to approve this loan while having HBD "stick its head in the ground" and pretend that Zaccaglin's financial condition may not be impacted by Cal Prop was contrary to prudent underwriting practices.

g.    Van Dellen, Shellem, and Koon approved this loan without obtaining a detailed analysis of the borrower's and guarantor's financial statements. There is

**COMPLAINT**

no indication in the CAM as to contingent liabilities.  Van Dellen's, Shellem's and Koon's decision to approve this loan "in the dark" was irresponsible.

h.     The borrower and guarantor were permitted to provide only annual financial statements.  In addition, Van Dellen, Shellem, and Koon did not require a minimum-tangible-net-worth covenant.  This was unduly risky given the weak financial support the sponsorship provided.

482.   Defendants knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Defendants in regard to this loan include, but are not limited to, the following:

a.     Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty

b.     Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.     Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.     Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.     Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.     Causing or allowing a loan to be renewed or extended to borrowers

who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h.      Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

i.      Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

483.   Defendants as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

484.   By their actions and inactions, as generally and specifically described above, Defendants failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

485.   As a direct and proximate result of the negligence and breach of fiduciary duties of Defendants, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

486.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Defendants pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**COMPLAINT**