## Count 42

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Koon, and Shellem Related to the Underwriting, Administration, Extension and Modification of a Loan to Drake Development, LLC for the Moreno Valley Ranchos Project)**

487.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 486 of this complaint, as though fully set forth herein.

488.   Van Dellen, Shellem, and Koon approved a loan to Drake Development, LLC for a project known as Moreno Valley Ranchos.  This loan was entered into on June 9, 2006, and refinanced a construction loan provided by Comerica Bank.  The Comerica loan was expiring on June 22, 2006, and had a loan balance totaling $1,808,727.  The Comerica loan paid for site acquisition, engineering, architectural, and various fees.  The project consisted of 56 lots in Moreno Valley, California.  The property's gross land area totaled just over 20 acres.  The property had a tentative map approved, and a final map was expected by September 1, 2006.  HBD cross-collateralized the loan with the Northpark 19 loan.  This loan had an 18-month term, and the loan commitment totaled $21,625,000.  The losses on this loan are estimated at approximately $4,000,000.

489.   The primary source of repayment of this loan was to be the sale of the units in the project.  The secondary source of repayment of this loan was stated to be the financial support from Drake Development and the guarantor, Zaccaglin.

490.   On May 4, 2007, HBD approved a 60-day waiver of the (1) final map date; (2) sales starting date; and (3) closing date.  The project was impacted by construction delays.  In addition, the builder lost one unit because it was needed for a permanent retention.

491.   On July 2, 2007, a loan modification memorandum was submitted.  At that time, the overall asset score dropped to Pass 4, and the market had degraded to Pass 5. As of August 15, 2008, the unpaid loan balance was $4,824,456, and the property had an "as-is" appraised value of $890,000.

492.   Van Dellen, Shellem, and Koon approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.     The loan-to-value ratio was set at the policy maximum of 85%, and the loan-to-cost ratio was set very close to the policy maximum of 90%.  These high advance rates provided far less insulation to the Bank in the event of a downturn in real estate values.  This was particularly risky given the weak financial condition of the sponsorship.

b.     The CAM noted that a $4,000,000 participation was to be arranged after the loan closed.  Van Dellen's, Shellem's, and Koon's decision to approve this loan without making the participation a condition of closing was an unnecessary risk.  HBD was ultimately unable to sell a participation, which reflects on the soundness of the credit.

c.     Van Dellen, Koon, and Shellem agreed to refinance a loan provided by Comerica.  The borrower was experiencing project delays while Comerica was the lender.  Van Dellen, Koon, and Shellem also approved this loan despite the borrower not yet having any project performance on the Northpark 19 project.  It was inherently risky for Van Dellen, Koon, and Shellem, particularly in June of 2006, to issue a second loan to a borrower in such short proximity in time.  HBD's decision to rush into a second loan with the borrower substantially increased its risk.

d.     The credit review memorandum for this loan notes that the units were a high price point for Riverside, which further increased risk.

e.     Zaccaglin had a large interest in Cal Prop Homebuilding, which had a very poor financial condition.  Cal Prop had been a publicly traded corporation that went private because of its financial problems.  In order to mitigate the risk associated with Zaccaglin's interest in Cal Prop, HBD simply eliminated Cal

Prop's poor financials from consideration.  But a Dun & Bradstreet report from 2005 for Cal Prop noted a moderate to high risk of severe delinquency over the next six months.  Van Dellen's, Shellem's, and Koon's decision to approve this loan while having HBD "stick its head in the ground" and pretend that Zaccaglin's financial condition may not be impacted by Cal Prop was contrary to prudent underwriting practices.

       f.     Van Dellen, Shellem, and Koon approved this loan without performing a detailed analysis of the borrower's and guarantor's financial statements.  There is no indication in the CAM as to contingent liabilities.  HBD's decision to approve this loan "in the dark" was irresponsible.

       g.     The borrower and guarantor were permitted to provide only annual financial statements.  In addition, Van Dellen, Shellem, and Koon did not require a minimum-tangible-net-worth covenant.  This was risky given the weak financial support they provided.

493.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

       a.     Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

       b.     Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

       c.     Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or

**COMPLAINT**

guarantor, and the prospective source of repayment, and the security provided for the loans.

d.    Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.    Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.    Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g.    Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h.    Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

i.    Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

494.    Van Dellen, Shellem, and Koon as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

495.    By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

496.    As a direct and proximate result of the negligence and breach of fiduciary

duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

497.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**S.   Count Based on Allegations Related to the Loan Made By HBD in the Villa Development, LLC Borrower Relationship.**

**Count 43**

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem and Koon Related to the Underwriting and Administration of a Loan to LB/L Villa Racquet Club, LLC for the Racquet Club Villas Project)**

498.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 497 of this complaint, as though fully set forth herein.

499.   Van Dellen, Shellem, and Koon approved a loan to LB/L Villa Racquet Club, LLC for a project known as Racquet Club Villas.  This loan was entered into on June 8, 2006.  The loan involved the acquisition, development and new construction of 38 luxury townhomes in Thousand Oaks, California by LB/L Villa Racquet Club, LLC. The borrower was indirectly managed and controlled by Villa Development, LLC and its principal, Mark Ross.  The loan commitment exceeded $19 million and had an 18-month term.  Losses on this loan exceed $2.3 million.

500.   Van Dellen, Shellem, and Koon approved this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

a.   Significantly slowing sales of homes in California (e.g. nearly 25% drop in sales activity year over year).

b.   Cash equity from the borrower was only 3.48%, well below the HBD policy minimum of 10%, and this risk was compounded by a lack of evidence of

any exceptionally strong market demand for the project.

        c.     The loan-to-cost ratio of 97% exceeded the HBD policy maximum of 90%, resulting in greater risk that increased costs and slower sales could lead to borrower default.

        d.     The borrower's creditworthiness, financial strength and liquidity were very weak as measured by HBD's credit scoring system, so guarantor financial support was especially critical.  Yet, the guarantors' liquidity and financial strength were also minimal and weak.

        e.     The principal guarantor's debt-to-worth ratio as initially computed by HBD was nearly five times lower than the correct ratio because it relied on incomplete (and arguably false) personal financial statements which excluded $2.9 million of real estate debt appearing on the guarantor's credit report.  Further, HBD appears to have disregarded the guarantor's potential contingent liabilities of $100 million relating to projects in New Mexico.

        f.     Although IndyMac had a right to draw on a $1,250,000 re-margining agreement due to events of default under the loan agreement, IndyMac never exercised those rights.  With the project stalled and no viable guarantor, it was critical that this source of repayment be accessed.

501.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

        a.     Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.      Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.      Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.      Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.      Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

502.   Van Dellen, Shellem, and Koon, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

503.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

504.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

505.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**T.     Counts Based on Allegations Related to the Loans Made By HBD in the Lafferty Homes, Inc. Borrower Relationship.**

<u>**Count 44**</u>

<u>**(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem and Koon Related to the Underwriting, Administration, Extension and Modification of a Loan to Lafferty Visalia I, LLC for the Ashley Grove Unit 13 Project)**</u>

506.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 505 of this complaint, as though fully set forth herein.

507.   Van Dellen, Shellem, and Koon approved a loan to Lafferty Visalia I, LLC for a project known as Ashley Grove Unit 13.  This loan was entered into on June 26, 2006, and financed the acquisition of land anticipated to lead to the development of 118 single-family residences.  While this loan was characterized in the CAM as an A&D loan that "will be paid off from a construction loan for production units provided by IndyMac Bank," the CAM contained none of the detailed construction budget information that would be necessary for a construction loan.  This loan had a 24-month term, and the loan commitment totaled $10,613,000.  The losses on this loan are estimated to exceed $3.8 million.

508.   The primary source of repayment of this loan was to be a construction loan from IndyMac.  The secondary source of repayment of this loan was stated to be the financial capacity of the guarantors and borrower.  Richard S. Lafferty ("Lafferty"), the principal of Lafferty Homes, Inc. provided a full recourse guarantee as did Lafferty Homes, Inc.

