**BB.   Count Based on Allegations Related to the Loan Made By HBD in the Pacific Pride Communities Borrower Relationship.**

**<u>Count 57</u>**

**<u>(Claim for Negligence and Breach of Duty of Care Against Van Dellen, Shellem, and Rothman Related to the Underwriting, Administration, Extension and Modification of a Loan to PPC Westwood Country 3, LLC for the Westwood Country Unit #3 (Inspirations) Project)</u>**

656.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 655 of this complaint, as though fully set forth herein.

657.   Van Dellen, Shellem and Rothman approved a loan to PPC Westwood Country 3, LLC for a project known as Westwood Country Unit #3 (Inspirations).  This loan was entered into on November 16, 2006, and provided an 18-month extension on financing for the third phase of the 177-unit Westwood Country Project located in Escalon, California, a suburb of Sacramento.  Phase 3, known as Inspirations at Westwood Country, consisted of 69 units comprised of seven home plans.  The loan commitment totaled $23,622,185, and the losses on this loan are estimated to total approximately $7 million.

658.   The primary source of repayment of this loan was to be the sale of the individual units in the project.  A secondary source of repayment was noted to be cash flow generated by the guarantors' six unrelated projects.

659.   On December 20, 2005, HBD entered into the original version of this loan.  At that time, the transaction had a credit risk rating of Pass 4, but contained many risks that made HBD's decision to underwrite this loan highly questionable.  These risks included the following:  (1) the borrower and guarantors put none of their own cash into the transaction and engaged in 100% financing; (2) the borrowers' and guarantors' combined adjusted equity totaled $5.172 million on a $25 million loan commitment; (3) HBD appears to have engaged in an effort to make the borrower and guarantors' numbers

look better by including the borrowers'/guarantors' projected profits in their other projects financed by IndyMac, which effectively increased their equity to nearly $15 million; (4) the borrower/guarantors had nearly $24 million in outstanding commitments with other lenders, which likely represented contingent liabilities; (5) the guarantors were only required to provide financial statements annually; (6) a paltry minimum liquidity covenant of $500,000 was set; (7) the property did not yet have a final map; (8) HBD exceeded its $15 million loans-to-one-borrower limit; (9) this was the guarantors' largest project to date; (9) the guarantors' combined liquidity totaled $349,000; and (10) one of the guarantors had a FICO score of 661.  The credit officer for the original approval recommended a participation of the difference between the loan-to-one-borrower maximum and the loan cap amount.  This was rejected by the Junior Loan Committee.

660.   On April 13, 2006, financial analyst John Garibay submitted a memo noting that the borrower had not begun construction on Westwood Country 3 because Westwood Country 2 project had not performed to projections.  Thus, the interest payments had depleted the interest reserve by nearly $200,000.  The borrower had not met the minimum sales rate during the past six months on the earlier project, and had averaged less than one sale per month.  The borrower had also resorted to offering free options and upgrades.

661.   On October 15, 2006, account officer Roger Perry submitted a CAM for this loan to request an 18-month extension to the existing loan.  Van Dellen, Shellem and Rothman approved the request, and the extension was booked with a new building loan agreement executed on November 16, 2006.

662.   On October 3, 2007, the borrower informed HBD that it would be liquidating the standing inventory.  HBD filed a notice of default in December 2007.  As of June 3, 2008, the property consisted of 10 homes and 50 finished lots.  HBD sold this note through the Eastdil note sale on June 20, 2008.  The unpaid balance at the time of sale was $9,640,000, and the sale price was $2,701,000.

663.   Van Dellen, Shellem, and Rothman approved, renewed and/or extended this

loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

  a. The credit risk rating for this transaction was a Pass 5 due to weak financial support and deteriorating market conditions.  Van Dellen's, Shellem's, and Rothman's decision to approve a Pass 5 loan in late 2006 was irresponsible.

  b. The borrower's earlier project was not performing as projected, which caused a need to extend this loan.  The CAM noted that Westwood Country Unit #2 had 2.8 sales per month versus a projected absorption of 5 sales per month.  Van Dellen, Shellem, and Rothman failed to recognize this as an indicator of how the Westwood Country Unit # 3 project would perform.

  c. Van Dellen, Shellem, and Rothman approved this loan despite statements in the CAM that construction had been delayed, sales were delayed, interest reserve was partially depleted, and home prices had declined.

  d. The projected profit margin dropped to only 4.31% versus a 10% policy requirement.  This left little room for the borrower to cut prices in order to respond to market declines.  There was no mitigant provided for this policy exception.

  e. Van Dellen, Shellem, and Rothman  approved this loan despite a statement in the CAM that the borrower had no profit incentive to complete the project because the land seller was entitled to over $2 million for the return of his equity, 7% interest on the note, and 40% of the project's net proceeds.

  f. Credit officer David Boggs noted in his credit review memo that the "as-is" loan to value was high.  This should have caused Van Dellen, Shellem, and Rothman concern given the borrower's inability to meet sales expectation on the earlier phase.

  g. David Boggs also noted that a minimum liquidity covenant of $500,000 was low for a loan commitment that exceeded $23 million.

**COMPLAINT**

h.   As with the prior loan, the borrower and guarantors were not contributing upfront cash equity, but rather were engaging in 100% financing.

i.   The borrowers' and guarantors' combined adjusted equity totaled $4.619 million on a $23.6 million loan commitment.  As with the earlier loan, HBD improperly included the borrower's and guarantors' projected profits in their other projects financed by IndyMac, which effectively increased their adjusted equity to $14.747 million.

j.   The borrower and guarantors had nearly $22 million in outstanding commitments with other lenders, which likely represented their contingent liabilities.  Their failure to produce 2005 tax returns for this application appears to have not caused Van Dellen, Shellem, and Rothman any concern.

k.   The guarantors were only required to provide financial statements annually, which compromised HBD's ability to react quickly to a declining sponsorship.

l.   Krcmarik noted that Mr. Hein's FICO scoring being only 661 in September of 2005, and dropping 80 points since September of 2003 due to the proportion of revolving balances involving credit limits being too high, and nine inquiries within the past three months, signified a red flag because Mr. Hein was "leveraging himself up, and was trying go even further."  Similarly, the CAM noted that Mr. Hurburt's FICO score dropped below 700 due to too many recent credit inquiries, which should have raised additional concerns.

m.   Krcmarik indicated that the guarantors' liquidity was low for a loan this size. He further indicated that he would want to see liquidity of at least $1 million.

n.   Van Dellen, Shellem, and Rothman approved this loan despite the CAM's warning that the borrower's and guarantors' financial condition was weak, and there was a question of whether they could handle a market downturn and/or a

rise in material costs.  Van Dellen, Shellem, and Rothman already knew the market was in a downturn, and yet approved this loan anyway.  Krcmarik stated that this weakness identified precisely what went wrong with this loan, and that the weakness would have been called out to Van Dellen, Shellem, and Rothman prior to loan approval.

664.   Van Dellen, Shellem, and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen, Shellem, and Rothman in regard to this loan include, but are not limited to, the following:

a.   Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.   Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.   Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.   Causing or allowing a loan to be made with deficient collateral.

e.   Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

f.   Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

g.      Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

h.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

i.      Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

j.      Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

k.      Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

665.   Van Dellen, Shellem, and Rothman as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

666.   By their actions and inactions, as generally and specifically described above, Van Dellen, Shellem, and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

667.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen, Shellem, and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

668.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen, Shellem, and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for

all losses.

**CC.   Count Based on Allegations Related to the Loan Made By HBD in the Rokas International Borrower Relationship.**

<u>**Count 58**</u>

<u>**(Claim for Negligence and Breach of Duty of Care Against Van Dellen and Rothman Related to the Underwriting, Administration, Extension and Modification of a Loan to 2300 S. Michigan Development Group, LLC for the Motor Row Project)**</u>

669.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 668 of this complaint, as though fully set forth herein.

