```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                        ---

 4       THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

 5

 6

 7   Federal Deposit Insurance        )

 8   Corporation,                     )

 9                   Plaintiff,       )

10                                    )   Case No.

11   vs.                             )   CV 10-4915-DSF(Shx)

12                                    )

13   Van Dellen, et al.,              )

14                   Defendants.      )

15   _____  )

16

17

18           REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                 Los Angeles, California

20               Monday, January 30, 2012

21

22   Pamela A. Batalo, CSR, FCRR, RMR
     Official Reporter
23   Roybal Federal Building
     255 East Temple Street
24   Room 181-I
     Los Angeles, California  90012
25   (213) 687-0446
```

```
 1   APPEARANCES:

 2

 3    FOR PLAINTIFF:          NOSSAMAN, LLP

 4                            BY:  THOMAS D. LONG

 5                                 DAVID J. FARKAS

 6                                 DAVID GRAELER

 7                            777 S. FIGUEROA STREET

 8                            34TH FLOOR

 9                            LOS ANGELES, CA 90017

10

11    FOR DEFENDANTS          CORBIN, FITZGERALD & ATHEY, LLP

12    SCOTT VAN DELLEN AND    BY:  MICHAEL W. FITZGERALD

13    WILLIAM ROTHMAN:             DAMIAN J. MARTINEZ

14                            601 WEST FIFTH STREET

15                            SUITE 1150

16                            LOS ANGELES, CA 90071

17

18    FOR DEFENDANTS          PAUL HASTINGS, LLP

19    KENNETH SHELLEM AND     BY:  KIRBY D. BEHRE

20    RICHARD KOON:                LAUREN E. BRIGGERMAN

21                            875 15TH STREET, N.W.

22                            WASHINGTON, DC 20005

23

24

25
```

1          Los Angeles, California, Monday, January 30, 2012

2                              1:48 p.m.

3                               -oOo-

4          THE CLERK:  Calling Calendar Item No. 16,

5    CV 10-4915-DSF(Shx), *Federal Deposit Insurance Corporation vs.*

6    *Van Dellen, et al*.

7          Counsel please state your appearances.

8          MR. LONG:  Good afternoon, your Honor.  Thomas Long

9    and my colleagues, David Graeler and David Farkas of Nossaman,

10   LLP, for plaintiff Federal deposit Insurance Corporation as

11   receiver of IndyMac Bank, F.S.B.

12         MR. FITZGERALD:  Good morning, your Honor.  Michael

13   Fitzgerald and Damian Martinez of Corbin, Fitzgerald & Athey

14   representing defendants Scott Van Dellen and William Rothman.

15   Mr. Van Dellen is present.

16         MR. BEHRE:  Good afternoon, your Honor.  Kirby Behre

17   and Lauren Briggerman on behalf of Mr. Shellem and Mr. Koon.

18         THE COURT:  Good afternoon to all of you.

19         What is the status of dealing with One West's

20   response, to the extent one can call it a response, to the

21   subpoena?

22         Please state your name again before you speak.

23         MR. BEHRE:  Yes, your Honor.  Kirby Behre on behalf of

24   Mr. Shellem and Koon.

25         We're at a crossroads with One West.  They say that it

1    is too burdensome for them to start digging to see what they

2    have.  They have no index of what it is they do have, and the

3    FDIC has no index.

4              MR. LONG:  Your Honor, if I might respond to that?

5              THE COURT:  With your name, please.

6              MR. LONG:  Thomas Long for plaintiff.

7              It is our understanding from speaking with counsel for

8    One West last week that counsel for Koon and Shellem have not

9    been in touch with them.  It is our understanding that they have

10   a considerable amount of records relating to all of the HBD

11   loans, and it is our understanding that they have e-mail boxes

12   for a number of additional custodians beyond what we have,

13   including some of the declarants submitted on this motion.

14             THE COURT:  And what was -- don't go anywhere.  When

15   are they going to provide those --

16             MR. LONG:  My understanding is we're hoping to get

17   production of some of those documents this week.  There have

18   been no meet and confer sessions, as I understand it, at least

19   none that the FDIC has participated in, between counsel for

20   defendants and counsel for One West.  We have offered to

21   participate in those meet and confer sessions, and we would

22   support reasonable portions of the subpoena being made

23   available.  The documents are required to be maintained by One

24   West.

25             THE COURT:  All right.  Well, you should convey to One

5

```
 1   West and its counsel that the Court wants the documents that are
 2   properly called for and producible to be produced as soon as
 3   possible, and you are to work with One West, which apparently
 4   asserts, among a myriad of other things, that they merely hold
 5   the documents as a custodian for the FDIC, so I want this
 6   resolved.  I want it resolved reasonably quickly.  I'm not sure
 7   you really need to go to the magistrate judge for that.  It was
 8   a very broad subpoena.  I'm not going to make any cuts or calls
 9   about its legitimacy or the legitimacy of the objections right
10   now, but I want the matter taken care of and I want the
11   documents that are properly provided to counsel, which
12   apparently the FDIC thought should be maintained and be
13   available, to be produced quickly to be provided to them.  So
14   you're in charge of that, Mr. Long.  Make sure it gets done.
15           MR. LONG:  I appreciate that.  Thank you, your Honor.
16           MR. BEHRE:  Your Honor, could I just clarify one
17   point?
18           THE COURT:  Yes.
19           MR. BEHRE:  We have met and conferred with One West on
20   two occasions, and that's why I say we're at a crossroads.
21           THE COURT:  Okay.
22           Now, there were a number of declarations attached to
23   the reply that apparently were not filed immediately after they
24   were signed.  Why was that?
25           MR. BEHRE:  Your Honor, we waited to file them with
```

1    our reply.