509.   The borrower ultimately never obtained construction financing and the loan lapsed into foreclosure.

510.    Van Dellen, Shellem, and Koon approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.      This loan involved a Pass 5 market and an overall credit score of Pass 4.  Thus, this loan should not have been approved under HBD's underwriting policies.

b.      The project had a profit margin of only 3.06%, which left the borrower little room to lower prices in an already deteriorating market.

c.      This loan's term was 24 months versus a 12-month-policy limit for A&D loans.  This lengthy term was particularly risky in a declining market.

d.      The CAM indicated that it would require 27.15 months to sell the units for the project.  This, combined with the term of the A&D loan, made this loan very speculative.  Nonetheless, the primary source of repayment on this loan was an anticipated construction loan from IndyMac.  But this loan was not underwritten as a construction loan, and information on the viability of construction and subsequent sellout was simply not considered during the underwriting of this loan.

e.      No senior manager site visit was performed as required by policy for loans that exceeded $10 million.  This was especially risky because both the borrower and the market were new for IndyMac.

f.      HBD approved this loan despite knowing that the market was an inferior market with absorption slowing and total months of supply in the project's submarket at 31.69 months.

g.      Lafferty Homes was overextended as it had 15 active projects at the time of the Lafferty Visalia and Lafferty Sanger applications.

h.      Credit officer Krcmarik suggested adding a net worth covenant of $5 million for the borrower and guarantors on the Lafferty Visalia loan and also suggested obtaining more complete financial information.  Krcmarik noted on his credit review memo that neither of these items were done.  Krcmarik did not know why there was no minimum-tangible-net-worth covenant and he would have

expected one.  Similarly, Rothman was surprised that there was no net-worth covenant.

i.      HBD exacerbated the risk of the borrower's condition by requiring only annual financial statements instead of quarterly statements.

j.      The CAM presented significant data related to slowing market absorption; this weakness was supposedly mitigated by the statement that the Fresno/Visalia regional housing market had enjoyed a strong price appreciation and record breaking home starts over the last several years.  Krcmarik stated that no reasonable person would conclude that prior market performance mitigated the market decline.

k.      The finished average housing prices for the project was estimated to be to be $458,686.  Homes in Visalia were selling at only $189,400 in 2005. Visalia is a 41-mile drive from Fresno.

l.      Lafferty's personal financial statement did not provide information about his contingent liabilities.  Krcmarik stated that he would have expected to see that information.  Van Dellen, Koon, and Shellem did not appear to have considered the guarantor's contingent liabilities before approving this loan.

m.      Van Dellen, Koon, and Shellem approved this loan with high loan-to-value and loan-to-cost ratios, which further increased risk.

511.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

a.      Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial

difficulty.

b.     Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.     Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.     Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.     Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.     Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g.     Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

h.     Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

i.     Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

j.     Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

512.   Van Dellen, Shellem, and Koon as officers, owed IndyMac the obligation to

exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

513.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

514.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

515.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 45

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Rothman Related to the Underwriting, Administration, Extension and Modification of a Loan to Lafferty Sanger I, LLC for the Olive Glen Project)

516.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 515 of this complaint, as though fully set forth herein.

517.   Van Dellen, Shellem, and Rothman approved a loan to Lafferty Sanger I, LLC for a project known as Olive Glen.  This loan was entered into on October 10, 2006, and was described as a "land loan" that would "be paid off from a construction loan for production units provided by IndyMac Bank."  However, the Lafferty Sanger CAM does not contain the detailed construction information necessary for an AD&C loan.  The project was generally located in the Fresno market, but Lafferty Sanger was described as "a small rural community that is located on the outskirts of the city of Fresno" and where the majority of the residents are involved in agriculture.  This loan had a 6-month term, and the loan commitment totaled $5,953,000.  The losses on this loan are estimated to

exceed $1.7 million.

518.   The primary source of repayment of this loan was to be a construction loan from IndyMac.  The secondary source of repayment of this loan was stated to be the financial capacity of the guarantors and borrower.  Lafferty provided a full recourse guarantee as did Lafferty Homes, Inc.

519.   A neighboring project financed by Central Pacific Bank resulted in Lafferty Sanger getting a construction loan on that project for four models and 11 production units.  However, IndyMac's portion of the project did not obtain construction financing and was ultimately foreclosed.

520.   Van Dellen, Shellem, and Rothman approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.   This loan involved a Pass 5 market and an overall credit score of Pass 5.  Thus, this loan should not have been made under HBD's underwriting policies.

b.   This project was a new market for IndyMac and was only the second HBD loan for Lafferty.

c.   This loan brought more competition and more units into the same overall market as the earlier Lafferty Visalia loan.  Moreover, Lafferty had other projects with other lenders in the same market.  Lafferty was highly exposed to a single market.

d.   The CAM for this loan described the market as having price declines and slowing market absorption, with the relevant submarket having two years worth of supply.

e.   Rothman noted that one of the weaknesses of this loan was that IndyMac was refinancing a Pomona First Federal loan.

f.   Rothman did not visit the property until after this loan was approved.  After his visit, he described the property as not being in an infill market but rather

as being on the outskirts of Visalia.  The CAM described the market as a small community three miles south of Fresno, but it is actually 14 miles away.  The average finished housing prices for the project was to be $327,500.  Notably, Homes in Sanger were selling for only $170,500 in 2006.

g.     The CAM did not show a senior management visit to the site of the project before this loan was made as required by HBD policy.  Rothman admitted that after he visited the project subsequent to loan approval, he learned that there was a lot more work to be done on the lots than they had been led to believe in the loan committee.  He called it "rural and remote."

h.     Lafferty's personal financial statement did not provide information about his contingent liabilities.

i.     The project had a profit margin of only 9.17%, which potentially left little room to lower prices in an already deteriorating market.

j.     This loan was made as a land loan but the source of repayment was anticipated to be a construction loan by IndyMac.

k.     As a member of the Junior Loan Committee on this loan, Rothman acknowledged that information was available to the committee showing that the cash and cash equivalents position of the borrower had dropped from $11.1 million when Lafferty Visalia was approved, to $7.7 million when Lafferty Sanger was approved eight months later.  Van Dellen, Shellem, and Rothman apparently did not consider or question this decline.

l.     There was no minimum-tangible-net-worth covenant and no quarterly financial reporting requirement for this loan.  This was true despite the fact that the credit officer recommended a net-worth and leverage covenant to Van Dellen, Shellem, and Rothman.

521.   Van Dellen, Shellem, and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who

reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Rothman in regard to this loan include, but are not limited to, the following:

a.    Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.    Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.    Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.    Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.    Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.    Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g.    Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

h.    Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

**COMPLAINT**

i.      Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

j.      Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

522.   Van Dellen, Shellem, and Rothman as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

523.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

524.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

525.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**U.   Count Based on Allegations Related to the Loan Made By HBD in the Pacer Communities, Inc. Borrower Relationship.**

## Count 46

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem and Koon Related to the Underwriting and Administration of a Loan to LB/L Pacer College Park PA 2, LLC for the College Park Project)**

526.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 525 of this complaint, as though fully set forth herein.

527.   Van Dellen, Shellem, and Koon approved a loan to LB/L Pacer College Park PA 2, LLC for a project known as College Park.  This loan was entered into on June 27, 2006.  The loan involved the acquisition, development, and construction of 70 detached condominium units and 68 finished lots in the College Park master plan community in Chino, California.  The borrower was indirectly managed and controlled by Pacer Communities, Inc. and its principal, Randy Poag, each of whom were also guarantors of this loan.  The loan commitment was $31,685,000 and had a 24-month term.  Losses on this loan are nearly $3.6 million.

528.   Van Dellen, Shellem, and Koon approved this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

a.   The profit margin was only 3.96%, well below the HBD policy minimum of 10%, potentially leaving the borrower with little room to lower prices in a slowing market.

b.   Significant and intense competition existed from public builders in the subject master plan, potentially further eroding the already low profit margin.

c.   The borrower was a single-purpose entity, so guarantor financial support was critical.  Yet one of the two principal guarantors had minimal liquidity to provide secondary financial support for repayment of the loan.

d.   The guarantors' assets could only partly satisfy repayment of this loan.

529.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Koon in regard to this loan include, but are not limited to, the following:

a.      Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.      Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.      Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

d.      Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

e.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

530.    Van Dellen, Shellem, and Koon, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

531.    By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

532.    As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

533.    With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## V.    Count Based on Allegations Related to the Loan Made By HBD in the Adams Homes Borrower Relationship.

### Count 47

### (Claim for Negligence and Breach of Duty of Care Against All Defendants Related to the Underwriting, Administration, Extension and Modification of a Loan to Adams Homes of Northwest Florida and Adams Homes LLC for a Borrowing Base)

534.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 533 of this complaint, as though fully set forth herein.