670.   Van Dellen and Rothman approved a loan to 2300 S. Michigan Development Group LLC for a project known as Motor Row.  This loan was entered into on March 16, 2007, and provided financing for the acquisition, development and construction of a 94-unit, 7-story-condominium building located in the south loop area of downtown Chicago.  The building was to include 99 deeded parking spaces on the initial two levels, and approximately 8,600 square feet of retail space on the first floor.  The loan commitment totaled $25,305,356, and the losses on this loan are estimated to total $3.5 million.

671.   The primary source of repayment of this loan was to be the sale of the individual condominium units in the project.  The CAM did not identify any secondary source of repayment.

672.   On November 29, 2007, IndyMac learned of a $360,000 broker lawsuit against the borrower and IndyMac for funds owed to the broker on the purchase transaction.  IndyMac notified the borrower that it was responsible for defending the suit.

673.   On February 8, 2008, the mezzanine lender informed HBD that the borrower and guarantor, Andrius Augunas ("Augunas"), left the country and abandoned the project due to the expiration of his immigrant work status.  HBD was unable to verify the details

**COMPLAINT**

1   of any immigration issues and was unable to contact the borrower directly.  HBD was

2   forced to take over the defense of the broker lawsuit at its cost.

3        674.   On February 29, 2008, HBD received notice that the architects on the project

4   filed a mechanics lien totaling $111,836.

5        675.   On March 4, 2008, Van Dellen sent an e-mail to Rothman, Camp, and the

6   account officer noting that they needed to research how HBD underwrote the borrower's

7   financial situation.  In particular, Van Dellen noted various liens and lawsuits involving

8   the borrower.  That same day, Rothman drafted an e-mail to the account officer asking

9   why he believed Augunas was a United States citizen if he only immigrated to the United

10  States in 2003.  The account officer's response simply noted that Augunas told HBD he

11  was a citizen.  Van Dellen and Rothman approved this loan despite the fact that HBD

12  failed to perform any due diligence in this regard such as requesting a birth certificate or

13  naturalization papers.

14       676.   On March 8, 2008, HBD received confirmation from the borrower's attorney

15  that the borrower misappropriated the buyer escrow deposits totaling $350,000.

16       677.   On March 14, 2008, Van Dellen, Rothman, and Wohl authorized HBD to

17  accept the mezzanine lender, Equibase Capital, as the borrower.  Equibase was willing to

18  step into the borrower position and hire a suitable developer if HBD agreed to waive a

19  requirement for an additional guarantee.  Equibase agreed to be responsible for the

20  architects' lien, and the loss of the borrower deposits.  In addition, Equibase approved

21  HBD assuming the defense of the broker's lawsuit and agreed to cover the first $50,000

22  of the costs of defense.  Any costs, settlement or judgment would be paid by IndyMac

23  and added to the first mortgage debt.  A formal modification agreement was executed as

24  of April 15, 2008.  In June of 2008, Equibase informed HBD that it would no longer

25  support the project financially.  This put Equibase in default, and a Notice of Default was

26  issued on June 12, 2008.

27       678.   As of July 28, 2008, the building was 74% complete.  The "as-is" value at

28

393199.1_DOC                              -262-
                                  **COMPLAINT**

that time indicated a potential impairment of approximately $2.19 million.  However, the account officer noted that HBD was highly skeptical of that valuation because the appraisal set forth an average sales price of $313,000 per unit, which was higher than the initial average value of $306,000 per unit at the original underwriting.  Thus, the account officer noted that the true market value was considerably lower.  More importantly, the account officer believed the project would be looked upon by interested buyers as an apartment project, which would render a much lower value.

679.  On August 20, 2008, Van Dellen and Rothman approved a workout plan that put a receiver in place to continue with construction to complete the building up to tenant improvements.  The plan also recommended proceeding with the foreclosure process with the ultimate goals of selling the asset when it was near completion.

680.  Subsequent to the FDIC being appointed receiver, the FDIC sold the note on this loan to Flagstar (the participant).  Camp testified that this loan was impaired at the time of sale.  The unpaid loan balance at the time of sale was $19,479,100.  The most recent appraisal report dated July 2008 provided an "as-is" value of $15,976,800.

681.  Van Dellen and Rothman approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.  The CAM noted that condominium sales in downtown Chicago had slowed, and that the market was rated as non-qualifying in the loan pricer due to the overall months of supply.  The mitigant for this weakness states that the 27.8 months of supply in the Chicago market was substantially higher than the 12-15 months reported for the downtown Chicago area for the first half of 2006.  Van Dellen's and Rothman's reliance on stale data was unreasonable given that this loan was closed in March of 2007.  In addition, the general decline of the Chicago market constituted a warning of the overall market trend.  Van Dellen and

Rothman appear to have relied unreasonably on "optimism that the submarket [would] remain healthy despite the nation's housing slowdown."

b.     Van Dellen's and Rothman's decision to approve a loan for a new condominium development in March of 2007 was inherently risky due to declining market conditions, and the inability to phase construction.  Van Dellen and Rothman exacerbated this risk by approving a loan with an 80% loan-to-value ratio and an 85% loan-to-cost ratio.  Their decision to approve a lengthy 24-month-loan term also increased the risk due to the already softening real estate market.  Moreover, Van Dellen and Rothman disregarded HBD's credit risk matrix by approving a loan that had a combined credit risk rating of Pass 5, and a market rating of Pass 5.

c.     HBD knew Rokas International was formed in 2000 by a Lithuanian entrepreneur named Andrius Augunas.  While the CAM reported that he was a United States citizen, there was insufficient due diligence performed to confirm his citizenship.  A routine credit check noted a lack of credit history, which should have presented an immediate red flag.  In addition, Augunas did not move to the United States until 2003, which was less than four years prior to loan origination.  In fact, the CAM identified as a "weakness" that Augunas had less than 5 years experience in the United States.  Camp indicated that if he knew Augunas came to the United States in early 2000, it would have raised a question in his mind as to whether he was, in fact, a U.S. citizen.  Not only was this not an immediate red flag to Van Dellen and Rothman, but they decided to approve the loan with limited disbursement controls, which were typically reserved for "established customers with conforming projects."  Camp stated that the bank could have easily verified citizenship by asking for a birth certificate or naturalization papers.

d.     Augunas provided a full repayment and completion guarantee.  Van Dellen and Rothman should have known that the guarantee provided little to no

**COMPLAINT**

support as Augunas' financials showed anemic liquidity totaling $1.46 million, and a net worth totaling $16.02 million. Camp stated that the borrower's net worth of $16.02 million was insufficient to repay the loan. Van Dellen's and Rothman's decision to approve a loan that exceeded the borrower's net worth by nearly $10 million demonstrates irresponsible loan underwriting. This was particularly true because the borrower had over $9 million outstanding on unrelated projects, which likely represented an equal sum of contingent liabilities for the guarantor. Camp noted that the fact that the sponsorship could not independently repay the loan suggests that a lower advance rate would have been appropriate.

e.      The borrower relied upon a mezzanine lender to provide the bulk of the equity contribution. This was particularly risky given the borrower's weak financial support, the product type, and the market conditions.

f.      Van Dellen and Rothman knew that the borrower and guarantor afforded weak financial support at the time of underwriting. Nonetheless, Van Dellen and Rothman approved this loan without requiring any financial reporting covenants that obligated the borrower to provide financial statements. In addition, Van Dellen and Rothman permitted the guarantor to provide annual financial statements instead of quarterly statements. This decision compromised HBD's ability to carefully monitor the financial condition of the sponsorship.

g.      Van Dellen's and Rothman's irresponsible decision to approve this loan was articulated quite well in an e-mail written by IndyMac's CEO Perry on March 7, 2008. Specifically, Perry admonished HBD management and stated: "You guys were nuts to do this loan. The original LTV and LTC are far too high for a condo project… when we knew housing was slowing. I don't think our guidelines allowed us to go this high. And we should never make a loan to someone whose net worth is below our loan amount… ever!!! In addition, we should never make a loan to a builder with so little skin in the game… and to a guy

who is barely off the boat!!!!!  I don't know what you guys were thinking."  These problems were exacerbated by the fact that this was a 24-month-condominium development that could not be phased.