2           THE COURT:  And you seriously thought that was the

3    appropriate approach?

4           MR. BEHRE:  Yes, I did, your Honor.

5           THE COURT:  Well, for future reference, it wasn't.

6    Don't hold back evidence that relates to your motion until after

7    the opposing party files its opposition and then just stick it

8    to them at the end.  So I'm not sure why you thought that was

9    appropriate, but now you know.

10          Along those lines, I also want to tell you, I don't

11   know why lawyers do this, and there's a lot of them in the room

12   so take heed, all of you, language like *failures are staggering*,

13   *violations of this magnitude rarely occur*, *stunning display of*

14   *incompetence, bitter irony, breathtaking dereliction of duty* are

15   not only unpersuasive, they're somewhat annoying.  I don't have

16   time for rhetoric.  I'm really, really busy.  Why anyone would

17   actually want this job, I don't know, but I hope everybody who

18   might get it would be getting here sooner rather than later.

19          But in any event, it's just -- I don't know whether

20   you stay up nights trying to think of clever phrases, but trust

21   me, no judge that I've ever spoken to has ever said, *Boy, can*

22   *that guy turn a phrase.*  They only say, *Boy, why didn't he get*

23   *to the point.*  So, please, in future pleadings, remember that.

24          MR. BEHRE:  Yes, your Honor.

25          THE COURT:  In addition to that, I've been around

 1   awhile both in practice and on the bench, so I suspect I've seen

 2   a few more cases than you, and really, it's not all that

 3   staggering and it's not all that great a magnitude, so when your

 4   experience and mine differ, it just takes all the more punch out

 5   of those comments.

 6            To make matters even worse, Counsel, your statement

 7   that the government failed to make any effort to preserve

 8   documents is simply false.  And your statements in your papers

 9   so often go beyond the bounds of zealous advocacy that I have to

10   say your papers had very little persuasive value.  In fact, as I

11   was trying to check some of the references you made to

12   deposition testimony, I looked at it three or four times because

13   I thought I must be searching for the wrong page because the

14   pages you were citing to had oftentimes no relationship to the

15   proposition you were citing them for.  So you really started off

16   extremely poorly as I started reading the papers, and I had

17   little confidence in anything you had to say as I went through

18   them.  The issue here is whether the documents are relevant to

19   the defense of Shellem and Koon and not anyone else, so all

20   these other references and broad statements were not helpful.

21            In addition, the tactics of the timing of the motion

22   are not acceptable.  In future, you should make sure that you

23   afford opposing counsel -- and this applies to all of you --

24   appropriate professional courtesy in the scheduling of matters.

25            That said, I'll turn to the government and tell you

1  that I don't think the government was nearly as diligent as its

2  counsel argues.  It certainly could have done more than it did.

3  Suggesting that it did things that it didn't need to do isn't

4  helpful.  It wouldn't matter how many terabytes of information

5  were provided if the relevant documents were destroyed or

6  weren't preserved.  So let me make sure I understand what the

7  government did and when.

8          There's an Exhibit 1 to a declaration that's a

9  November 2008 *Memo to FDIC employees*, and I'm not really sure

10 what it means to send a memo to FDIC employees in November in

11 the context of this particular case.  Were the people working in

12 the bank FDIC employees?

13         MR. LONG:  Your Honor, in November 2008, the FDIC was

14 receiver of the back, so my view would be yes, the employees of

15 the bank were being employed by the FDIC as the receiver.

16         THE COURT:  And so did they get that memo, the rank

17 and file people sitting at the desks, with the e-mail.

18         MR. LONG:  I don't know that the rank and file did,

19 but I think I can lay out for you in quite some detail why we

20 believe all the documents have been appropriately preserved and

21 nothing here has been destroyed.