535.   Van Dellen, Shellem, and Koon approved a loan to Adams Homes of Northwest Florida and Adams Homes LLC on July 17, 2006.  This loan was a renewal of a $60,000,000 borrowing base facility to Adams Homes for the construction of entry-level homes in Florida, Alabama, and the southern portion of Mississippi.  The majority of the lot takedowns would be speculative, but the acquisition of finished lots was capped at $20 million.  Speculative homes were limited to 15 per subdivision and 75 in total.  This loan had a 12-month term.  The losses on this loan are estimated to exceed $12.8 million, or $9.6 million net of the participation.

536.   The primary source of repayment of this loan was to be the sales of completed homes to end buyers.  The secondary source of repayment of this loan was stated to be the cash flow and liquidity of the borrower.

537.   IndyMac had a prior relationship with Adams Homes consisting of a $30 million borrowing base that was repaid in full when HBD curtailed its lending operations in the Florida region in 2000-2001.  HBD reestablished a relationship with Adams Homes when it approved a $60,000,000 borrowing base on June 3, 2005.  On July 17, 2006, Van Dellen, Shellem, and Koon approved a renewal of the $60,000,000 borrowing base loan.  Dan Rutherford ("Rutherford) was the account officer for the relationship as of this renewal.

538.   On September 5, 2007, Rutherford submitted a new CAM to renew and

1  modify the $60,000,000 borrowing base.  The borrower was seeking a 12-month renewal.

2  A $15,000,000 participation was contemplated by the proposed renewal.  The CAM

3  noted that recent disruptions in the credit markets could have an effect on Adams Homes'

4  ability to operate in the future because Adams Homes emphasized entry-level housing

5  where borrowers may have difficulty obtaining or qualifying for mortgage financing.  At

6  this time, the borrower's outstanding debt with other lenders increased from $226 million

7  in 2006 to $348 million.  The CAM noted that Adams Homes was not immune to the

8  market slowdowns, as they had 2,000 sales fall out in 2006.  Despite market slowdowns,

9  Adams Homes continued to acquire lots and held in excess of a two-year supply.  The

10  combined credit rating dropped to a Pass 4, and the market scored only 5.00 points,

11  which translated to a Pass 5 classification.

12      539.   On September 13, 2007, Van Dellen and Shellem approved the renewal.

13  The loan proceeded to the Senior Loan Committee on September 21, 2007, where it was

14  not approved.

15      540.   On December 26, 2007, a 45-day extension was approved in order to

16  develop a plan to liquidate the credit line in an orderly fashion.  At that time, $39,771,989

17  was outstanding.  HBD noted that the borrower's cash on its balance sheet dated

18  September 30, 2007, was insufficient to repay the outstanding balance.  The workout plan

19  was to extend the line of credit by nine months with a $5 million principal repayment by

20  March 1, 2008; $25 million was due June 30, 2008, and monthly payments of $5 million

21  were due thereafter.  On January 22, 2008, a nine-month extension was approved by Van

22  Dellen and Rothman in accordance with the workout plan.

23      541.   On June 23, 2008,  HBD reported an unpaid balance totaling $18,301,491.

24  On July 11, 2008, the unpaid balance was reduced to $17,952,875.

25      542.   On March 31, 2009, the FDIC sold the note to LNV Corporation for

26  $2,085,006.59.  The FDIC loan balance was reported to be $14,892,904.19.

27      543.   Defendants approved, renewed and/or extended this loan despite substantial

28

known risks and or risks that should have been known in the exercise of due diligence. These risks include, but are not limited, to the following:

a.     The 2006 CAM noted that several of the markets where Adams Homes was active had experienced slowdowns in sales as interest rates had risen and investors had dropped out of the market.  75% of Adams Homes' business was in Florida markets, which collectively averaged 17.5 months of supply.  HBD rated the market as a Pass 4.  The CAM noted that 2006 was expected to show a decline in the level of sales and backlog.  Up to $20 million or one third of the facility could be used for lot acquisition in markets that had experienced tremendous growth.

b.     Adams Homes had to maintain a large supply of lots in order to maintain its pace of operations.  Thus, there was a danger that cash flow could be negatively impacted by the holding costs if the pace of sales slowed.  There was no cash equity contributed by the borrower.

c.     The size of this loan exposed HBD to far greater risk, and would render it difficult for the borrower to close out the loan in the event HBD decided to not renew the loan.  This exposed HBD to substantial risk in the event the non-renewal was due to deteriorating market conditions.

544.   Defendants knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Defendants in regard to this loan include, but are not limited to, the following:

a.     Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.     Causing or allowing a loan to be made in violation of applicable laws,

regulations, and/or HBD's internal policies.

c. Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d. Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e. Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f. Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g. Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

h. Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

i. Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

j. Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

545. Defendants as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use

under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

546.   By their actions and inactions, as generally and specifically described above, Defendants failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

547.   As a direct and proximate result of the negligence and breach of fiduciary duties of Defendants, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

548.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Defendants pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**W.     Count Based on Allegations Related to the Loan Made By HBD in the Maisel Presley Borrower Relationship.**

**Count 48**

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Rothman Related to the Underwriting, Administration, Extension and Modification of a Loan to 26th 305 & D 2420, LLC for the National City Condos Project)**

549.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 548 of this complaint, as though fully set forth herein.

550.   Van Dellen, Shellem, and Rothman approved a loan to 26th 305 & D 2420, LLC for a project known as National City Condos (also known as City Grove).  This loan was entered into on August 16, 2006, and refinanced an existing HBD loan for the acquisition and conversion of a 72-unit-apartment project into for-sale condominiums located in National City, California.  The project was 15% complete at the time of renewal.  The project itself was made up of two buildings, with one building containing 48 one-bedroom units, and the other building containing 24 two-bedroom units.  This loan had an 18-month term, and the loan commitment totaled $13,145,000.  The losses on

this loan are estimated to exceed $5.6 million.

551.   The primary source of repayment of this loan was to be the sale of the units in the project.  The CAM noted that the borrower and guarantors were unlikely sources to repay the loan due to the sluggish market and their high leverage and low liquidity.  Thus, foreclosure and sale of the collateral and collection of any shortfall from the guarantors were identified as "possible" sources of repayment.

552.   In August 2005, HBD approved the original loan to the borrowers with a loan commitment totaling $12,477,000.  Account officer Terwilliger believed this was a "semi-good" loan at the time it was made.

553.   On March 24, 2006, vandals apparently entered the 24-unit building with the intent to steal copper wire.  This apparently caused a short in the electrical system that resulted in a fire.  An insurance company paid nearly $480,000 for the resulting damages, which the borrower believed was more than the actual cost to restore the building to its pre-fire state.

554.   On August 18, 2006, HBD approved the subject 18-month renewal loan.  On October 13, 2006, Terwilliger met with the borrower and learned that the borrower had severe cash flow problems over the past year due to the lack of available loan funds to cover overhead on their condominium projects.  It was subsequently discovered that the borrower's last draw from HBD totaling $276,017 was not used to pay for work on the project, but instead was used for the borrower's overhead.

555.   On October 25, 2006, HBD sent a notice of default and reservation of rights letter to the borrower.  On November 14, 2006, Van Dellen, Shellem, and Rothman approved the continuation of funding for 60 days via the reservation of rights letter sent on October 25, 2006.

556.   On January 12, 2007, a notice of default was filed.  On February 17, 2007, sales opened on the first building.  As of March 15, 2007, the outstanding balance was $11,348,163 with $1,796,836.55 not yet disbursed, the interest reserve was depleted, and

$32,204.32 in interest was due on March 20, 2007.  The first building was approximately 88% completed and the second building was approximately 20% completed.  As of May 31, 2008, there were only eight closings, and one sale in escrow.

557.   On June 19, 2008, HBD executed an agreement to sell its note to Floit Properties, Inc. for $5,750,000.  At that time, the unpaid balance was $11,376,818, which resulted in a loss of $5,626,818.  Terwilliger stated that the note sale under the circumstances was the best possible result for the Bank.