682.   Van Dellen and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen and Rothman in regard to this loan include, but are not limited to, the following:

a.   Causing or allowing a loan to be made to a borrower and guarantor who were or should have been known to be not creditworthy and/or in financial difficulty.

b.   Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.   Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.   Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.   Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.   Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

**COMPLAINT**

g.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h.      Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

i.      Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

683.    Van Dellen and Rothman as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

684.    By their actions and inactions, as generally and specifically described above, Van Dellen and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

685.    As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

686.    With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**DD.   Count Based on Allegations Related to the Loan Made By HBD in the Pacific Century Homes Borrower Relationship.**

## Count 59

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen and Rothman Related to the Underwriting, Administration, Extension and Modification of a Loan to PCG Savannah, LLC for the Savannah 76 Project)**

687.    Plaintiff incorporates by reference and re-alleges each of the allegations in

paragraphs 1 through 686 of this complaint, as though fully set forth herein.

688. Van Dellen and Rothman approved a loan to PCG Savannah, LLC for a project known as Savannah 76. This loan was entered into on April 10, 2007, and provided financing for the acquisition of 76 finished lots, followed by the development and construction of single-family homes in Litchfield Park, Arizona, a suburb of Phoenix. The loan commitment totaled $21,350,000, and the losses on this loan are estimated to total $4.5 million.

689. The primary source of repayment of this loan was to be the sale of the homes constructed in the project. The secondary source of repayment of this loan was support from the borrower and guarantors, and the liquidation of assets or refinance of collateral.

690. The construction on this project never commenced. As of October 2008, the guarantors Pacific Century Homes and William Lo had no liquidity and no means to support the loan. On June 28, 2008, a notice of default was recorded, and a foreclosure sale was scheduled for December 2, 2008. A receiver was in place to manage the project.

691. Van Dellen and Rothman authorized a note sale on October 14, 2008, to Cason Tyler Communities. The unpaid balance at that time was $6,481,823, and the negotiated sale price was $3,250,000 for a loss of $3,335,323. There was a FAS 114 impairment at that time totaling $2,805,323. The note sale did not close, and this loan is currently being administered by IndyMac Ventures LLC. The unpaid balance totals at least $6.6 million.

692. Van Dellen and Rothman approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence. These risks include, but are not limited, to the following:

a. Arizona was a new market for the borrower. Both Mr. Lo and HBD lacked experience in the market. In fact, HBD's account officer in this market, Letty Kaufman, was terminated for poor performance.

b.     The Phoenix market was softening during the year prior to loan approval, which resulted in declining home prices and rising inventory and slowing absorption rates.  The submarket had 32 months of supply, and the subject project had nearly 28 months of supply, with 24 months of supply at the subject price point.  Van Dellen's and Rothman's decision to approve a 24-month loan in a deteriorating market with 24 months of supply evidences irresponsible underwriting.

c.     The project involved a new community with few comparables to support the valuation assigned to the project.  In addition, the project was not "in fill" as preferred by HBD.

d.     The CAM predicted a low 6.5% profit margin versus 10% policy requirement.  This left little room for the borrower to cut prices in order to respond to market declines.

e.     The loan-to-value ratio was at the policy maximum of 85%, which provided no flexibility to respond to market declines.

f.     There were 23 speculative units versus a policy maximum of 12 units. This increased the Bank's exposure to this weak and low profit project.

g.     The project's average appraised retail value of $371,108 per unit versus Phoenix's median price of $305,000 represented 121.7% of the CMA, and would likely have created further absorption problems.

h.     Van Dellen and Rothman approved this loan with no verification of the borrower's or guarantor's assets, who were ultimately unable to repay the loan when it defaulted.  The borrower had a low FICO score of 619 due to improper billing and misapplications of funds.  This violated HBD's policy requirement of 660.

      i.     The combined credit risk rating of Pass 4 in a Pass 5 market violated HBD policy designed to prevent the approval of mediocre credits in poor or declining markets.

      j.     The guarantor, Bill Lo ("Lo") had 36 projects in process totaling 27,934 units. While Lo reported liquidity of $19.2 million and adjusted net worth of $288.8 million, he had $282.2 million in contingent liabilities as of December 31, 2006. Lo's exposure weakened his strength as a guarantor.

      k.     Van Dellen and Rothman approved this loan without any quarterly financial reporting covenant. Their decision to settle for annual reporting was risky given the guarantor's high leverage and the declining market conditions.

693. Van Dellen and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac. The negligence and breaches of duty by Van Dellen and Rothman in regard to this loan include, but are not limited to, the following:

      a.     Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

      b.     Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

      c.     Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

      d.     Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.      Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.      Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g.      Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

h.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

i.      Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

694.   Van Dellen and Rothman as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

695.   By their actions and inactions, as generally and specifically described above, Van Dellen and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

696.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

697.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**EE.    Counts Based on Allegations Related to the Loans Made By HBD in the Dunmore Homes Borrower Relationship.**

<u>Count 60</u>

<u>(Claim for Negligence and Breach of Duty of Care Against Van Dellen and Rothman Related to the Underwriting, Administration, Extension and Modification of a Loan to Dunmore Fullerton Ranch, LLC for the Whispering Oaks Project)</u>

698.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 697 of this complaint, as though fully set forth herein.

699.   Van Dellen and Rothman approved a loan to Dunmore Fullerton Ranch, LLC for a project known as Whispering Oaks.  This loan was entered into on May 22, 2007, and refinanced a land loan that was originally provided by Guaranty Bank on August 2004.  Guaranty's loan matured on March 27, 2007. This loan's term was 12 months and contemplated 112 units.  The loan commitment totaled $4,136,956, and the losses on this loan are estimated to total approximately $3 million.

700.   The primary source of repayment of this loan was to be a land loan and construction loan to build out the 112 proposed zero-lot-line homes.  A secondary source of repayment was noted to be the sale of the property.  A tertiary source of repayment was noted to be the liquidation of the assets of the guarantors Dunmore Homes and Sydney B. Dunmore ("Dunmore").

701.   In August 2007, the underlying managing member of the borrowing entity Dunmore Fullerton Ranch LLC notified all lenders that they were stopping construction on all projects.  In September 2007, Dunmore Homes sold the company and all assets to Michael Kane, an individual unknown to HBD, and presented HBD with a plan to build out all assets with 100% financing and a 4% management fee.  HBD rejected the plan and that same month classified this loan Substandard 1.  HBD filed a notice of default on October 30, 2007, and subsequently foreclosed on the property.

702.   On February 28, 2008 a foreclosure took place with the unpaid loan balance

as of that date being $3,849,184.  HBD made a credit bid at foreclosure of $2,313,034 for a resulting loss on foreclosure of $1,536,150.  The security was sold on March 31, 2009 for net sale proceeds of $875,500, resulting in an additional loss given the bid value on the collateral at foreclosure.  The additional loss at the time of the sale was $1,437,534 which, together with the loss at foreclosure (and net of the recovery on sale), results in a total loss of $2,973,684.