22         THE COURT:  Well, I'm not sure how much detail I want,

23 but why don't you give it a shot, and I'll stop you when I think

24 I've had enough.

25         MR. LONG:  All right.

```
 1              And I just want to augment, your Honor, part of what's
 2    been in the brief up to now.  It's been laid out in the
 3    briefing.
 4              When the investigation began in 2009, our firm -- my
 5    firm was retained in early 2009.  The demand letters were sent
 6    March of 2009.  At the same time approximately as the demand
 7    letters were sent out, the sale to One West took place.
 8              In the fall of 2009, we produced to Mr. Behre a number
 9    of documents in connection with scheduling his clients'
10    depositions for early 2010, and at that time -- and I believe
11    this is laid out in one of my declarations -- I sent a letter to
12    Mr. Behre suggesting that we had produced what we had from our
13    investigation, and if he felt he was missing anything, to let me
14    know.
15              This case was filed July 2010.  We had a Rule 26
16    exchange promptly in August of 2010.  In the course of the
17    Rule 26 exchange, both parties essentially identified only
18    documents that the FDIC had produced or publicly available
19    information.
20              In the Joint Rule 26 report, we submitted to
21    your Honor on November 8, 2010, at page 3, lines 15 through 16,
22    the parties agreed to the following:  Quote, *Most of the key*
23    *documents are identified in the Complaint and in defendants'*
24    *Answers to the Complaint,* close quote.
25              This is, of course, at direct odds with what the
```

```
 1    premise of this motion is, which is that the key documents have

 2    not been preserved.  Quite to the contrary, the key documents

 3    have been preserved.  Mr. Behre is unable to identify any

 4    documents which have been destroyed, are unavailable, or

 5    otherwise are relevant to this case.

 6            THE COURT:  Now you're launching into an argument on a

 7    topic that I didn't ask about and you didn't represent you were

 8    going to tell me about.

 9            MR. LONG:  I apologize.

10            THE COURT:  Get to the point you were telling me

11    about.

12            MR. LONG:  Okay.  The point, in addition as to other

13    things we have done to produce documents, has been basically as

14    requested from time to time by counsel for the defendants, if

15    they are unable to find anything, we will locate it for them.

16    We received, for example, a request at 6:00 p.m. last Friday for

17    18 different documents defendants indicated they couldn't find.

18    I'm advised we've so far found 14 of them and are in the process

19    of forwarding those, and we will endeavor to find the others.

20            As far as I know, in every situation where defendants

21    have identified to us a credit approval memorandum, which we

22    believe are the most key documents, for a given loan, we have

23    promptly identified it for them from among documents previously

24    produced to them and have made an additional copy available.

25            We have ourselves spoken with One West, indicated to
```

```
 1    counsel for One West our view that they should respond to the

 2    subpoena appropriately, that they should not make unreasonable

 3    objections.  We've reminded them of their obligations under

 4    Section 107.02 of the Purchase Agreement between FDIC and One

 5    West to make documents reasonably available and to preserve all

 6    documents for 10 years.

 7         So I think, in sum, we have done everything reasonably

 8    possible to make available to defendants all of the pertinent

 9    documents.  Certainly nothing has been done that rises to the

10    level of spoliation of evidence.

11         THE COURT:  All right.  Well, I guess I was expecting

12    a little bit more.  We're talking in part about -- never mind

13    whether it's relevant at this point or not or helpful to the

14    defense -- some people who sat at desks and communicated by

15    e-mail with the defendants and others about these loans.  Was

16    anything done to preserve that e-mail history or the documents?

17         MR. LONG:  My understanding is that to the extent we

18    do not have e-mail custodians, that the e-mail server that

19    existed prior to the sale to One West Bank has been preserved by

20    One West and that at least some of the custodians identified by

21    defendants are among those for whom the e-mails still exist.

22         THE COURT:  And that's in addition to this T drive?

23         MR. LONG:  Yes, it is.  The T drive is a separate

24    issue.  It is the shared drive for documents.  It is not the

25    same as the e-mail drive.
```

```
 1              Now, the information I learned about the e-mails I've
 2    only learned last week.  We do not ourselves yet have the
 3    documents that One West and its counsel have described to us,
 4    but we've asked that they be produced expeditiously.
 5              THE COURT:  Well, I suppose that's an alternative way
 6    to do it as opposed to waiting for subpoenas and meet and
 7    confers for you to just tell One West that pursuant to the
 8    agreement, you want your documents back --
 9              MR. LONG:  That's what we intend to do.
10              THE COURT:  All right.  Okay.
11              MR. BEHRE:  Your Honor, may I respond briefly?
12              THE COURT:  You may.
13              MR. BEHRE:  What we're seeking in our motion,
14    your Honor -- and this is Kirby Behre bound on behalf of Shellem
15    and Koon -- are custodial records for the individuals who worked
16    there.  So Mr. Long is talking about key documents.  What we're
17    talking about is custodial information for the employees that
18    worked at the bank, including my clients, including the loan
19    officers, including the credit officers and those types of
20    folks.  So we're not talking about key documents or what's on
21    the T drive.  The basis for our motion is the failure to image
22    those computers.
23              THE COURT:  Okay.
24              MR. BEHRE:  One other point, your Honor.  I understand
25    from the employees or the former employees we have spoken to
```

1    that nobody received the freeze notice, so I understand the

2    letter went to the folks at the FDIC.  I haven't seen any

3    evidence that it went to anyone who was a former or then current

4    employee of the FDIC.

5            THE COURT:  All right.  What about this relativity

6    database.  Have you looked at that?

7            MR. BEHRE:  We have, your Honor.  We got access last

8    month.  Some of the material -- it's better than what we had.

9    It's difficult to navigate.  It's not well organized, but it's

10   better than it was a month ago.

11           THE COURT:  Well --

12           MR. BEHRE:  But that -- maybe -- I'll -- I think I

13   know where you're going.  That does not contain the custodial

14   documents of these custodians, the government's own witnesses.

15           MR. LONG:  Your Honor, if I might respond.

16           THE COURT:  All right.  Go ahead.

17           MR. LONG:  Mr. Koon and Mr. Shellem left the bank in

18   the middle of 2006, two years before the bank was seized.  There

19   is no evidence anywhere in the record that their documents --

20   their custodial documents existed at the time of seizure.

21           As to the distribution of hold requests, among the

22   evidence of hold requests that we distributed were Mr. Gill,

23   the supervising attorney at FDIC asking Mr. Vogel, the general

24   counsel of One West, to distribute a litigation hold internally

25   within One West.  He did so.  Among the people included in that

1    hold were Mr. Todd Camp, who was a credit administrator, and

2    other individuals involved in the workout of HBD loans.

3         I can't promise that every scrap of paper or every

4    electronic blip that someone might conceive is relevant here

5    will be found, but I can indicate that we have taken reasonable

6    steps to preserve everything, and as suggested by your Honor, we

7    will take steps to make sure that One West complies with its

8    obligations.

9         THE COURT:  Do you know what retention or destruction

10   procedures IndyMac had at the time it was taken over?

11        MR. LONG:  I don't believe there was any policy of

12   routinely destroying documents.  From the e-mail servers that we

13   saw and the e-mail boxes that we saw, people's e-mails went back

14   for over five years at the time that the bank was seized, and I

15   haven't seen any evidence of what a document retention policy

16   was for IndyMac.