558.   Van Dellen, Shellem, and Rothman approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.     Van Dellen, Shellem, and Rothman approved this loan despite the CAM describing a dramatic slowdown in the San Diego condominium market since late summer 2005.  The absorption rate dropped from a high of 10 to 20 units per month to 1 to 5 units.  This was attributed to rising supply of condominium units, slowing sales, rising interest rates, rising prices affecting affordability, and other events.  Van Dellen's, Shellem's, and Rothman's decision to renew this loan at an increased commitment level in the face of obvious market softening was irresponsible.

b.     The original appraisal report for this project estimated an absorption rate of six sales per month.  An updated appraisal projected only two sales per month.  The CAM noted that the San Diego market had 19.3 months of supply as of the first quarter of 2006 due to slowing sales and rising inventory.  In addition, the San Diego resale market had approximately 21,000 units listed versus approximately 6,600 units two years earlier.  This was further evidence of a declining market that Van Dellen, Shellem, and Rothman should not have ignored.  The market value of the collateral property "as-is" declined $430,000 from June

**COMPLAINT**

30, 2005 to August 3, 2005.  Thus, HBD's collateral value was deteriorating at the time it approved the renewal.

c.      The 112-unit project had a market value "as-is" condominiums of $21,840,000 versus a purchase price of $21,800,000.  In addition, the market value as a post-renovation apartment building was $19,100,000.  Under an income approach, the project had a value of $15,626,180.  These figures indicated that any softening in the real estate market would render the purchase price higher than the property's value under any analysis.  In addition, the DCR as an apartment was well below 1.0.  In fact, the project had a DCR of only 0.57:1.00 versus a policy requirement of 1 to 1.  There was no mitigant provided for this policy exception.  These factors naturally presented substantial risks to HBD if the builder was unable to complete the conversion.

d.      Despite an appraisal setting forth an absorption rate of two units per month, the borrower believed it could average four to five units per month based on the nearby comparables and their sales prices.  Thus, the borrower believed it could sell the units and repay this loan within 18 months.  Van Dellen's, Shellem's, and Rothman's decision to follow the borrower's projections and utilize a 4-unit-per-month-absorption rate was particularly risky given the market trends, and it created a situation where this loan was not likely to be repaid during the 18-month term.  Van Dellen, Shellem, and Rothman attempted to protect against slowing absorption by imposing a release rate of net proceeds or 133% of par, whichever was higher.  If the net proceeds were less than 133%, the borrower would need to make up the difference out of pocket.  This strategy appeared risky given the borrower's rapidly deteriorating financial condition.  In addition, the borrower's liquidity crisis would be exacerbated by its inability to derive cash flow from the sale of units from this project.

e.      The initial loan advance at closing of the renewal (outstanding $8,862,542) was higher than the market value "as-is" apartments of $8,600,000, and the projected market value post conversion stabilized for rental property of $7,200,000.  This was a policy exception for which no meaningful mitigant was provided.

f.      The project had a profit margin of 8.97% versus a 10% policy requirement.

g.      The interest reserve was not fully packed.  HBD's policy required fully packed interest with a 2% rate shock.  The mitigant states that this loan had enough interest up to January of 2007, at which time interest reserve would be funded out of unit closings.  This, of course, presumed there would be unit closings in January.  In fact, the CAM noted that it may take up to nine months to get approval permits for the 24-unit building.  Thus, Van Dellen, Shellem, and Rothman appear to have taken a gamble given the borrower's poor past performance on this project.

h.      The CAM noted that the financial strength of the borrower and guarantors declined significantly over the prior six months.  This was attributed to a number of factors, including a slow down in the San Diego condominium market resulting in decreased profits.  This trend was troubling, as the borrower maintained a portfolio of 25 condominium projects totaling 1,550 units, of which 1,042 were unsold or unreleased.  Due to a slow down in sales leading to a high level of standing inventory, construction delays, and other issues, the aggregate interest reserve for the 25 projects was just over $1 million.  Thus, the borrower was paying interest for some of its projects out of pocket, or repacking interest reserve.  Thus, it was questionable whether the borrower had the financial capacity to complete the project being financed by HBD.

**COMPLAINT**

i.     The borrower was only able to contribute approximately $200,000 in cash equity to the renewal due to its high leverage, limited liquidity, and the need to "repack" the depleting interest reserves and/or pay interest out of pocket for its other projects.

j.     The CAM noted that the sponsors had total contingent liabilities of $275.8 million, debt to worth of 8.0 to 1.0, and liquidity to debt of 0.01 to 1.00. Thus, Van Dellen, Shellem, and Rothman approved this loan without a secondary source of repayment.  The CAM stated that the borrowers and guarantors were unlikely sources to repay this loan due to the sluggish market and their high leverage and low liquidity.  The best that HBD could hope for was that foreclosure and sale of the collateral and collection of any shortfall from the guarantors were "possible" sources of repayment.  Van Dellen, Shellem, and Rothman irresponsibly placed all of HBD's prospects for repayment in the sale of units in a sluggish market.

k.     Maisel had an average FICO score of 650, and Presley had an average FICO score of 645, below the minimum score set by HBD policy.

l.     The project scored a Pass 5 on the combined credit risk rating, and yet was approved by Van Dellen, Shellem, and Rothman.

559.   Van Dellen, Shellem, and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Rothman in regard to this loan include, but are not limited to, the following:

a.     Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.      Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.      Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.      Causing or allowing a loan to be made with deficient collateral.

e.      Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

f.      Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

g.      Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

h.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

i.      Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

j.      Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

k.      Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

**COMPLAINT**

560.   Van Dellen, Shellem, and Rothman as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

561.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

562.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

563.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## X.   Count Based on Allegations Related to the Loan Made By HBD in the Integral Partners Borrower Relationship.

### Count 49

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem and Rothman Related to the Underwriting, Administration and Renewal of a Loan to Integral Communities I for the MacArthur Place Project)

564.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 563 of this complaint, as though fully set forth herein.

565.   Van Dellen, Shellem, and Rothman approved a loan to Integral Communities I for a project known as MacArthur Place.  This loan was entered into on August 29, 2006 and later renewed by Van Dellen and Rothman on March 7, 2008.  The loan involved the extension of financing initially provided to the borrower in August 2005 to acquire and develop a four-acre site in Santa Ana, California, to be cleared and

entitled for 276 condominium units located throughout a series of five-story buildings. The original loan commitment was $17,930,000 and had an 18-month term, and the renewal slightly reduced the loan commitment to $17,200,000 with a new, 12-month term.  Losses on this loan total nearly $4 million.

566.   Van Dellen, Shellem, and Rothman approved and/or renewed this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

a.   Development of 276 units exceeded the HBD policy maximum of 125 units.

b.   The borrower had no intention of building the 276 condominium units and instead intended to repay the loan by selling the entitled four-acre site to a builder, in contravention of HBD policy requiring a construction loan subsequent to the subject acquisition and development loan.

c.   Even during a time when the overall real estate market was thriving, two previous borrower attempts to sell the project site had already failed.

d.   The loan-to-cost ratio of 86% exceeded the HBD policy maximum of 75%.

e.   The loan term of 18 months was longer than the first 12-month term covering the initial financing, evidencing a slower-developing project with a greater risk of additional delay.

f.   At the time of loan renewal in March 2008, the profit margin was projected to be negative 13.91%, in contravention of HBD policy requiring a minimum of a 10% profit margin.  This was particularly troubling given that by Spring 2008, the real estate market was significantly weak.

g.   The borrower was a single-purpose entity, so guarantor financial support was critical.  Yet the guarantees were only full payment guarantees upon the occurrence of certain conditions subsequent.  Further, some of the reported

financial information for one of the two guarantors was not clearly documented, and this guarantor's exact cash position was unknown.  Finally, although HBD policy required a liquidity analysis less than 90 days before loan approval, such an analysis was not performed within this timeframe for the guarantor.

567.    Van Dellen, Shellem, and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Rothman in regard to this loan include, but are not limited to, the following:

a.    Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.    Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.    Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.    Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.    Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.    Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without

any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g.     Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

h.     Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

i.     Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

568.   Van Dellen, Shellem, and Rothman, as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

569.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

570.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

571.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**COMPLAINT**

**Y.**   **Count Based on Allegations Related to the Loan Made By HBD in the Private Island Homes, LLC Borrower Relationship.**

**Count 50**

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Koon Related to the Underwriting, Administration, Extension and Modification of a Loan to Private Island Homes Cottonwood Creek, LLC for the Cotton Wood Creek Estates Project)**

572.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 571 of this complaint, as though fully set forth herein.