703.   Van Dellen and Rothman approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.   This loan was a Pass 3 credit in a Pass 5 market in mid-2007 when Van Dellen and Rothman were aware the market was deteriorating.

b.   Only the borrower's liquid assets were verified.

c.   The profit margin was disregarded in underwriting.

d.   This loan was a refinance of a Guaranty Bank loan where the only apparent explanation by Guaranty Bank as to why it was not renewing the loan was that it had had the loan on its books too long.

e.   This loan was a raw land loan on unentitled land.  The land had no tentative map in place.  Approval of a tentative map was estimated to be three to five months away with approval of the final map sometime after that.  This information was communicated to Van Dellen and Rothman prior to their approval of the loan.

f.   This loan was not cross-collateralized, cross-defaulted, or cross-paid with the Dunmore Windsor loan.

g.   The contingent liabilities of the personal guarantor Sydney Dunmore were not analyzed.

h.   The quick collapse of the borrower after the origination of this loan demonstrates that the underwriting of this loan failed to utilize adequate due

diligence to sufficiently explore the financial condition of the borrower and guarantors.

704.   Van Dellen and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen and Rothman in regard to this loan include, but are not limited to, the following:

a.   Causing or allowing a loan to be made to a borrower and guarantor who were or should have been known to be not creditworthy and/or in financial difficulty.

b.   Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.   Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.   Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.   Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.   Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g.   Causing or allowing a loan to be made, renewed, and/or extended

despite poor and deteriorating market conditions.

      h.    Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

      i.    Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

      j.    Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

705.   Van Dellen and Rothman as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

706.   By their actions and inactions, as generally and specifically described above, Van Dellen and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

707.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

708.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 61

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen and Rothman Related to the Underwriting, Administration, Extension and Modification of a Loan to Dunmore Canterbury LLC/DHI for the Windsor Project)

709.   Plaintiff incorporates by reference and re-alleges each of the allegations in

**COMPLAINT**

paragraphs 1 through 708 of this complaint, as though fully set forth herein.

710.   Van Dellen and Rothman approved a loan to Dunmore Canterbury LLC/DHI for a project known as Windsor.  This loan was entered into on June 4, 2007, and provided financing to construct 65 single-family residences and to refinance three models and construct one additional model in Yuba City, California, in Sutter County about 40 miles north of Sacramento.  This loan replaced prior financing from Guaranty Bank which was assisting the borrower in the construction.  This loan's term was 30 months.  The loan commitment totaled $16,265,600, and the losses on this loan are estimated to exceed $1.6 million.

711.   The primary source of repayment of this loan was to be the sale of homes constructed in the project.  A secondary source of repayment was noted to be support from the guarantor Dunmore Homes.  Dunmore himself did not personally guarantee this loan.

712.   In August 2007, the underlying managing member of the borrowing entity Dunmore Fullerton Ranch LLC notified all lenders that they were stopping construction on all projects.  In September 2007, Dunmore Homes sold the company and all assets to Michael Kane, an individual unknown to HBD.  In September 2007, this loan was classified as Substandard 1.  The borrower reportedly admitted not using draw funds appropriately and liens were filed against the project.

713.   HBD sold the note through Eastdil in a sale closing on June 30, 2008, prior to the seizure of the Bank.  The unpaid balance at the time of sale was $3,705,000 and the sale proceeds were $2,036,750, resulting in a loss of $1,667,250.

714.   Van Dellen and Rothman approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.  This loan was approved in mid-2007, when Van Dellen and Rothman were aware of deteriorating market conditions.  Indeed, this loan had a combined credit risk rating of Pass 5, and involved a Pass 5 market.

b.  The borrower had over $330 million in contingent liabilities.

c.  The borrower experienced a significant decrease in revenue and net income over the past several years.

d.  The guarantor had a large inventory of lots on a consolidated basis.

e.  The project was in an outlying market.

f.  In violation of HBD policy, no personal guarantee was provided from principal Sydney Dunmore.  This was particularly risky given the market condition.

g.  HBD was slightly exceeding its market concentration limits in this market.  In addition, HBD had loans to Corinthian Homes and Reynen & Bardis Communities with tract developments located in Linda, California, five miles east of Yuba City, the location of this project.

h.  Consideration of HBD projects with Corinthian Homes and Reynen & Bardis in nearby Linda, California suggested that sales rates could be as slow as one unit per month.  In addition, the account officer's discussions with other banks lending to the borrower, including Comerica, revealed that the borrower was offering incentives on all of their projects because absorption had slowed significantly.

i.  This loan involved refinancing an existing loan by Guaranty Bank. The account officer discussed the refinance with Guaranty Bank, but she provided an inadequate explanation as to why Guaranty Bank was not continuing on as the lender.

j.  This loan was approved with high loan-to-value ratios and loan-to-cost ratios, which offered little margin for declining values.

k.     The 30-month-loan term was unreasonably long given the deteriorating market conditions.  It was unreasonably risky for Van Dellen and Rothman to approve a loan that was not projected to pay off until January of 2010.

l.     The quick collapse of the borrower after the origination of this loan demonstrates that the underwriting of this loan failed to utilize adequate due diligence to sufficiently explore the financial condition of the borrower and guarantors.

715.   Van Dellen and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen and Rothman in regard to this loan include, but are not limited to, the following:

a.     Causing or allowing a loan to be made to a borrower and guarantor who were or should have been known to be not creditworthy and/or in financial difficulty.

b.     Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.     Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.     Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

e.     Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

f.      Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

g.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

h.      Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

i.      Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

j.      Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

716.   Van Dellen and Rothman as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

717.   By their actions and inactions, as generally and specifically described above, Van Dellen and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

718.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

719.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

**FF.    Count Based on Allegations Related to the Loan Made By HBD in the AKT Development Borrower Relationship.**

<u>**Count 62**</u>

<u>**(Claim for Negligence and Breach of Duty of Care Against Van Dellen and Rothman Related to the Underwriting, Administration, Extension and Modification of a Loan to Angelo K. Tsakopoulos for the Mangini Ranch Project)**</u>

720.    Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 719 of this complaint, as though fully set forth herein.

721.    Van Dellen and Rothman approved a loan to Angelo K. Tsakopoulos ("Tsakopoulos") for a project known as Mangini Ranch.  This land acquisition loan was entered into on June 4, 2007.  The purpose of this loan was to refinance the Mangini Ranch Property, with all loan funds being advanced at loan closing -- $39.1 million to the borrower, and $900,000 toward loan fees ($40 million total).  The CAM identified a seller carry back note totaling $8,709,400.  Thus, the borrower was permitted to take out over $31 million in appraised equity out of this property for his discretionary use.  This loan did not include an interest reserve; the borrower was to pay approximately $3.6 million per year in interest out of pocket.

722.    Mangini Ranch consisted of 934 gross acres of land within the City of Folsom's sphere of influence.  The city is approximately 20 miles from Sacramento, California.  The property was zoned AG-80, which provides for agricultural uses.  Nonetheless, approximately 453 acres were proposed for development of 3,506 residential units of low, medium, and high density.  This loan was the first loan with Mr. Tsakopoulos since June 2006; he had been an IndyMac client since 1997.

723.    The primary source of repayment of this loan was to be the sale of the property.  The CAM noted that the property's "as-is" value was $110 million, and that a sale of a portion "should" pay off the loan.  The secondary source of repayment of this loan was noted in the CAM as reoccurring cash flow from income properties, and one

time land sales from properties controlled by the borrower.  In addition, full recourse guarantees were obtained from AKT Development and Tsakopoulos.

724.   On September 13, 2007, HBD approved the borrower's request to modify the liquidity reporting requirement to enable the borrower to include availability in lines of credit.  Camp indicated that allowing Tsakapoulos to satisfy his minimum liquidity covenant through the use of lines of credit was not as beneficial as cash because the lines of credit create a liability.