17        THE COURT:  All right.  Well, certainly defense

18   counsel has the defendants, and the defendants know, at least

19   generally, what they had or wrote or did that would be helpful,

20   so I think the defendants perhaps could have made a better

21   showing, if a better showing could, in fact, be made.

22        The comment in the papers that *serious questions*

23   *whether the documents still exist* suggests to me that this

24   motion was premature.  The fact that it was made before the

25   response, albeit now we know unsatisfactory response by One

 1   West, also causes me concern because I don't think I really

 2   needed to be spending the time on this at this point.  An

 3   evidentiary hearing at this point is premature.  Any sanctions

 4   at this point are premature.  The motion is premature.  Based on

 5   what I see, I would certainly consider a jury instruction

 6   targeted to certain evidence or certain issues, if I had a whole

 7   lot more information of what it was that might have been out

 8   there or was out there that we now can't find, but we are very

 9   much in advance of my considering doing that.  So I'm not

10   inclined to grant the motion for sanctions.

11          With regard to the motion to bifurcate, I suppose I

12   should clarify, to the extent there was any misunderstanding,

13   that I didn't mean to suggest that the FDIC wouldn't be able

14   eventually to try all of its claims.  It was always my view that

15   the FDIC or the parties would choose certain claims to proceed

16   with, and I simply said that I wasn't going to make the FDIC

17   dismiss the non-Phase 1 claims before the FDIC thought it was

18   appropriate to do so.

19          Maybe the best place to start is to ask the FDIC now

20   for a brief explanation of how it intends to present the case.

21   You start off in your papers, I think, by saying that there are

22   *few inaccuracies*.  I don't know if you mean the information in

23   the CAMs is correct so it was just the defendants' evaluation of

24   the information that was negligent, or exactly what you're --

25   how you're planning to proceed.

1            MR. LONG:  Your Honor, thank you.  You hit the nail

2      exactly on the head.  By and large, the CAMs accurately -- the

3      underwriting that was performed by the individuals subordinate

4      to the defendants, keeping in mind the defendants were the four

5      top managers, the loan committee members, the underwriting that

6      was done by their subordinates, whom we did not name as

7      defendants, by and large was accurate.  That underwriting

8      culminated in the CAM which was presented to the loan committee.

9      The theory of our case -- and there's no real dispute that the

10      primary thing the loan committee relied on was the CAM.

11            The main theory of our case will be as to most of the

12      loans, that the CAM disclosed information and that other

13      information available about market conditions were such that it

14      was unreasonable and negligent for these defendants to approve

15      each of the loans, and that is how the case will be presented.

16      The case in chief will be primarily expert testimony as a

17      result.  There will be some percipient testimony, and I think --

18      and I'm sure defendants are correct, they will also present

19      percipient testimony as part of their case in chief.

20            But I think the case can be -- notwithstanding that

21      there is a mountain of discovery and a mountain of information

22      that's developed pretrial, if expert discovery is done properly

23      in this case and if the evidence is properly distilled, we

24      believe we can present all of the evidence in our case in chief

25      as to all of our claims, and do it in a reasonable period of

1    time.

2        THE COURT:  That would be helpful if I knew what *a*

3    *reasonable period of time* was in your mind, which is probably

4    different from mine.

5        MR. LONG:  Well, let's start and set the ceiling.  I

6    trust Mr. Fitzgerald's judgment when he says he's arguing as to

7    what the total amount is per loan, that that sets the highest

8    amount that would even be conceivable.  And he estimates three

9    hours per loan.

10        I don't think it's going to be that long.  Having

11    spent time talking with our experts, having spent time looking

12    at draft reports that summarize what the problems with the loans

13    are, I think the direct examination presenting a case of

14    negligence for the loan can be done in less than an hour.  Now,

15    I realize we have 66 loans, and I realize I'm only talking about

16    plaintiff's case in chief and I'm only talking about the expert

17    testimony on those loans, so I realize that doesn't necessarily

18    summarize all of the hours that there will be in the trial, but

19    that's a start.

20        THE COURT:  What kind of expert testimony are you

21    going to be presenting?

22        MR. LONG:  There will be two categories of expert

23    testimony we'll be presenting.  One will be from experts who are

24    experienced in underwriting home builder loans of exactly this

25    type, and they will opine as to whether it was negligent for

1  defendants to approve loans of this nature based upon the

2  information provided in the CAMs.  Another expert will be

3  testifying largely just to summarize evidence that's otherwise

4  available and to assist in the calculation of damages for each

5  loan.

6          THE COURT:  Are the main issues, if you can categorize

7  them -- and I may be totally off in my understanding of what was

8  going on here.  But we have home builders who are going to

9  build, I assume, more than one home at a time?

10          MR. LONG:  Yes.  In this case, your Honor, what's

11  different about the home builder division -- and I think all the

12  parties are in agreement.  It's something that makes this case

13  fundamentally different from all the other cases involving

14  IndyMac.  The typical loan was more than $5 million.  The

15  typical loan was for either acquisition or development of a

16  tract of land or construction of multiple single family homes or

17  condominiums or conversion of condominiums or some combination.

18  And the loans would be anywhere from $5 million on up to

19  whatever the loan to one borrower limit was for the particular

20  borrower.

21          THE COURT:  And is the concern that -- and I guess

22  there was some guarantee by the home builder persons or entities

23  that the home builder didn't have the, say, net worth, for want

24  of a better word, or the tracts were in an area where no one

25  would pay the kind of money that was going to have to be charged

1    or something more specific to the individual loan, or I believe

2    in your papers, there's also a reference to generally at some

3    point in this economy, nobody should have been giving loans to

4    anybody to build homes.