573.   Van Dellen, Shellem, and Koon approved a loan to Private Island Homes Cottonwood Creek, LLC for a project known as Cottonwood Creek Estates.  This loan was entered into on September 5, 2006, and provided financing for the acquisition, development, and construction of 77 single-family-detached homes and one custom lot in the City of Vacaville, California.  This loan had an 24-month term, and the loan commitment totaled $53,912,691.  The losses on this loan are estimated at $9 million.

574.   The primary source of repayment of this loan was to be the sale of the units in the project.  The secondary source of repayment was identified as the borrower and guarantor, Vincent Rover ("Rover"), who provided full recourse guarantees .

575.   The project consisted of two parcels that were less than a quarter mile apart. The two parcels were named Knoll Creek and Rancho Rogelio.  The borrower planned to construct 38-single-family lots on Knoll Creek, which consisted of 22.66 acres.  An additional 40 lots would be developed on Rancho Rogelio, which consisted of 20.93 acres.  Knoll Creek was subject to a Williams Act contract, which greatly minimized property taxes in exchange for prohibition against any use apart from an agricultural use. A notice of non-renewal typically required nine years to cancel the contract, but the borrower was seeking an early cancellation, which would have resulted in increased tax liability to be paid at the time a final map was approved by the City Council.  Rancho

Rogelio was also agriculturally zoned.

576.   In April of 2005, the borrower submitted an application for (1) rezoning the property to RE-10 to accommodate 40 lots; (2) planned development; (3) early cancellation of the Williams Act contract; and (4) a tentative tract map.  On June 6, 2006, the planning commission recommended approval of the applications relating to environmental, zoning, and development.  The City Council was to hear and act upon the applications on June 27, 2006.  The CAM identified a number of additional pending project approvals, including Regional Water Quality Control Board certification, improvement plans, grading plans, final map, request for planned growth allocations, and development of architectural plans.  HBD projected that the build out of the project would occur within the two-year-loan term.

577.   On January 26, 2007, HBD approved a request to move (1) the construction start date from January 14, 2007 to May 14, 2007; (2) the sales start date from March 14, 2007 to July 14, 2007; (3) the final map date from March 14, 2007 to July 14, 2007; and (4) the closing start date from September 14, 2007 to January 14, 2008.  This was necessitated by delays in the approval of improvement plans and the final tract map.  The account officer noted a cumbersome approval process with the City of Vacaville, which would not issue any more than 300 building permits per year.

578.   On August 13, 2007, credit officer Krcmarik approved a 90-day waiver of the sales start date of July 14, 2007.  The account officer again noted that the project had been delayed due to difficulties obtaining development approval from the City of Vacaville.

579.   On October 8, 2007, the account officer requested that all disbursements on this loan be stopped until further notice.  He again pointed to the delay in the start of construction.  On October 17, 2007, HBD discovered that the borrower and guarantors failed to satisfy the $1 million liquidity covenant.  As of October 1, 2007, the projected market value upon completed construction had dropped to under $53 million.  Thus, the

collateral value was roughly equal to the commitment amount.  The "as-is" value was just over $8 million.  The unpaid balance at that point exceeded $10.1 million.

580.   A notice of default was filed during the week of April 7, 2008, and a guarantor suit was initiated the same week.  As of March 25, 2008, the "as-is" value of the property had dropped to $2.92 million.

581.   Van Dellen, Shellem, and Koon approved, renewed and/or extended this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.      Van Dellen, Shellem, and Koon approved this loan without having sufficient due diligence to understand the City of Vacaville's entitlement process.  Six months after the CAM was submitted, the account officer discovered that the City of Vacaville only issued 300 building permits per year.  This information would have shed substantial light on whether it was realistic to expect this loan to payoff within its two-year term.

b.      HBD projected that the build out of the project would occur within the two-year-loan term.  While the CAM suggested that this loan would be repaid with the sale of the 67th home, and that the 67th home was projected to sell in the 24th month, that conclusion was overly ambitious.  The appraiser noted that the units would sell at a rate of 4 per month.  Thus, it would take 17 months to sell 67 homes.  This left only seven months to clear substantial development hurdles, including obtaining a final map on Knoll Creek and a tentative map and final map on Rancho Rogelio.  Thus, Van Dellen, Koon, and Shellem appear to have contemplated extending this loan irrespective of any potential development delays.  The added time associated with completing this project would likely have extended it to at least 2009, which increased the risks associated with a downturn in the market.  Moreover, Van Dellen, Shellem, and Koon approved this loan as an AD&C loan despite the fact that Rancho Rogelio was not yet tentatively mapped,

which was a violation of HBD policy.  HBD believed a tentative map would be approved within three weeks.  It appears Van Dellen, Shellem, and Koon took an unnecessary risk to approve this loan instead of waiting the three weeks for tentative map approval.

c.     The CAM noted that sales had slowed in most projects from 7-15 units per month to 3-11 units per month.  In addition, the CAM noted 23.50 months of supply in the project's submarket, and 36.17 months of supply at the project's price point and submarket.  Thus, the market was clearly trending downward, and should have caused Van Dellen, Koon, and Shellem to be very cautious before approving a loan that would likely require more than two years to repay.

d.     The CAM noted that a Phase I Environmental Site Assessment revealed a copper arsenate spill on Rancho Rogelio.  This spill was noted to have resulted in surface staining only, but there was no indication as to what the remediation would involve.  The environmental clean up ultimately cost at least $300,000.  Van Dellen, Koon, and Shellem appear to have approved this loan without requiring sufficient due diligence relative to the magnitude of the contamination.

e.     The loan-to-cost ratio for this loan was 90%.  HBD's policy required a maximum loan-to-cost ratio of 85% when the average price exceeded 125% of the comparable market average ("CMA").  There was no mitigant for this policy exception, and thus nothing to adequately address the increased risk.

f.     Van Dellen, Koon, and Shellem permitted the borrower to utilize $4,843,000 in appraised equity despite having controlled (not owned) Knoll Creek for only 13 1/2 months, and despite having owned Rancho Rogelio for 20 months.  HBD credit policy required two years control and three years ownership.  The remaining equity consisted of cash totaling $1,147,000, of which a substantial

**COMPLAINT**

portion was financed by a subordinated equity partner who would record a second trust deed.  Thus, Van Dellen, Koon, and Shellem approved a loan to a borrower that was highly leveraged, and engaging in virtually 100% financing.  This created a more speculative development, and was particularly risky where the development hurdles were substantial.

g.     The borrower was not required to provide quarterly or annual financial statements.  The guarantor was permitted to provide only annual financial statements.

582.   Van Dellen, Shellem, and Koon knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Defendants in regard to this loan include, but are not limited to, the following:

a.     Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.     Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.     Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.     Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.     Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with

the loan application and failing to control the disbursement of loan proceeds.

      f.    Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

      g.    Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

      h.    Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

      i.    Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

      j.    Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

583.   Van Dellen, Shellem, and Koon as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

584.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Koon failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

585.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Koon, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

586.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Koon pursued a common

plan or design with each other, and therefore are jointly and severally liable for all losses.

**Z.    Counts Based on Allegations Related to the Loans Made By HBD in the MWH Development Corp. Borrower Relationship.**

### Count 51

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Rothman Related to the Underwriting, Administration, Extension and Modification of a Loan to Dickerson Manor, LLC for the Dickerson Manor Project)**

587.    Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 586 of this complaint, as though fully set forth herein.

588.    Van Dellen, Shellem, and Rothman approved a loan to Dickerson Manor, LLC for a project known as Dickerson Manor.  This loan was entered into on September 22, 2006, and provided financing for the construction of a 20-unit-condominium project in Toluca Lake, California.  The site consisted of four parcels that were construction ready.  The project involved a single phase of construction.  The borrower anticipated beginning construction by mid-August 2006 with a final map recordation date of September 15, 2006.  Construction was projected to be completed by December 30, 2007.  This loan had an 18-month term, and the loan commitment totaled $8,700,000.  The losses on this loan are estimated to exceed $1 million.

589.    The primary source of repayment of this loan was to be the sale of the units in the project.  The secondary source of repayment was identified as the borrower and guarantors Mark Handel ("Handel"), Scott Adler ("Adler"), and the Handel Family Trust.