725.   In January 2008, HBD obtained an updated appraisal of the property that revealed an "as-is" value of $93,000,000.

726.   On May 19, 2008, Wohl sent Tsakopoulos a letter noting a request to extend this loan an additional three years.

727.   In July 2008, HBD obtained another updated appraisal of the property that revealed an "as-is" value of $63,000,000.  Thus, the loan-to-value ratio had increased to over 63%.  In December 2008, HBD obtained another appraisal of the property that revealed an "as-is" value of $23,350,000.  Thus, the loan to value ballooned to 171%.

728.   Despite the impairment, the borrower continues to make interest payments out of pocket.  It is currently unknown how Tsakapoulos plans to repay this loan, but he requested a loan extension.  Absent an extension, the term of this loan expires in mid-2010.

729.   Van Dellen and Rothman approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

   a.   A $40 million land loan in a deteriorating Pass 5 market in May 2007 with a three-year term was inherently risky.  This is especially true when HBD's collateral was unentitled, agriculturally-zoned, raw land.  HBD's policy states that a land loan should not exceed 24 months.  In addition, HBD's maximum

commitment amount per loan was not to exceed $25 million.  There was no meaningful mitigant identified for these policy violations.

b.      Van Dellen's and Rothman's decision to approve a $40 million land loan on property that had only an $8.7 million note was tantamount to an equity line of credit, and bore little resemblance to residential subdivision financing.  It does not appear as if the borrower intended to utilize any of the surplus funds to develop the property, and there was no loan budget that accounted for development.  Moreover, the entire commitment amount was to be disbursed at loan closing.  While the CAM did not address this issue, the Senior Loan Committee noted that "cash out" to the borrower of over $30 million was a policy exception.  Van Dellen's and Rothman's decision to approve such a loan without having the borrower's updated financial statements and in a deteriorating market was strikingly risky.

c.      The CAM identified a slow housing market and substantial entitlement issues that might include public opposition from environmental groups and potential lawsuits.  Wohl noted in an e-mail to Perry that "lending on land -- particularly in this dollar amount -- merits more scrutiny in today [sic] market environment…"  Van Dellen's and Rothman's decision to approve a loan on property that might prove not to have development potential was truly risky, as its value and marketability would drop considerably if it proved undevelopable.

d.      HBD's policy precluded new land acquisition financing transactions for tracts of land that would not have a recorded tentative tract map within 12 months of closing.  Van Dellen and Rothman approved this loan despite the fact that the property was at least 2-3 years away from receiving a recorded tentative tract map.

e.      The CAM noted that HBD's policy required a 50% participation on all loans over $5 million.  Van Dellen and Rothman approved this loan without

**COMPLAINT**

making such a participation a condition of closing.  A participation was never sold on this loan.

      f.    The borrower's purchase price for the property on September 12, 2002 was $5,602,620.  As noted, the appraised value in 2007 was $110 million. Thus, the collateral value appears overstated.  Moreover, while the loan-to-value ratio was conservative at 36.35%, it necessarily hinged on an appraised value of $110 million.  A 50% drop in land value -- not uncommon in down markets -- would bounce the loan-to-value ratio up to 73%.

      g.    The borrower's financial statements were dated as of December 31, 2005, which were unreasonably stale given his large land holdings, and the drastically changed market conditions present in May 2007.  The guarantor, AKT Development Corp., provided financials from June 2006, which were also stale, and revealed adjusted equity of negative $17.5 million.  HBD's policy required business financial statements and personal financial statements within 180 days of the credit request.  The mitigating factor focused on the strength of the borrower's and guarantors' financial conditions in 2004 and 2005, which failed to provide an actual mitigant.

      h.    The borrower had 21 other loan facilities as of January 31, 2007. These loans totaled nearly $200 million, and had an outstanding sum in excess of $166 million.  The vast majority of these facilities were lines of credit and land loans.  IndyMac's loan was the single largest commitment amongst the 21 other loans.  In addition, this loan was roughly double the size of any prior loan HBD ever made to this borrower.  Van Dellen's and Rothman's decision to approve such a land loan given the market conditions reveals an undue risk taken by HBD.

      i.    Tsakapoulos' total liquid assets at underwriting were a little over $40.5 million, and of that amount, over $39 million were in a line of credit.  As of June 30, 2007, Tsakapoulos had a paltry $83,668 in cash.

-283-
**COMPLAINT**

j.      The borrower and guarantors were only required to provide annual financial statements, which minimized HBD's ability to assess the quality of its secondary source of repayment in a declining real estate market.  HBD's policy required quarterly financial statements.  There was no meaningful mitigant provided.

k.      Credit officer Denise Gomez ("Gomez") was very junior and lacked experience to handle this transaction.  Camp stated that while Gomez could verify the accuracy of the CAM, she may not have had the financial background to analyze the borrower's financials for this transaction.  The borrower's financial condition was of paramount importance to the security of this loan.  Van Dellen's and Rothman's decision to approve this loan after HBD's most junior credit officer was assigned to it evidenced very questionable judgment.

730.   Van Dellen and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen and Rothman in regard to this loan include, but are not limited to, the following:

a.      Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.      Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.      Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.      Causing or allowing a loan to be made with deficient collateral.

e.      Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

f.      Causing or allowing a loan to be made, extended, and/or renewed with inadequate or problematic appraisals.

g.      Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

h.      Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

i.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

j.      Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

k.      Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

l.      Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

731.   Van Dellen and Rothman as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

732.   By their actions and inactions, as generally and specifically described above,

**COMPLAINT**

Van Dellen and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

733.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

734.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## GG.   Count Based on Allegations Related to the Loan Made By HBD in the Alpine Real Property Borrower Relationship.

### Count 63

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen and Rothman Related to the Underwriting, Administration, Extension and Modification of a Loan to Whittier Ranch Homes LLC for the Whittier Ranch Project)

735.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 734 of this complaint, as though fully set forth herein.

736.   Van Dellen and Rothman approved a loan to Whittier Ranch Homes LLC for a project known as Whittier Ranch.  This loan was entered into on or about May 2, 2007, and provided financing to construct 40 single-family residences and to pay down an existing construction loan with Security Pacific Bank.  The remaining 101 lots that comprise Whittier Ranch were to remain with Security Pacific Bank.  The project was located in Indio, California.  This loan's term was 12 months.  The loan commitment totaled $10,550,000, and the losses on this loan are estimated to exceed $5 million.

737.   The primary source of repayment of this loan was to be the sale of units constructed in the project.  A secondary source of repayment was noted to be support from the guarantor Lane Lowry and his trust.

738.   In the third quarter of 2007, the borrower and guarantors defaulted on their

liquidity covenant.  An updated appraisal report indicated a decline in collateral value. The borrower informed the Bank of significant financial decline whereby it was unable to make interest payments on the loan or otherwise repay the loan outside of project performance.

739.   In the fourth quarter of 2007, the borrower reported that it was unable to obtain certificates of occupancy due to additional improvements/reimbursements required by the City on HBD's collateral as well as the adjacent 101 lots held by Security Pacific Bank.  Security Pacific Bank was unwilling to cover any additional expenses and had initiated foreclosure proceedings on the 101 lots.

740.   In the first quarter of 2008, the borrower ceased all construction and marketing efforts on the project due to IndyMac's decision to initiate foreclosure proceedings.  A notice of default was recorded on April 24, 2008.