5            MR. LONG:  Well, you know, your Honor, it's actually a

6    combined summary of everything you just said.  And although the

7    facts are specific as to each loan, there are recurring themes,

8    and indeed part of our point and part of the reason we want to

9    try as many of the loans together as reasonably possible is that

10   we don't want any finder of fact to come away with the false

11   impression that out of the two hundred loan portfolio at HBD,

12   the small number of loans we're allowed to put in trial is some

13   sort of unusual aberration that need not be taken seriously.

14           Indeed, the problems were of the type you described.

15   They were guarantors with very large contingent liabilities

16   because they had multiple loans and therefore the guarantees

17   were of little or no value.  They were situations where

18   appraisals were based upon mistaken assumptions; therefore, the

19   collateral was of little or no value.  They were situations

20   where the cash flow analysis and therefore the expectation for

21   repayment was inaccurate or overly optimistic because

22   assumptions about sales were unrealistic.  And it's the same

23   theme repeatedly over and over again but for different loans and

24   for different contexts at different points in time with

25   different approvals by different defendants.  So there's a large

1    amount of overlap such that having separate trials won't be

2    particularly efficient.

3              THE COURT:  Well, part of the problem is the kind of

4    time that you're talking about is really hard to have available,

5    considering the fact that I think I mentioned before, in federal

6    court we have both civil and criminal calendars, and criminal

7    cases take precedence, so it's not realistic to say I am going

8    to give you several months to try a case and we're going to take

9    a break for a week or so every time I have a Speedy Trial Act

10   case that needs to go to trial.  So if I'm dealing with two jury

11   trials, that gets very difficult.  I can do two trials in one

12   day, but then I need two sets of staff, and that has its own

13   issues.

14             So I guess I'm more inclined to go back to the

15   original plan which it seems you're varying from now only

16   because you now think that you have a shot at going beyond the

17   policy limits that you've got because of the demand, I guess,

18   that hasn't been responded to?  Is that still the state of

19   affairs?

20             MR. LONG:  Well, that's still the state of affairs,

21   but there really are two reasons, your Honor.  In the course of

22   doing the discovery, it's been a long time since we've been in

23   front of you.  It's been nearly a year.  And in the course of

24   doing discovery and in consulting with the experts, I've become

25   convinced that it's not efficient and it would be disruptive to

1   our case to try the case in fragments where we take on perhaps

2   only a third of the loans or less.  I mean, defendants suggest

3   that we have as few as five loans.  I am convinced it's

4   fragmentary, it's not productive.

5          I can suggest an alternate approach which I think

6   we're willing to agree to which would be to reduce by about a

7   third, reduce by 19 the number of loans we have.  It would not

8   have a significant effect on the damage claims we're making, and

9   we could bifurcate those out to be tried later, if at all, and

10  take on a smaller number.

11         Now, that still leaves 47, but that still leaves me

12  enough of the core of the case that I have the bulk of the

13  damage claims and I have enough loans to provide the examples I

14  want to provide across the portfolio of what went wrong.

15         So that would be one suggestion I would make, as

16  opposed to the suggestions defendants are making of try 5 loans

17  at a time or try 10 loans at a time, which I think unduly

18  fragments the case.

19         THE COURT:  Well, you had started out talking about

20  loan relationships, and the 10 you identified actually had, it

21  looks like, 25 separate loans, and then I wasn't sure whether

22  the defense was talking about loan relationships or loans.  So

23  why don't I hear from the defense.

24         MR. FITZGERALD:  Thank you, your Honor.  Michael

25  Fitzgerald on behalf of Mr. Van Dellen and Mr. Rothman.

1          Your Honor, first if I could correct counsel, I picked

2    three hours per loan as an amount that would just be ludicrously

3    inadequate, but then multiplying that by 66, it came to a number

4    that was larger than what the Court had indicated on February 28

5    that the Court had available, and that was the purpose in

6    selecting that number.  I have tried 25 cases to verdict, and I

7    just don't see how the numbers pencil out, you know, sitting

8    here in a courtroom in the way that Mr. Long has suggested, no

9    matter how brief he tries to make the direct examination of the

10   experts.

11          THE COURT:  Okay.  Now, you really need to learn how

12   to slow down.

13          MR. FITZGERALD:  Thank you, your Honor.

14          I would like to respond to the Court's question then

15   directly where we were talking about loan relationships.  You

16   know, we -- the parties jointly -- well, the plaintiffs

17   suggested to the Court and we tacitly agreed or did not object

18   on February 28th that there could be 10 loan relationships which

19   involved more than 10 loans.  Counsel for plaintiffs indicated

20   to the Court that that would take, I believe it was, 50 days,

21   and the Court indicated that that was simply too much time.  And

22   therefore the defendants had jointly suggested 5 loan

23   relationships.  We had suggested that the parties pick them and

24   then pick them, 2 to plaintiffs, 1 for each of the defendants,

25   and a final one to be jointly agreed or selected by the

1    magistrate judge, if that proved impossible.  And then counsel

2    for Shellem and Koons suggested that the plaintiffs pick

3    whichever 5 of the original 10 that they chose.

4          It was only recently that we learned that counsel in

5    fact decided to have a different approach to the case of using

6    this expert-centric approach to try to cram in all 66 loans into

7    one trial.  That came as a surprise to us.  It was not something

8    that we had learned during the multiple discussions on this

9    matter that have occurred since February 28th.  And that itself

10   is a reason why that would be an unfair approach.  It's just not

11   how we've gone about preparing the case for trial.  And beyond

12   that, it simply has not been shown, even here, let alone in the

13   motion opposition, that it's something that's plausible.