590.    In February 2008, the borrower advised HBD that the company's financial condition had deteriorated significantly, and that several of its projects were in various stages of foreclosure with other lenders.  The borrower did not have the ability to re-margin any of its three existing HBD loans.

591.    On May 15, 2008, a loan modification was approved that authorized HBD to execute a forbearance agreement that would expire on June 30, 2009.  In addition, a

quarterly curtailment schedule of $2,175,000 per quarter was established, and HBD was to collect net sales proceeds from unit closings with a minimum release price of 115% of par.  The loan modification application noted that this loan had matured and HBD had not been able to observe project performance.  In addition, this loan was on non-accrual and the borrower was unable to financially support this loan.  Finally, the market was noted to have slowed.  The outstanding principal at that time totaled $7,639,704.

592.   On October 31, 2008, a Notice of Default was recorded.  On December 16, 2008, HBD noted that past due interest totaled $560,378.93.  At that time, seven units had closed, and 13 unit remained.  The unpaid principal balance totaled $5,230,091 versus a value of $5,837,000, and a disposition value of $4,669,600.  On December 30, 2008, HBD noted an as-is value of $4,900,000 versus an unpaid balance of $5,230,091.  On February 23, 2009, HBD noted that three more units were about to close, which would leave eight units.  At that time, the "as-is" value was $4,164,154, the disposition value was $3,706,154, and the unpaid balance was $4,380,197.23.  The unpaid interest totaled $869,228.92.

593.   Van Dellen, Shellem, and Rothman approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.     Van Dellen, Shellem and Rothman approved this loan despite the fact that the borrower provided no cash equity for the project, and instead relied upon a mezzanine lender to provide 100% of the equity.  Thus, the borrower was permitted to engage in a speculative 100% financed transaction, which increased risk to HBD.

b.     This loan contained a combined minimum liquidity covenant of only $850,000.  This covenant amount was inadequate for a single-phase, condominium loan with an $8.7 million commitment.  The amount of the minimum liquidity covenant likely represented the available combined liquidity of the borrower and

guarantors and should have signaled a warning to Van Dellen, Shellem, and Rothman regarding the financial capacity of the borrower and guarantors.

      c.    The CAM noted that Handel had only $768,878 in liquidity and $155,000 in income for 2004.  Similarly, the CAM noted that Adler had only $1,293,874 in liquidity, and $221,000 in income for 2004.  The guarantors' liquidity and income was insignificant in relation to the $8.7 million loan commitment.  The CAM characterized both guarantors as offering limited secondary support to this loan.  While the CAM did not specifically address contingent liabilities, based on the borrower's and guarantors' other projects, it appears they had combined contingent liabilities of nearly $130 million, and actual outstanding debt of over $100 million.  Van Dellen, Shellem, and Rothman did not appreciate the potential impact this degree of leverage would have on the borrower's and guarantors' ability to repay this loan.  In fact, it appears Van Dellen, Shellem, and Rothman approved this loan despite the fact that HBD did not even obtain financial  statements from three of the four owners of the borrower entity.  Thus, Van Dellen, Shellem, and Rothman approved this loan with no viable secondary source of repayment, and essentially gambled that the market would remain strong and the project economically viable.

      594.   Van Dellen, Shellem, and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Rothman in regard to this loan include, but are not limited to, the following:

      a.    Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.      Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.      Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.      Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.      Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.      Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h.      Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

i.      Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

j.      Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

595.   Van Dellen, Shellem, and Rothman as officers, owed IndyMac the

**COMPLAINT**

obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

596.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

597.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

598.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

### Count 52

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen and Rothman Related to the Underwriting, Administration, Extension and Modification of a Loan to MS Foothill LP for the Foothill 200 Project)

599.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 598 of this complaint, as though fully set forth herein.

600.   Van Dellen and Rothman approved a loan to MS Foothill LP for a project known as Foothill 200.  This loan was entered into on April 12, 2007, and provided financing for the acquisition, development, and construction of 200 lots in Sylmar, California.  The project would consist of 74 townhomes and 126 raw lots.  The property was situated on just over nine acres and consisted of nine parcels.  The project called for three phases of construction.  This loan refinanced an existing loan with Comerica Bank. The property had an approved tentative map, and final map approval was expected by the end of May 2007. This loan had an 18-month term, and the loan commitment totaled

$25,825,000.  The losses on this loan are estimated to exceed $4.8 million.

601.   The primary source of repayment of this loan was to be the sale of the units in the project.  A residual balance of $1,906,580 in month 18 was secured by the 126 raw lots aggregately valued at $11.34 million, which was intended to be paid off with future phased HBD construction loans based on demand and satisfactory performance.  The CAM indicated that the borrower and guarantors offered limited financial sponsorship to provide secondary support to this loan.  The account officer conceded that there was really no secondary source of repayment for this loan.

602.   On September 27, 2007, HBD agreed to waive the construction date and final map approval covenant due to ongoing delays.  On December 17, 2007, an updated appraisal indicated nearly a 34% decline in value, which revealed a principal impairment.  The interest reserve was frozen and this loan was placed on non-accrual.  As of December 31, 2007, there was still no site work commenced, as the grading permit had not yet been pulled, and the final map was still not recorded.

603.   In February 2008, the borrower and guarantors advised HBD that the company's financial condition had deteriorated significantly, and that several of their projects were in various stages of foreclosure with other lenders.  The borrower did not have the ability to re-margin any of their three HBD loans.

604.   HBD stopped disbursements on this loan effective April 1, 2008.  On May 14, 2008, a Notice of Default was recorded.  According to the account officer, the borrower never started work on the project.  HBD subsequently foreclosed on the property.  The unpaid balance at the time of foreclosure was $13,353,436, and the foreclosure bid was $3,639,693.  Thus, the charge off was $9,713,743.  HBD's share net of the participation was $4,856,872.

605.   Van Dellen and Rothman approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.      HBD utilized an absorption rate of 4 units per month.  Thus, it would take nearly 15 months to sell all 74 units.  The CAM identified over 20 months of supply in the applicable submarket.  The real estate market was clearly softening by March of 2007.  In fact, the CAM noted that there had been a recent decline in overall pricing within the marketplace, and inventory was staying on the market longer.  Given these market conditions, Van Dellen's and Rothman's decision to approve an 18-month construction loan without substantial financial sponsorship was imprudent.

b.      This project would result in a residual balance of $1,906,580 in month 18.  The CAM stated that the residual balance would be secured by the 126 raw lots aggregately valued at $11,340,000, which was intended to be paid off in the future with phased HBD construction loans based on demand and satisfactory performance.  This structure added risk to the Bank because raw land values tend to drop sharply in down markets.  It was imprudent for Van Dellen and Rothman to approve a loan whose structure did not have a more certain repayment plan.

c.      The borrower was already experiencing delays on another project that was being financed by HBD through PBG.  That loan was known as MS San Jose 6, and was in negotiation for a 12-month extension due to construction delays.  Van Dellen's and Rothman's decision to approve a 200-unit, $25 million loan to a borrower that was having performance problems on another project was careless and unduly risky.

d.      The borrower provided no cash equity for the project, and instead relied upon a mezzanine lender to provide 100% of the equity.  Thus, the borrower was engaged in a speculative 100% financed transaction, which increased risk to HBD.  This was particularly true given the guarantors' contingent liability profile and limited liquidity due to the numerous MWH Development projects in process at the time of loan origination.

e.      The CAM noted that MWH Development had only $44,300 in cash as of December 31, 2006.  The company had seen a steady decline in accounts receivable over the three years prior.  It had total assets of $2,449,600 versus liabilities of $4,364,000.  While the company's net worth was $13.3 million, its year-end 2006 working capital was negative $1,915,000.  The company was essentially illiquid.  The CAM showed Mark Handel as having $1,172,000 in assets and $2,922,000 in liabilities, including $2,094,000 in estimated taxes.  Mr. Handel was illiquid, and a bank-prepared pro forma cash flow after tax was negative $21,000.  The CAM showed Scott Adler as having $2,644,000 in assets and $81,000 in liabilities.  A bank-prepared pro forma cash flow was negative $155,000.  Combined, the borrower and guarantors had total liquid assets of $3,511,000, but were essentially illiquid.  In addition, they had approximately $100 million in contingent liabilities, though the CAM did not identify their specific contingent liabilities.  The account officer stated that he called out to the Junior Loan Committee the fact that the guarantors personally guaranteed all of MWH Development's loans.