741.   The account officer stated that it was a foolish decision on workout with Whittier Ranch that ultimately led to a bigger loss because the borrower was prepared to complete the homes.  The account officer further stated that the borrowers had agreed to pay interest out-of-pocket if the Bank allowed them to finish the homes and get them in sale-ready conditions.  In fact, the borrowers sent in their first interest check only to have management "pull the rug out from underneath them."  This caused the borrowers to issue a stop payment on the interest check.  Approximately 19 homes had been completed except for floor coverings and countertops.  The borrower was also willing to make a personal guarantee and sign a note on any deficiency on the sale of those notes.  But the borrower needed an additional loan advance, a portion of which was going to be used to energize street lights for the tract.  While the cost to energize the street lights was only $38,000, the account officer stated that Van Dellen and Rothman did not want to pay for something that was not part of HBD's collateral.  Shortly after this deal, Van Dellen and Rothman transferred the account officer out of workout.  The account officer explained that at the time he was taken out of workout, his most recent evaluation demonstrated that

**COMPLAINT**

he was performing at 100% of expectation as a workout officer.

742.   Van Dellen and Rothman approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  These risks include, but are not limited, to the following:

a.     The CAM noted that the submarket where this project was located was over-supplied with 33 months of inventory.  The account officer characterized this as "a lot" of inventory.

b.     The borrower and guarantor had large land holdings with 19 projects in various stages of pre-development and limited interest reserves to draw upon.  They were clearly overextended and had low liquidity at approximately 5%.  The account officer stated that the guarantor maintaining a large land holding was a weakness because land does not produce any revenue, and it requires large amounts of revenue to "keep going."

c.     The account officer acknowledged that real estate prices in the Riverside/San Bernardino area were softening at the time this loan was approved.

d.     The account officer conceded that this loan involved a property in the Indio area, and there was a huge amount of competition there.

e.     The account officer conceded that while the secondary source of repayment identified in the CAM noted that the loan guarantor Lane Lowry and Trust offered sufficient liquidity and net worth to provide secondary support to the loan, that proved not to be true because most of Lowry's real estate holdings were raw land that was in the entitlement stage, and when land values dropped, land was particularly impacted and he lost all of his net worth.  The account officer explained that these were all risk factors that were identified in the CAM.

f.     The account officer conceded that a problem with this loan was that the borrower was heavy in land holdings and lacked revenue producing projects,

and that any borrower that is heavy in land holdings is riskier than a borrower that is building projects via actual construction loans.

743.   Van Dellen and Rothman knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen and Rothman in regard to this loan include, but are not limited to, the following:

a.      Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.      Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.      Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.      Causing or allowing a loan to be made with deficient collateral.

e.      Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

f.      Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

g.      Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

h.     Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

i.     Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

j.     Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

k.     Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

744.   Van Dellen and Rothman as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

745.   By their actions and inactions, as generally and specifically described above, Van Dellen and Rothman failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

746.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen and Rothman, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

747.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen and Rothman pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## HH.   Count Based on Allegations Related to the Loan Made By HBD via PBG in the Shahvand Aryana and James Braswell Borrower Relationship.

## Count 64

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen and Shellem Related to the Underwriting, Administration, Extension and Modification of a Loan to Aryana/Olive Grove Land Development, LLC for The Olive Project)

748.    Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 747 of this complaint, as though fully set forth herein.

749.    Van Dellen and Shellem approved a loan to Aryana/Olive Grove Land Development, LLC for a project known as The Olive.  The borrower's equal managing members were Shahvand Aryana and James Braswell.  This loan was a PBG loan that was entered into on or about March 15, 2006, and provided financing for the acquisition, development, and construction of 33 lots and the subsequent construction of 14 single-family homes in Yucaipa, California.  This loan had a 12-month term, and the loan commitment totaled $5,600,000.  The losses on this loan are estimated to exceed $2 million.

750.    A letter from HBD dated November 6, 2006 advised the borrower that the final recorded map was due August 1, 2006 and the construction was supposed to commence on July 1, 2006.  The letter requested an update on the status of the map and warned that the borrower's failure to obtain a final map or start construction could be considered an event of default.  However, the Bank continued to approve draws and disburse funds to the borrower.

751.    On December 11, 2006, a stop notice and mechanic's lien was recorded in a dispute over $36,963.

752.    On March 28, 2007, the loan was extended for 60 days.  The extension did not include a requirement to have a final tract map.

753.    On April 26, 2007, a letter from HBD advised the borrower that the loan

term matured on March 14, 2007 and that the following items were outstanding: recorded mechanics lien, clouded title from wrongfully recorded grant deed and deed of trust, and the need for current general liability insurance.  However, the Bank continued to approve draws and disburse funds to the borrower.

754.   On May 25, 2007, a second extension memorandum was approved with a 10-month term that included an additional advance of $698,500.  There was still no final tract map, and many other items remained unfulfilled by the borrower.  The loan was extended twice despite the fact that a year after funding, the site development was only 74% completed and direct construction work had not begun.

755.   On March 28, 2008, a default letter was sent to the borrower.  In excess of $4.2 million was disbursed on the project as of that time.  A full payoff demand was made on July 18, 2008.  On August 27, 2008, the borrower sought bankruptcy protection pursuant to Chapter 11.

756.   An original condition of the loan was to have a final map by August 1, 2006, but no final map had been approved and recorded at the time of the two extensions and no final map was ever obtained.

757.   Van Dellen and Shellem approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  In addition, Van Dellen and Shellem in the exercise of due diligence should have known that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  These risks include, but are not limited, to the following:

> a.   The majority of the equity contributed by the borrower was from market appreciation over the two years prior to funding the loan.  HBD advanced most of the cost of the land as part of the initial loan advance.  No cash was contributed to this deal, which was a policy violation.

b.      The appraisal used for the underwriting of the loan was dated August 6, 2005 and prepared for 1st Centennial Bank, which was more than six months prior to the anticipated funding.  There was no indication in the file that the appraiser issued a reliance letter for use by IndyMac.  IndyMac advanced most of the cost of the land as part of the initial loan advance.

c.      Guarantor Aryana had a FICO score of 645 at the time of the initial CAM.  In addition, there were 40 derogatory credit items on the report.

d.      Financial covenants for 2008 were not adhered to.  Financial statements were 298 days past due, tax returns were 328 days past due, and minimum liquidity was 84 days past due.  Yet, funds in excess of $360,000 were still advanced in 2008.  There was a repeated failure to properly supervise loan disbursements on this loan.  In fact, extensive disbursements were made prior to the borrower obtaining a final tract map.

e.      The CAM lacked any background information regarding the guarantors other than a reference that they "had prior experience."  The slightest bit of due diligence would have revealed that James Braswell and Shahvand Aryana had an unsuccessful partnership in other projects from 2006 through 2009 that resulted in ownership battles and lawsuits.

f.      James Braswell had an $18,000 tax lien that required resolution before funding.  The guarantor was supposed to provide evidence of the resolution of this tax lien prior to funding the vertical construction.  A note in the Bank file suggests that the tax lien may have been one of the causes for the delay in the final tract map.  Nonetheless, HBD funded the loan and later extensions.

g.      HBD extended the loan twice without obtaining new financial information and without performing a new credit analysis.  The borrower was clearly having difficulty, but the loan was not downgraded, and no reasonable plan to retire the loan was presented.

h.    The $5.6 million loan commitment exceeded the policy maximum for PBG of $5 million.  This violation was compounded by the subsequent additional advance totaling nearly $700,000.

i.    The 33 units on this project exceeded PBG's policy limit of 25 units.