14         We would ask the Court, as we set forth in our papers,

15   to direct the parties to pick 5 loan relationships which could

16   be tried within a reasonable amount of time, and I would point

17   out to the Court, that it's clear that there will be things

18   beyond the specific loan relationships that have been discussed.

19   I mean, Mr. Long has much admitted that he has a kind of

20   Rule 404(b) sort of approach of *I want to show all of the loans*

21   *together so the jury can draw certain conclusions.*  Whether that

22   would be appropriate anymore than it would be appropriate in a

23   criminal case I doubt, but that clearly is their intention.

24   Moreover, the Complaint has a very voluminous prefatory section

25   before one gets to the 66 loans showing certain background

```
 1  facts, showing certain themes, and then also showing the
 2  damages.  And all of that would be very time-consuming to
 3  present to a jury.  I think the amount of time necessary to
 4  present those matters, if the Court decides that they're
 5  relevant for the jury's consideration, and then to present the
 6  facts of the individual loans, no matter how cursory that is,
 7  and then to let the defendants have due process and be able to
 8  rebut the allegations that are being made against them, and then
 9  discuss the damages, it's going to be time-consuming.
10          THE COURT:  Have you had an opportunity to think, in
11  light of Mr. Long's advice now that he is planning on relying to
12  a great degree on expert testimony, how the defense would be
13  presenting its case?
14          MR. FITZGERALD:  Your Honor, I think it would be
15  through a combination of experts and percipient witnesses.  In
16  part, the percipient witnesses, being the four defendants
17  themselves, to say, *This is why when I decided to approve this*
18  *loan, why I thought it was an appropriate evaluation of risk and*
19  *reward for the bank.*  And then there are other people as well
20  who can talk about the markets and other matters relating to the
21  individual loans, and then there are experts, both people who
22  have experience in underwriting, people who were involved in
23  economic forecasting for the various markets, people who are
24  knowledgeable about the overall allegation, which is that
25  production should have halted sometime early in 2006, in part
```

1   because of their knowledge of macroeconomics and in part because

2   of their knowledge of what other similarly situated banks were

3   doing here in Southern California at the time.

4          One of the weaknesses, I believe, in the plaintiff's

5   case and something which they have not really addressed and

6   something which would require a certain amount of time is that

7   the standard of care has to be derived from what other

8   reasonably prudent bankers were doing at the time, and in part,

9   that would rely on the testimony of our clients, it would rely

10  on the testimony of other percipient witnesses, and it would

11  rely on experts who have a basis for knowing what a number of

12  banks were doing.

13         MR. LONG:  If I might respond, your Honor.

14         THE COURT:  Go ahead.

15         MR. LONG:  I don't think -- and Mr. Fitzgerald said

16  something about this case some time back that I agree with.  He

17  analogized it to a car crash case, and I would call it those 66

18  car crashes.

19         I don't think it's pertinent to present, if you're

20  trying to demonstrate the standard of care, for example, if the

21  case were negligence of a doctor, negligence of a driver of

22  automobiles, to go out and take on testimony of how other

23  doctors operated and how other people drove their automobiles.

24  The expert testimony can state the standard of care.

25         I don't have authority to waive jury trial on behalf

1    of the plaintiff, but another method the parties may want to

2    consider for keeping the trial to a minimum amount of time and

3    efficiency would be to agree to a bench trial.  That would allow

4    your Honor as well to accept written statements in lieu of

5    testimony as a way of saving trial time.

6         And I believe your Honor is also familiar with the

7    procedure -- years ago I remember having cases in front of

8    Judge Harry Hupp, who assigned trial minutes to each side.

9         THE COURT:  I use hours, but it's the same idea.

10        MR. LONG:  Same idea.  It was essentially the

11   equivalent a chess clock, though, because obviously everyone has

12   to be responsible for their own questioning.  I think certainly

13   we would have no problem -- once a reasonable trial time was

14   established, we would frame our case to fit within that time.

15   But we're already prepared, as I've said, to set aside, to

16   bifurcate 19 of the loans, which we think are less significant

17   in terms of the damage claims, and to proceed only on 47.  And

18   that will certainly save some time.  That works out to 141

19   hours, using what I think is a very generous estimate by

20   Mr. Fitzgerald and far in excess of what my experts would

21   indicate.