f.      Notably, the account officer indicated that the guarantors Mark Handel, Scott Adler and MWH Development Corp. were weak financially, and that if the primary source of repayment failed to repay this loan, the guarantors would not be able to either.  The account officer included the weakness of the guarantors in the CAM because he wanted to make sure Van Dellen and Rothman knew that the primary source of repayment was probably the only source of repayment on the deal.  Irrespective of this fact, Van Dellen and Rothman approved the loan.

g.      The account officer noted that since the Dickerson Manor CAM was prepared in June of 2006, the borrower took on an additional $77 million in debt. The account officer characterized this as a significant increase in debt being carried by the borrower.

h.     The account officer stated that the CAM noted that MWH had a large number of projects under development, and that if Van Dellen and Rothman had questions about them, he could identify the changes, including the increase in leverage from debt totaling $20 million to $70 million.

i.     Given the increased debt carried by the borrower, the account officer believed the credit risk rating should change.  The account officer further explained that it remained a Pass 3 because IndyMac insisted on more equity to offset the risk.  But he conceded that the equity contribution of 16.83% was not put in by the developer because it was a 100% financed project.

j.     The account officer stated that Van Dellen and Rothman based their decision to approve this loan on the borrower being able to build the project, finish it, sell the units, and pay this loan off.  They did not necessarily consider the borrower not being able to overcome some obstacles.  The account officer also indicated that the borrower's assets were heavily tied to real estate, and thus, particularly susceptible to fluctuations in real estate values.

k.     The Handel Family Trust owned 49.5% of the borrower entity, and yet Van Dellen and Rothman approved this loan despite HBD not reviewing any financial statements for the Trust.  In addition, Van Dellen and Rothman did not require a guarantee from the Handel Family Trust, which violated credit policy. This was especially risky given the weak sponsorship and the declining state of the market.

606.   Van Dellen and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen and Rothman in regard to this loan include, but are not limited to, the following:

a.     Causing or allowing a loan to be made to a borrower and guarantors

who were or should have been known to be not creditworthy and/or in financial difficulty.

b. Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c. Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d. Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e. Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f. Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g. Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h. Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

i. Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

j. Causing or allowing a loan to be made, renewed or extended where

**COMPLAINT**

there was very little likelihood of the loan repaying within the term of the loan.

607.   Van Dellen and Rothman as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

608.   By their actions and inactions, as generally and specifically described above, Van Dellen and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

609.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

610.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 53

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen and Shellem Related to the Underwriting, Administration, Extension and Modification of a Loan to MS San Jose 6, LP for the San Jose 6 Project)

611.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 610 of this complaint, as though fully set forth herein.

612.   Van Dellen and Shellem approved a loan to MS San Jose 6, LP for a project known as San Jose 6.  This loan was a PBG loan that was entered into on April 27, 2006, and provided financing for the acquisition, development, and construction of six two-level-townhouse-style condominiums and 13 on-site-parking spaces in San Jose, California.  This loan had a 12-month term, and the loan commitment totaled $2,750,000. The losses on this loan are in an amount to be established at trial.

613.   The primary source of repayment of this loan was to be the sale of the units

in the project.  The secondary source of repayment was stated in the CAM to be guarantees from Mark Handel, Scott Adler, Calabasas 2000, LLC, MWH Development Corporation, and the Handel Family Trust.

614.   In April 2007, the maturity was extended 12 months to facilitate completion of the project.  Default letters were sent out on April 9, 2008.

615.   A June 30, 2008 CAR and a July 30, 2008 workout memorandum noted that the project experienced various construction-related delays and the loan matured on April 25, 2008 without full repayment or full completion, and with no unit sales having been consummated.  The borrower had a large portfolio of other projects with few revenue-producing projects and very limited liquidity.  The borrower reported that several of these ongoing projects were in various states of foreclosure with other lenders.  The interest reserve for this loan was depleted, and the borrower and guarantors were unable to make interest and/or principal payments out of pocket.  MWH Development Corporation was insolvent and Mark Handel and Scott Adler were likely to declare personal bankruptcy. The borrower incurred $361,000 in cost overruns that were not included within the loan budget, and the borrower could not pay that cost out of pocket.  The outstanding balance on the loan was $2,668,321.

616.   Van Dellen and Shellem approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.      The CAM clearly identified red flags as to the large number of ongoing residential development projects owned and managed by MWH Development Corporation, the MWH Group of Companies, and guaranteed by Mark Handel and Scott Adler.  Van Dellen and Shellem failed to comprehend the magnitude of the risk, instead emphasizing past performance over the future ramifications of a large volume of contingent liabilities.  The total debt commitment for the MWH entities was nearly $130 million while the outstanding

**COMPLAINT**

debt was over $100 million.  The CAM contained very little analysis of the borrower's and guarantors' contingent liabilities.  As such, Van Dellen and Shellem approved this loan without knowing the exact volume and timing of the contingent liabilities, and the degree of overall relationship risk was never fully identified or analyzed.

      b.    The borrower and guarantors provided outdated financial statements, and no financial statements were obtained for the Handel Family Trust.  These exceptions to Bank policy were not addressed.

617.  Van Dellen and Shellem knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen and Shellem in regard to this loan include, but are not limited to, the following:

      a.    Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

      b.    Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

      c.    Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

      d.    Causing or allowing a loan to be made with deficient collateral.

      e.    Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

      f.    Causing or allowing a loan to be made without taking proper and

reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

g.    Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

h.    Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

i.    Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

618.    Van Dellen and Shellem as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

619.    By their actions and inactions, as generally and specifically described above, Van Dellen and Shellem failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

620.    As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen and Shellem, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

621.    With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen and Shellem pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**AA.    Counts Based on Allegations Related to the Loans Made By HBD in the Mountain View Bravo Borrower Relationship.**

**<u>Count 54</u>**

**<u>(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Rothman Related to the Underwriting, Administration, Extension and Modification of a Loan to S.K.Y. 21, LLC for the Section 21 Land Loan Project)</u>**

622.    Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 621 of this complaint, as though fully set forth herein.

623.    Van Dellen, Shellem, and Rothman approved a loan to S.K.Y. 21, LLC for a project known as Section 21.  This land acquisition loan was entered into on October 9, 2006, and replaced an existing credit facility on 453 acres representing three quarters of Section 21.  The remaining one quarter was not to be encumbered by this loan.  The property was located in the northeast section of Bakersfield, California.  This loan had a 36-month term, and the loan commitment totaled $9,820,972.  The losses on this loan are estimated to exceed $3 million.

624.    The primary source of repayment of this loan was to be via refinancing of the loan to facilitate site development.  The secondary source of repayment was identified as support from the borrower and its affiliates.  However, no personal guarantees were obtained.

625.    This loan was downgraded to Special Mention 1 in December 2007 and then to Substandard 1 on December 27, 2007 due to deterioration of the value of the collateral as shown by significant drops in the appraised value.  The borrower was described as nonresponsive and as having "marginal liquidity and financial strength."  Notice of termination of the commitments was sent to the borrower on May 12, 2008, and on May 14, 2008, the commitments were collapsed to their outstanding balances.

626.    As of May 20, 2009, this loan had an unpaid balance of $7,188,574 with an impairment of $3,055,416.

**COMPLAINT**

627.   Van Dellen, Shellem, and Rothman approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.     No personal guarantees were obtained from Mountain View Bravo's principals.  This violated HBD's credit policy, and was especially risky for a land acquisition loan where no project was being constructed through the loan.

b.     The profit margin on this loan was shown as negative.  This was purportedly mitigated by the borrower's significantly lower cost basis on the land.

c.     This loan was for a 36-month term, which violated the maximum term of 24 months for land loans allowable under HBD policy.  Van Dellen, Shellem, and Rothman were already aware that the real estate market, particularly in the California Central Valley, was in decline.  Accordingly, their decision to approve a land loan that would not mature until October of 2009 was irresponsible.

d.     The land loan was made with no defined plans for land development or build out, and therefore was entirely speculative.

e.     The Bakersfield market and a north submarket were a Pass 5 market at the time of loan origination, and had a reported 19 months of inventory.  The CAM acknowledged "continued weakness in the resale market [which] will eventually take a toll on new home sales."  The CAM also acknowledged that builders were adopting a "wait and see" attitude with respect to land purchases.

f.     This loan was a Pass 3 credit in a Pass 5 market in violation of HBD policy.