758.    Van Dellen and Shellem knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen and Shellem in regard to this loan include, but are not limited to, the following:

a.    Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.    Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.    Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.    Causing or allowing a loan to be made with deficient collateral.

e.    Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

f.    Causing or allowing a loan to be made, extended, and/or renewed with inadequate or problematic appraisals.

g.    Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

h.     Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

i.     Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

j.     Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

759.   Van Dellen and Shellem as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

760.   By their actions and inactions, as generally and specifically described above, Van Dellen and Shellem failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

761.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen and Shellem, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

762.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen and Shellem pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

II.    **Counts Based on Allegations Related to the Loans Made By HBD via PBG in the John Gates  Borrower Relationship.**

## Count 65

**(Claim for Negligence and Breach of Duty of Care Against Van Dellen and Shellem Related to the Underwriting, Administration, Extension and Modification of a Loan to Caymus Court, LLC for Caymus Court Project)**

763.    Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 762 of this complaint, as though fully set forth herein.

764.    Van Dellen and Shellem approved a loan to Caymus Court, LLC for a project known as Caymus Court.  John Gates ("Gates") was the principal for Caymus Court, LLC and provided a full recourse guarantee.  This loan was a PBG loan that was entered into on or about March 30, 2006.  The loan provided financing for the acquisition, development, and construction of 33 lots and the subsequent construction of 9 single-family homes in Paso Robles, California.  This loan had a 12-month term, and the loan commitment totaled $4,150,000.  The losses on this loan are estimated to exceed $850,000.

765.    The project experienced entitlement delays.  As of July 31, 2007, the loan-to-value ratio for Caymus Court exceeded 157%.  Gates' net worth declined from $22.4 million as of December 2, 2005 to negative $20.6 million as of December 31, 2007.  In addition, Gates had nearly $62 million in contingent liabilities at that time.

766.    Van Dellen and Shellem approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  In addition, Van Dellen and Shellem in the exercise of due diligence should have known that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  These risks include, but are not limited, to the following:

a.      The loan-to-value ratio was 82.42% which was stated to be a policy exception.

b.      The CAM did not identify Gates' prior experience with residential developments.  The workout officer conceded that she discovered that Gates' experience was almost entirely with commercial real estate.

c.      There was no analysis of the borrower or guarantor's contingent liabilities set forth in the CAM.  The workout officer conceded that the guarantor proved to not be a viable secondary source of repayment because he was pursued by many other lenders on other projects he was involved in.  She further acknowledged that this information should have been reflected at origination by contingent liabilities.

d.      The CAM failed to identify that Gates had several legal actions against him over the years, he had a possible bankruptcy in the early 90s, had several state and federal tax liens, and had $770,000 in delinquent taxes.  The workout officer stated that this information should have been included in the CAM.

767.   Van Dellen and Shellem knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen and Shellem in regard to this loan include, but are not limited to, the following:

a.      Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.      Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.      Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or

guarantor, and the prospective source of repayment, and the security provided for the loans.

      d.    Causing or allowing a loan to be made with deficient collateral.

      e.    Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

      f.    Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

      g.    Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

      h.    Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

      i.    Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

      j.    Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

      k.    Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

768.   Van Dellen and Shellem as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

769.   By their actions and inactions, as generally and specifically described above, Van Dellen and Shellem failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

770.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen and Shellem, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

771.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Van Dellen and Shellem pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 66

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen and Shellem Related to the Underwriting, Administration, Extension and Modification of a Loan to Poplar Pointe, LLC for Poplar Pointe Project)

772.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 771 of this complaint, as though fully set forth herein.

773.   Van Dellen and Shellem approved a loan to Poplar Pointe, LLC for a project known as Poplar Pointe.  Gates was the principal for Poplar Pointe, LLC and provided a full recourse guarantee.  This loan was a PBG loan that was entered into on or about June 13, 2006.  The loan provided financing for the acquisition, development, and construction of 8.36 acres of raw land in Wasco, California into 39 finished lots and to construct detached single-family residences on the finished lots.  This loan had a 15-month term, and the loan commitment totaled $9,925,000.  The losses on this loan are estimated to exceed $4.6 million.

774.   HBD agreed to reset the minimum liquidity requirement several times after the loan was approved.  This loan matured on September 13, 2007.  A notice of default was filed on October 30, 2007.  The Bank foreclosed on May 14, 2008.

775.   Van Dellen and Shellem approved, renewed and/or extended this loan

despite substantial known risks and or risks that should have been known in the exercise of due diligence.  In addition, Van Dellen and Shellem in the exercise of due diligence should have known that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  These risks include, but are not limited, to the following:

      a.    The CAM did not identify any of Gates' other projects.  Van Dellen and Shellem approved the Caymus Court loan to Gates, and should have known that the CAM was lacking pertinent information regarding Gates' other projects and his contingent liabilities.  The workout officer acknowledged that this information should have been provided and considered as a part of "prudent underwriting" because it reflects on the guarantor's ability to repay the loan if the project failed.

      b.    The CAM did not discuss Gates' prior experience with residential projects.  The workout officer assigned to this loan conceded that his prior experience was exclusively with commercial projects.

      c.    This loan involved a large loan commitment and large number of units for PBG, which increased risk.  In fact, the 39 units violated PBG credit policy.

      d.    The borrower only contributed $600,000 in cash equity to this loan, which violated PBG's credit policy.  The workout officer assigned to this loan indicated that the cash equity was insufficient for this loan.

      e.    The workout officer indicated that there were enough red flags relating to whether the guarantor had contingent liabilities such that the approving loan committee members had enough information to inquire further of the account officer.

f.     The loan was underwritten with 2004 tax information despite the fact that it was approved in mid-2006.  The workout officer characterized the financial statements as being "pretty stale."  The cash flow in 2004 was negative.

g.     Wasco is a commuter market for Bakersfield, which means that it would be impacted first and hardest by a downturn in real estate.

h.     The seller of the property carried back a note that was payable by the borrower.  HBD considered this third-party debt as borrower equity, which was inherently risky.

776.   Van Dellen and Shellem knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen and Shellem in regard to this loan include, but are not limited to, the following:

a.     Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.     Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.     Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.     Causing or allowing a loan to be made with deficient collateral.

e.     Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

f.     Causing or allowing a loan to be made without taking proper and

reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

g.   Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

h.   Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

i.   Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

j.   Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

k.   Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

777.   Van Dellen and Shellem as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

778.   By their actions and inactions, as generally and specifically described above, Van Dellen and Shellem failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

779.   As a direct and proximate result of the negligence and breach of fiduciary duties of Van Dellen and Shellem, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

780.   With respect to all of their actions and inactions in managing and

administering the affairs of IndyMac, Van Dellen and Shellem pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## Count 67

### (Claim for Negligence and Breach of Duty of Care Against Van Dellen Related to the Underwriting, Administration, Extension and Modification of a Loan to Paso Robles VII, LLC for Windmill Ranch Estates Project)

781.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 780 of this complaint, as though fully set forth herein.

782.   Van Dellen approved a loan to Paso Robles VII, LLC for a project known as Windmill Ranch Estates.  Gates was the principal for Paso Robles VII, LLC and provided a full recourse guarantee.  This loan was a PBG loan that was entered into on or about December 19, 2006.  The loan provided financing for the acquisition of seven estate-sized lots in Paso Robles, California.  This loan had a 12-month term, and the loan commitment totaled $4,150,000.  The losses on this loan are estimated to exceed $1 million.

783.   Van Dellen approved, renewed and/or extended this loan despite substantial known risks and or risks that should have been known in the exercise of due diligence.  In addition, Van Dellen in the exercise of due diligence should have known that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  These risks include, but are not limited, to the following:

      a.   The CAM noted that the bulk of Gates' net worth was in 14 partnership LLC interests valued at over $45 million.  The workout officer for this loan stated that she would expect to see contingent liabilities associated with those partnerships.  Nonetheless, there were no contingent liabilities identified in the CAM.

b.      The CAM did not discuss Gates' prior experience with residential projects.  The workout officer assigned to this loan conceded that his prior experience was exclusively with commercial projects.

c.      There were 34 months of supply in Paso Robles at the time the loan was approved.

d.      This loan caused HBD to violate its total loans to one borrower limit.

e.      The appraisal report used to underwrite this loan was dated April 10, 2006, which violated PBG credit policy.

f.      The price point for the completed project was going to be 163% of median prices.