22        THE COURT:  Well, there's obviously good arguments on

23   both sides.  I think what's most telling, though, is that we

24   started out this case with the idea that we were going to have

25   10 loan relationships and a number of loans, and that's quite a

```
 1  few, even trying to fit them into the time that we have
 2  available.  So I'm really inclined to allow the FDIC to do the
 3  choosing as opposed to having each side choose a couple.  At
 4  this point it seems to be insurance-company driven, and I don't
 5  know how valid it is to suggest that the insurance companies'
 6  delay in responding or perhaps its ultimate rejection of an
 7  offer is a reason to think they now no longer have any policy
 8  limits.  That certainly may well be the case under California
 9  law, but I don't think we're going to know the answer to that
10  before this case is tried.
11          I did have a question about that.  Someone mentioned
12  along the way 12 insurers and two policy periods, and now
13  somehow we're talking about $80 million and one year or
14  something.  What's going on?
15          MR. FITZGERALD:  Your Honor, it's the sense of the
16  FDIC, which seems likely to be correct, that this case falls,
17  either exclusively or jointly, in Tower 2, and the point is --
18  and that's significant because Tower 2 is as yet untouched and
19  very few, if any, of the other cases have plausible claims on
20  Tower 2, whereas Tower 1 it might very well be that this case
21  also falls within Tower 1.  In fact, to the extent that we
22  continue to get paid, which is still an issue, the carriers who
23  have been paying us and we hope will pay us in the future are
24  Tower 1 carriers, but there are many, many demands on Tower 1
25  from a large number of cases, whereas this case and one or two
```

```
 1    of the other cases do make plausible demands on Tower 2.

 2             So the kind of working assumption going forward of how

 3    the cases might be resolved is that this case would be able to

 4    make a substantial demand on Tower 2.  There are eight carriers

 5    in each tower, one primary and seven excess, and each of them

 6    have $10 million; hence, $80 million in each tower.

 7             THE COURT:  So there is 80 million in Tower 2, and so

 8    far the fees are being paid out of a different tower?

 9             MR. FITZGERALD:  Tower 1, your Honor.

10             THE COURT:  Are we in danger of going from Tower 1 to

11    Tower 2 for the fees or not yet?

12             MR. FITZGERALD:  Not yet, but -- well, it's -- it's --

13    not yet.  We're at $45 million in Tower 1 for fees and costs.

14             THE COURT:  Well, I'm sure lawyers can figure out a

15    way to eat away at that, especially once we start getting

16    experts, etc., involved.

17             Did you want to say something, Mr. Long?

18             MR. LONG:  I agree with every word Mr. Fitzgerald

19    said, although I believe we may actually be at 35 million

20    because we are still in the Chartis tier.

21             MR. FITZGERALD:  I'm sorry, not.  That's correct.

22             MR. LONG:  Unless there was a $10 million bill I

23    wasn't aware of, which would frighten me.

24             THE COURT:  So you have potentially 80 million of real

25    dollars, and if you had your way, it would be unlimited based on
```

```
 1    the failure of one or more of the -- I guess it takes all seven
 2    to reject your offer before there is --
 3             MR. LONG:  Well, your Honor, our position is we made a
 4    reasonable demand within limits, and if we then establish -- and
 5    I think your Honor has captured it exactly.  We don't know the
 6    answer to the question under communally unless and until there
 7    is a judgment in excess of limits.  We think there will be.  But
 8    then, of course, part of the reason we want to try the entirety
 9    of our case or enough of it so we can establish the damages is
10    to establish that point.
11             THE COURT:  Well, I'm inclined to let the FDIC choose
12    which of the defendants' proposals it wants to accept, or
13    alternatively, the FDIC can propose as many as you want to up to
14    the original 10, so long as you can present them in 40 hours,
15    and that means you're on your feet, opening, closing, I don't
16    allow much *voir dire*, but --
17             MR. LONG:  Your Honor, so I understand, that would be
18    10 loan relationships, not just 10 borrower relationships.
19             THE COURT:  Correct.  And --
20             MR. LONG:  And -- I'm sorry.
21             THE COURT:  Forty hours for you.  I haven't yet
22    figured out how much time I would give to the defendants, but it
23    would not be -- since you're not claiming you can do it in a
24    short, reasonable period of time, I wouldn't be limiting you to
25    the same amount of time.  I don't know how much time I would be
```

1   giving you at this point.  But you've got to sit down and figure

2   out if you can really present your case in that amount of time.

3   Otherwise, it's probably better to pick five loans, five

4   relationships, whatever you want to do, as I say, as between the

5   defendants' two options.  I think it's more appropriate to let

6   the FDIC choose whatever you want to present.

7            MR. LONG:  Okay.  Thank you, your Honor.

8            THE COURT:  So you'll talk to defense counsel and

9   figure out which one you want to do and let them know what loan

10  relationship so they know going forward exactly what they need

11  to focus on.

12           MR. LONG:  As your Honor suggested, I think we will

13  want to pick 10 relationships.  We will want to do the picking,

14  but we will advise them, and if your Honor lets us know the

15  deadline by which we should do so, we will do so, and we assume

16  the remaining loans are bifurcated, not dismissed.

17           THE COURT:  Correct.  Is 14 days enough?

18           MR. LONG:  Yes.

19           THE COURT:  All right.  So 14 days you'll advise the

20  defense.

21           MR. LONG:  Your Honor, if I might inquire, if we think

22  we can fit more than 10 loan relationships and however many

23  loans that is -- 20, 25 -- if we think we can fit more into 40

24  hours, may we do so?

25           THE COURT:  No, because that's just going to expand

1   exponentially the work they have to do.  They weren't expecting

2   it.  They had your list.  I think we will limit you to that.

3             MR. LONG:  Understood.

4             THE COURT:  With regard to the continuance, where are

5   we with fees?  Are there monthly amounts that have rolled over?

6   Are you using up every dollar that's coming your way every

7   month?

8             MR. FITZGERALD:  Your Honor, there was a substantial

9   overage in the last few months.  It has gone down considerably.

10  I believe as of this morning, the best estimate from my firm's

11  legal assistants is that it's no longer in seven figures, the

12  rollover from past months.

13            We have submitted our November and December bills to

14  Chartis, and as of yet, Chartis has neither told us -- has

15  neither paid them nor told us that they're not going to pay

16  them.  They simply have not made a response as to what they

17  intend to do going forward with our bills.

18            THE COURT:  All right.  Where are you with discovery?

19            MR. FITZGERALD:  Your Honor, we have propounded some

20  written discovery.  We have interviewed a number of potential

21  experts, awaiting to either get word from Chartis that they

22  intend -- will pay them or -- and also to find out exactly which

23  loans so we would know the number of underwriting experts that

24  we would need to handle that.

25            The parties have had a number of depositions, although

```
 1    there are -- under the amounts that the parties agreed to and
 2    the Court approved at the status conference.  We still have a
 3    number of depositions left to do.  Certainly, you know, our
 4    feeling is -- and this is something where, as the Court is well
 5    aware, the defendants did differ.  We were of the view that the
 6    easiest thing would be to just continue all of the matter -- all
 7    of the deadlines for two months.  The other defendants said that
 8    while they were in favor of moving the discovery and the expert
 9    deadlines, they did not want the trial deadline moved.  You
10    know, certainly that would be our second choice clearly.  I
11    mean, that is right now the most pressing deadlines for us,
12    especially since we've been uncertain about what the exact loans
13    would be that would constitute the trial.
14            Nonetheless, we continue to believe -- Mr. Van Dellen,
15    who obviously has an interest in having his reputation
16    vindicated since it's very difficult for him to work in the
17    financial field while this case is going on, is -- nonetheless
18    believes that's in his interests and Mr. Rothman's interest to
19    have the entire case put back for two months.
20            As I said, if the Court disagrees in light of the
21    objection of the other defendants, then we believe that the next
22    best alternative is to give us more time for the experts and
23    more time for discovery.
24            THE COURT:  Are both sets of defendants coming out of
25    the same insurance pool?
```

```
 1              MR. FITZGERALD:  Correct, your Honor.

 2              THE COURT:  Okay.  I assume you're taking steps,

 3    Mr. Fitzgerald, to figure out what's going to happen if you're

 4    no longer able to represent clients?

 5              MR. FITZGERALD:  Yes, your Honor.  That was a

 6    matter -- as referred to obliquely in the papers, we did not

 7    move for a continuance on that basis because frankly if

 8    Mr. Corbin and I had made the decision that the firm was not

 9    going to continue, then Mr. Van Dellen and Mr. Rothman would

10    have had to have found new counsel, and I didn't want new

11    counsel to face having to come in here and make a Motion for

12    Reconsideration under Local Rule 17-19.

13              As it is, the firm would continue.  If it should

14    happen that I would no longer be practicing law, then

15    Mr. Martinez has joined the firm as a partner, and he would be

16    replacing me as the trial counsel in this case.

17              THE COURT:  All right.  Excellent.  Well, you can't

18    imagine how many people are sincerely hoping that soon you will

19    no longer be able to practice law.

20              MR. FITZGERALD:  I'm pleased that Mr. Van Dellen

21    Mr. Rothman are not among them.

22              THE COURT:  Okay.  And just in case somebody ever

23    looks at this on the Ninth Circuit and some for reason doesn't

24    know what we're talking, Mr. Fitzgerald is the nominee for the

25    open on the district court, and we're all very anxious to have
```

 1   him.

 2          I am inclined at this time, in light of the position

 3   of both the government and the other defendants, to continue all

 4   of the dates, except the trial date, and it may be for reasons

 5   of my scheduling, if nothing else.  As I said, due to criminal

 6   cases, which we have an abundance, that the trial would have to

 7   be continued, but I think it's best at this point to keep that

 8   date as it is, but I will continue the other dates, and you

 9   should all continue to communicate with each other and think of

10   ways to reduce the trial time, if you can.

11          I'm never anxious to have a bench trial because

12   they're actually quite a bit more work.  It always seems like a

13   good idea at the time until I have to do findings and

14   conclusions.  It would make scheduling easier, but I have no

15   particular desire to do that, so I'm not suggesting that anybody

16   check with his client to see if that's something they're

17   interested in.  That's a matter for you to decide on your own.

18          So at the moment then we do have a scheduling that's

19   proposed.  The change dates -- if there's anything that falls on

20   an incorrect date of day of the week or holiday, Ms. Plato will

21   change it, but other than that, we will leave the trial date the

22   same and continue the other dates.

23          MR. FITZGERALD:  Your Honor, the final pretrial

24   conference would then be set on October 12th after the trial

25   date, so the pretrial conference would have to remain where it

```
 1    is as well.  I notice then that the -- it would be four days
 2    before we have a settlement conference as well, so it should --
 3    the final pretrial conference should be set at a somewhat later
 4    date than its current date of August 13 at a date that suits the
 5    Court's calendar.
 6              THE COURT:  Do you want to just agree on a date and
 7    let us know?
 8              MR. FITZGERALD:  Yes, your Honor.
 9              MR. LONG:  We can do that, your Honor.  How many days
10    is the continuance then?
11              THE COURT:  I don't know.  He had a proposed order
12    that was about 60 days for each thing, I think.
13              MR. FITZGERALD:  That's correct.
14              MR. BEHRE:  Your Honor, I have one request.
15              THE COURT:  Sure.
16              MR. BEHRE:  The rebuttal expert report date, it's only
17    three weeks after the initial reports are due, and I would ask,
18    in light of the government's desire to kind of boost their
19    experts, that we get more than three weeks for fear that we're
20    going to get three or four expert reports, and we won't be able
21    to do that in three weeks.
22              THE COURT:  That's fine.  Why don't you talk about
23    that as well and figure out what makes sense for everybody.  I
24    assume you will be providing them with a number of reports as
25    well.
```

```
1              All right.  See if you can agree on those dates and

2    provide them to us, and let us know if you can't, and I will

3    just make the call.

4              MR. FITZGERALD:  Thank you, your Honor.

5              MR. LONG:  Thank you, your Honor.

6              THE COURT:  Thank you.

7

8              (Proceedings adjourned at 2:41 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*CERTIFICATE OF OFFICIAL REPORTER*

*COUNTY OF LOS ANGELES )*
                      *)*
*STATE OF CALIFORNIA   )*

          *I, Pamela A. Batalo, Federal Official Realtime Court Reporter, Registered Professional Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 18, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.*

*Date:  February 1, 2012*

*/s/ Pamela A. Batalo*
_____
*Pamela A. Batalo, CSR No. 3593, FCRR, RMR*
*Federal Official Court Reporter*