628.   Van Dellen., Shellem, and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Rothman in regard to this loan include, but are not

limited to, the following:

      a.    Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

      b.    Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

      c.    Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

      d.    Causing or allowing a loan to be made with deficient collateral.

      e.    Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

      f.    Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

      g.    Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

      h.    Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

      i.    Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

      j.    Causing or allowing a loan to be made, renewed or extended despite

the borrower having a high geographic concentration of property in the same market.

k.     Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

629.   Van Dellen, Shellem and Rothman as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

630.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

631.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

632.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 55

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Rothman Related to the Underwriting, Administration, Extension and Modification of a Loan to S&J Alfalfa for the Section 19 Project)**

633.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 632 of this complaint, as though fully set forth herein.

634.   Van Dellen, Shellem, and Rothman approved a loan to S&J Alfalfa, Inc. for a project known as Section 19.  This land acquisition loan was entered into on November 28, 2006, and replaced an existing HBD raw land loan that was scheduled to mature in

February 2007.  The new loan was to be a land loan secured by Section 19 which was approximately 591 net acres of land located in northeast Bakersfield.  The Section 19 loan and previously financed loans to the borrower, and entities related to the borrower, resulted in HBD having 26.4% of the 23,866 lots contained in the Bakersfield market.  As a result, HBD was financing about 1.21 years of inventory.  This loan had a 36-month term, and the loan commitment totaled $19,865,248.  The losses on this loan are estimated to exceed $4.5 million.

635.    The primary source of repayment of this loan was to be via refinancing of the loan to facilitate site development.  The secondary source of repayment was identified as support from the borrower and its affiliates.  However, no personal guarantees were obtained.

636.    Prior to this loan's maturity, the Bakersfield market unsurprisingly continued to deteriorate.  Subsequent appraisals valued the project at significantly less than the appraisal used during loan origination.  As noted in a CAR from June 30, 2008, the borrower had "significant exposure in the Bakersfield area and marginal liquidity and financial strength."

637.    In early November 2007, an appraisal showed that the value of the collateral had fallen to $12 million such that the loan-to-value ratio increased to 124%.  On May 14, 2008, the commitment on the Section 19 land loan, as well as other commitments to Mountain View Bravo, were collapsed to their outstanding balances.  The land loan for Section 19, along with the land loan for Section 21, was in the note sale pool and had a potential buyer.  But on June 24, 2008, the borrower cancelled the purchase agreement due to issues discovered in the due diligence process.

638.    The note for the Section 19 land loan was finally sold on March 31, 2009. The unpaid balance at the time of sale was $9,474,906.  The note sale proceeds were $396,337.  The resulting total loss was $9,078,569 or $4,539,285 net of a 50% participation.

639.   Van Dellen, Shellem, and Rothman approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.   No personal guarantees were obtained from Mountain View Bravo's principals.  This violated HBD's credit policy, and was especially risky for a land acquisition loan where no project was being constructed through the loan.

b.   The profit margin on this loan was 6.22%, which violated HBD's credit policy.

c.   This loan resulted in HBD having 26.4% of the lots in the Bakersfield market.  The appraisal submitted with the CAM identified market saturation, decreasing absorption rates, and declining sales.  This loan resulted in significant overexposure by HBD in late 2006 to the deteriorating Pass 5 Bakersfield market.  In fact, Van Dellen, Shellem, and Rothman had approved another land loan to the same borrower relationship in the same market only one month earlier.  Their decision to compound risk to HBD through this loan is astounding.

d.   This loan was for a 36-month term, which violated the maximum term of 24 months for land loans allowable under HBD policy.  Van Dellen, Shellem, and Rothman were already aware that the real estate market, particularly in the California Central Valley, was in decline.  Accordingly, their decision to approve a land loan that would not mature until November of 2009 was irresponsible.

e.   This land loan was made with no defined plans for land development or build out, and therefore was entirely speculative.

f.   The appraisers assumed that the 46 active and abandoned oil wells on the site would not interfere with a proposed development.  This was an unrealistic assumption that was clearly called out to Van Dellen, Shellem, and Rothman in HBD's appraisal review.

g.      The appraisal review acknowledged that Bakersfield was attempting to shift development to the northeast, where Section 19 was located, but the area was a new area for development having absorbed only a few hundred homes over the prior 10 years and "some sections have soil issues."

h.      The appraiser reported that overall market conditions were slowing down, especially in resales where inventory had ballooned and price cutting was occurring.  Nonetheless, "the appraised values [did] not take into consideration any deterioration in the current market."  This was also an unrealistic assumption that was clearly called out to Van Dellen, Shellem, and Rothman in HBD's appraisal review.

i.      This loan was a Pass 3 credit in a Pass 5 market in violation of HBD policy.

j.      The workout officer assigned to address the Mountain View Bravo relationship candidly acknowledged that both the Section 19 and Section 21 land loans were risky and that he likely would not have recommended them because he was a bit more conservative in regard to lending than simply taking a section of land in Bakersfield.

640.   Van Dellen, Shellem, and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Rothman in regard to this loan include, but are not limited to, the following:

a.      Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.      Causing or allowing a loan to be made in violation of applicable laws,

regulations, and/or HBD's internal policies.

c.     Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.     Causing or allowing a loan to be made with deficient collateral.

e.     Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

f.     Causing or allowing a loan to be made, extended, and/or renewed with inadequate or problematic appraisals.

g.     Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

h.     Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

i.     Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

j.     Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

k.     Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

l.     Causing or allowing a loan to be made, renewed or extended where

there was very little likelihood of the loan repaying within the term of the loan.

641.   Van Dellen, Shellem and Rothman as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

642.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

643.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

644.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 56

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen and Rothman Related to the Underwriting, Administration, Extension and Modification of a Loan to Sycamore Villas Development, LLC for the Summer Moon II Project)

645.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 644 of this complaint, as though fully set forth herein.

646.   Van Dellen and Rothman approved a loan to Sycamore Villas Development, LLC for a project known as Summer Moon II.  This loan was an interim construction loan to facilitate the construction of 80-detached-single-family residences with price points between $215,000 and $316,000 located in Arvin, Kern County, California in the Bakersfield area.  This loan was entered into on January 10, 2007, and had an 18-month term, and the loan commitment totaled $17,909,040.  The losses on this loan are

**COMPLAINT**

estimated to exceed $917,000.

647.   The primary source of repayment of this loan was to the sale of completed homes to end buyers.  The secondary source of repayment was identified as support from the guarantor.  However, as with the other loans in the Mountain View Bravo borrower relationship, no personal guarantee was obtained from the principal, Philippe Laik.

648.   Mountain View Bravo commitments were collapsed to their outstanding balances on May 14, 2008.  This loan was downgraded to Special Mention 1 in early December 2007 and to Substandard 1 on December 27, 2007.

649.   The note on this loan was sold on March 31, 2009.  Prior to sale, the unpaid balance on this loan was $1,915,517.  The note sold for $79,681, which resulted in a loss of $1,835,836 of which HBD's share was $917,918.

650.   Van Dellen and Rothman approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.   No personal guarantees were obtained from Mountain View Bravo's principals.  This violated HBD's credit policy.

b.   The profit margin on this loan was 3.4%, which violated HBD's credit policy.

c.   This loan was part of a number of loans in the latter half of 2006 and into 2007 that increased HBD's exposure to the Bakersfield market.  This loan caused HBD to exceed its geographic concentration limitation for the Central Valley.   Van Dellen, Shellem, and Rothman had approved two others loan in the same borrower relationship in the same market only one month earlier.  Van Dellen's and Rothman's decision to compound risk to HBD through this loan is astounding.

d.   The Bakersfield market had a 20-month supply of inventory as of the fourth quarter of 2006.

e.     The Bakersfield market was continuing to deteriorate.  This loan was a Pass 4 credit in a Pass 5 market in violation of HBD policy.

651.   Van Dellen and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen and Rothman in regard to this loan include, but are not limited to, the following:

a.     Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.     Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.     Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.     Causing or allowing a loan to be made with deficient collateral.

e.     Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

f.     Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

g.     Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

**COMPLAINT**

h.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

i.      Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

j.      Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

k.      Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

652.   Van Dellen and Rothman as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

653.   By their actions and inactions, as generally and specifically described above, Van Dellen and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

654.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

655.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.