784.    Van Dellen knew, or in the exercise of due diligence should have known, that his practices and the practices of IndyMac's employees who reported to him and over whom he exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Van Dellen in regard to this loan include, but are not limited to, the following:

a.      Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.      Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.      Causing or allowing a loan to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.      Causing or allowing a loan to be made with deficient collateral.

e.      Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the

debt.

f.      Causing or allowing a loan to be made, extended, and/or renewed with inadequate or problematic appraisals.

g.      Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

h.      Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

i.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

j.      Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

k.      Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

l.      Causing or allowing a loan to be made, renewed or extended where there was very little likelihood of the loan repaying within the term of the loan.

785.   Van Dellen as an officer, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

786.   By his actions and inaction, as generally and specifically described above, Van Dellen failed and neglected to perform his duties properly as an officer of IndyMac and breached his fiduciary duty of care to IndyMac.

787.   As a direct and proximate result of the negligence of Van Dellen, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

**JJ.   Count Based on Other Loans Resulting in Losses**

**Count 68**

**Claim for Negligence and Breach of Duty of Care Against All Defendants Related to the Underwriting, Administration, Extension and Modification of Loans Not Specifically Detailed as an Individual Count)**

788.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 787 of this complaint, as though fully set forth herein.

789.   Subsequent to the seizure of the Bank by the FDIC, 108 HBD loans were sold to OneWest Bank.  Based upon information and belief, only two of the 108 loans are performing or performed.  In addition, Plaintiff did not sell a number of loans where the collateral had been foreclosed and was held as REO.  Based upon information, these loans have an unpaid balance exceeding $280 million, a percentage of which will result in losses to Plaintiff in an amount to be established at trial.

790.   Defendants knew, or in the exercise of due diligence should have known, that their practices and the practices of IndyMac's employees who reported to them and over whom they exercised supervisory control, were improper, imprudent, and harmful to IndyMac.  The negligence and breaches of duty by Defendants in regard to these loans include, but are not limited to, the following:

a.   Causing or allowing a loan to be made to a borrower and guarantors who were or should have been known to be not creditworthy and/or in financial difficulty.

b.   Causing or allowing a loan to be made in violation of applicable laws, regulations, and/or HBD's internal policies.

c.   Causing or allowing a loan to be made with inadequate or inaccurate

financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans.

d.      Causing or allowing a loan to be made with deficient collateral.

e.      Causing or allowing a loan to be made where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt.

f.      Causing or allowing a loan to be made, extended, and/or renewed with inadequate or problematic appraisals.

g.      Causing or allowing a loan to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application and failing to control the disbursement of loan proceeds.

h.      Causing or allowing a loan to be renewed or extended to borrowers who were not creditworthy or were known to be in financial difficulty and without any reduction in principal and without taking proper steps to obtain security or otherwise protect the Bank's interests.

i.      Causing or allowing a loan to be made outside the normal and prudent trade areas of the Bank.

j.      Causing or allowing a loan to be made, renewed, and/or extended despite poor and deteriorating market conditions.

k.      Causing or allowing a loan to be made, renewed, and/or extended despite the Bank having a high geographic concentration of loans in the same market.

l.      Causing or allowing a loan to be made, renewed or extended despite the borrower having a high geographic concentration of property in the same market.

m.      Causing or allowing a loan to be made, renewed or extended where

there was very little likelihood of the loan repaying within the term of the loan.

791.   Defendants as officers, owed IndyMac the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances in the management, supervision and conduct of IndyMac's business and financial affairs.

792.   By their actions and inactions, as generally and specifically described above, Defendants failed and neglected to perform their duties properly as officers of IndyMac and breached their fiduciary duties of care to IndyMac.

793.   As a direct and proximate result of the negligence and breach of fiduciary duties of Defendants, Plaintiff has suffered losses and other compensatory and consequential damages, in amounts to be established at trial.

794.   With respect to all of their actions and inactions in managing and administering the affairs of IndyMac, Defendants pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## VII.   PRAYER FOR RELIEF.

**WHEREFORE**, Plaintiff prays for relief against Defendants as follows:

A.   For compensatory and consequential damages, jointly and severally, in an amount to be proven at trial;

B.   For its costs of suit against all Defendants;

C.   For prejudgment interest;

D.   For attorneys' fees, costs for the investigation and litigation, and interest; and

**COMPLAINT**

E.      For such other and further relief as this Court deems just and proper.

JULY 2, 2010                               NOSSAMAN LLP
                                           THOMAS D. LONG
                                           DAVID GRAELER


                                           By
                                                   DAVID GRAELER
                                           ATTORNEYS FOR FEDERAL DEPOSIT
                                           INSURANCE CORPORATION, AS RECEIVER
                                           OF INDYMAC BANK, F.S.B.

                              **JURY DEMAND**

The Plaintiff requests a trial by jury for all claims alleged herein.

Respectfully submitted this 2nd day of July, 2010.


                                           NOSSAMAN LLP
                                           THOMAS D. LONG
                                           DAVID GRAELER


                                           By
                                                   DAVID GRAELER
                                           ATTORNEYS FOR FEDERAL DEPOSIT
                                           INSURANCE CORPORATION, AS RECEIVER
                                           OF INDYMAC BANK, F.S.B.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Ronald S. W. Lew and the assigned discovery Magistrate Judge is Stephen J. Hillman.

The case number on all documents filed with the Court should read as follows:

## CV10- 4915 RSWL (SHx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===============================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address:
Nossaman LLP
Thomas D. Long (SBN 105987)
David Graeler (SBN 197836)
445 S. Figueroa Street, 31st Floor
Los Angeles, CA 90071

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR INDYMAC BANK, F.S.B.<br><br>PLAINTIFF(S)<br><br>v.<br><br>SCOTT VAN DELLEN, RICHARD KOON, KENNETH SHELLEM, AND WILLIAM ROTHMAN<br><br>DEFENDANT(S). | CASE NUMBER<br><br>CV10 4915-RSWL (SH)<br><br><br>**SUMMONS** |
|---|---|

TO:   DEFENDANT(S): SCOTT VAN DELLEN, RICHARD KOON, KENNETH SHELLEM, AND WILLIAM ROTHMAN

A lawsuit has been filed against you.

Within   21   days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, Nossaman LLP _____, whose address is 445 S. Figueroa Street, 31st Floor, Los Angeles, CA 90071 _____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:   2 JUL 2010 _____

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                   SUMMONS

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| Federal Deposit Insurance Corporation, as Receiver for IndyMac Bank, F.S.B. | Van Dellen, Scott<br>Koon, Richard<br>Shellem, Kenneth<br>Rothman, William |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) Nossaman LLP<br>    Thomas D. Long (SBN 105987)<br>    David Graeler (SBN 197836)<br>    445 S. Figueroa Street, 31st Floor<br>    Los Angeles, CA 90071 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1 U.S. Government Plaintiff   ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No     ☒ MONEY DEMANDED IN COMPLAINT: $ 350 million +

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Negligence and breach of fiduciary duties.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☒ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE/PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Accommodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

CV10 4915

FOR OFFICE USE ONLY:   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)                                CIVIL COVER SHEET                                Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ No   ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
　　　　　　　　　　　　　　☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
　　　　　　　　　　　　　　☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
　　　　　　　　　　　　　　☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☒   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  |  |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles |  |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
　　Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles |  |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date July 2, 2010
　　　　　　　　　　　　　　　　　　　David Graeler

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |